Jason Marsili, CA Bar No. 233980
jmarsili@rmrllp.com
ROSEN MARSILI RAPP LLP
3600 Wilshire Blvd Suite 1800
Los Angeles, CA 90010
Telephone: 213-389-6050

Paul J. Lukas, MN Bar No. 22084X*
lukas@nka.com
Kai H. Richter, MN Bar No. 0296545*
krichter@nka.com
Brock J. Specht, MN Bar No. 0388343*
bspecht@nka.com
Brandon T. McDonough, MN Bar No. 393259*
bmcdonough@nka.com
Jennifer K. Lee, MN Bar No. 0399012*
jlee@nka.com
NICHOLS KASTER, PLLP
4700 IDS Center
80 S 8th Street
Minneapolis, MN 55402
Telephone: 612-256-3200
Facsimile: 612-338-4878
*pro hac vice applications forthcoming

ATTORNEYS FOR PLAINTIFF

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| Patricia Klawonn, on behalf of the Motion Picture Industry Individual Account Plan,<br><br>          Plaintiff,<br><br>     v.<br><br>Board of Directors for the Motion Picture Industry Pension Plans and John and Jane Does 1-20,<br><br>          Defendants. | Case No.<br><br>**COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, AND OTHER EQUITABLE RELIEF**<br><br>**(1) Breach of Fiduciary Duties under ERISA (29 U.S.C. § 1104)** |

-1-
**COMPLAINT**

**SUMMARY**

1.      Plaintiff Patricia Klawonn, on behalf of the Motion Picture Industry ("MPI") Individual Account Plan (the "Plan"), brings this action under the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001, *et seq.* ("ERISA"), against the Board of Directors for the Motion Picture Industry Pension Plans ("Board") and John and Jane Does 1-20 (collectively, "Defendants"). As described herein, Defendants have breached their fiduciary duties with respect to the Plan in violation of ERISA, to the detriment of the Plan and its participants and beneficiaries. Plaintiff brings this action to remedy this unlawful conduct and to obtain appropriate monetary and equitable relief on behalf of the Plan as provided by ERISA.

**INTRODUCTION**

2.      As of the fourth quarter of 2019, Americans had approximately $8.9 trillion in assets invested in defined contribution plans, such as 401(k) and 403(b) plans. *See* Investment Company Institute, *Retirement Assets Total $32.3 Trillion in Fourth Quarter 2019* (March 19, 2020), available at https://www.ici.org/research/stats/retirement/ret_19_q4.

3.      The potential for disloyalty and imprudence is much greater in defined contribution plans than in defined benefit plans. In a defined benefit plan, the participant is entitled to a fixed monthly pension payment, while the sponsor is responsible for funding the plan and is liable for any shortfalls if the plan cannot make those payments. As a result, the sponsor bears all risks related to excessive fees and investment underperformance. *See Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 439 (1999).

4.      In a defined contribution plan, however, participants' benefits "are limited to the value of their own investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1826 (2015). Thus, the sponsor has no financial incentive to keep costs low or to closely monitor the plan to ensure that every

**COMPLAINT**

1  investment remains prudent, because all risks related to high fees and poorly
2  performing investments are borne by the participants.

3        5.      To protect Americans' retirement savings, ERISA imposes strict
4  fiduciary duties upon retirement plan fiduciaries. *See* 29 U.S.C. § 1104(a)(1). These
5  fiduciary duties include a duty to exercise appropriate "care, skill, prudence, and
6  diligence" in managing the plan's investment options, *see* 29 U.S.C. § 1104(a)(1), and
7  are considered "the highest known to the law." *Howard v. Shay*, 100 F.3d 1484, 1488–
8  89 (9th Cir. 1996).

9        6.      In a typical defined contribution plan, the fiduciaries will create a
10  "menu" of investment options designed to meet a wide range of needs, allowing
11  participants to determine which investments on the menu are best suited for them and
12  how much money to invest in each option. However, instead of following this almost
13  universally adopted approach, Defendants elected to adopt a one-size-fits-all
14  approach. Specifically, Defendants funneled all of the Plan's assets into a single
15  investment pool (which invests in a mix of pre-determined underlying investments
16  with the same allocation of assets among these investments for all participants) and
17  locked Plan participants into that investment, without regard to their age, anticipated
18  retirement date, or individual preferences or needs.

19        7.      Unfortunately for participants, this unorthodox one-size-fits-all
20  investment strategy designed by Defendants was not a prudent one. To the contrary,
21  it was wildly unsuccessful. From 2011 to 2018, the Plan's returns lagged significantly
22  behind its peers, landing in the bottom 5% of the 1,651 plans with more than $100
23  million in assets on a 3-year basis, and in the ***bottom 3%*** of these plans on a 10-year
24  basis. Among plans with over $1 billion in assets, the Plan ranked ***173rd out of 175***
25  on a 10-year basis.

26        8.      These abysmal returns were not the result of coincidence or bad luck.
27  Rather, they are the product of a fundamentally flawed investment strategy that relied
28  heavily on hedge funds and other investments with excessive fees. The subpar

performance of these investments clearly did not justify their expense. Moreover, Defendants were aware that the Plan was trailing even Defendants' self-selected benchmarks significantly during the statutory period. Yet, Defendants failed to adjust their investment strategy.

9. Further, because Defendants locked all participants into the same asset allocation in the same underlying investments, participants had no ability to pursue a different investment strategy.

10. Based on this conduct and the other facts alleged herein, it is reasonable to infer that Defendants' process for managing the Plan's investments was flawed and inconsistent with the applicable standard of care under ERISA. Accordingly, Plaintiff asserts a claim against Defendants on behalf of the Plan for breach of their fiduciary duty of prudence under ERISA.

## JURISDICTION AND VENUE

11. Plaintiff brings this action pursuant to 29 U.S.C. § 1132(a)(2) and (3), which provide that participants in an employee retirement plan may pursue a civil action on behalf of the plan to remedy breaches of fiduciary duties and other unlawful conduct in violation of ERISA, and to obtain monetary and appropriate equitable relief as set forth in 29 U.S.C. § 1109.

12. This case presents a federal question, and this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1)(F).

13. Venue is proper pursuant to 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b) because this is the District where the Plan is administered, where the breaches of fiduciary duties giving rise to this action occurred, and where Defendants may be found. In addition, Plaintiff also resides in this District.

## THE PARTIES

### PLAINTIFF

14. Plaintiff Patricia Klawonn resides in Santa Monica, California, and has been a participant in the Plan since at least 1992. Plaintiff has never been given any

-4-
**COMPLAINT**

choice of investments and was subject to Defendants' investment decisions. Plaintiff has suffered financial harm and has been injured by Defendants' unlawful conduct as described herein.

## THE PLAN

15.    The MPI Individual Account Plan was established, as restated, on January 1, 1993.[1] The Plan is one of two retirement plans the Board manages on behalf of MPI members; the Board also manages a defined benefit plan, known as the MPI Pension Plan.

16.    The Plan at issue is an "employee pension benefit plan" within the meaning of 29 U.S.C. § 1002(2)(A) and a "defined contribution plan" within the meaning of 29 U.S.C. § 1002(34).

17.    The Plan covers eligible employees of motion picture industry employers in the Los Angeles area that have executed a collective bargaining agreement containing a participation provision approved by the Board. It also covers certain employees who are not covered by a collective bargaining agreement but whose employers have contracted with the Board to participate in the Plan.

18.    From the end of 2014 until the end of 2018,[2] the Plan had between 79,000 and 92,000 participants, and between $3.7 billion and $4.5 billion in assets.

19.    Participants' accounts are funded by employer contributions, which are allocated to participants on an annual basis.[3] Employees are not permitted to contribute their own money to the Plan.

---

[1] The Summary Plan Description lists the Plan's inception date as August 1, 1979. *See Summary Plan Description*, Exhibit A, at 32.

[2] 2018 is the most recent plan year for which reported Form 5500 information is available for the Plan.

[3] Employer contributions to a retirement plan are part of a standard benefits package offered by employers to attract and retain talented employees. *See* 401K SPECIALIST, *Top 4 Priorities of 401(k) Plan Sponsors* (Jan. 3, 2016) (highlighting survey findings that, among large defined contribution plan sponsors, attracting and retaining talented employees is a top priority), *available at* http://401kspecialistmag.com/top-4-priorities-of-401k-plan-sponsors; Joan Vogel, *Until Death Do Us Part: Vesting of Retiree Insurance*, 9 Indus. Rel. L.J. 183, 216 (1987) (noting that employers offer

-5-
**COMPLAINT**

20.     The Plan includes one overarching investment in which participants are automatically enrolled. Within that investment, Defendants invest in numerous underlying investment accounts, and the combined returns net of fees for these underlying investment accounts equal the Plan's investment performance. Participants have no choice over how their money is invested, including the allocation of assets among the underlying investments. Instead, the Plan has a "one-size-fits-all" investment strategy to which every participant is bound. Defendants' choices are therefore critical to participants' investment results and, ultimately, their ability to retire with adequate assets.

### DEFENDANTS

***Board of Directors for the Motion Picture Industry Pension Plans***

21.     Defendant Board of Directors for the Motion Picture Industry Pension Plans is based in Studio City, California. The Board is the "plan sponsor" within the meaning of 29 U.S.C. § 1002(16)(B), and is a "named fiduciary" pursuant to 29 U.S.C. § 1102(a) with respect to the Plan because it is identified in the Plan Documents as a fiduciary under ERISA.[4]

22.     The Board is also a functional fiduciary because it has discretionary authority with respect to the Plan and the Plan's investments. The Board's fiduciary responsibilities include, among other things, "discretion over the ... investment of the assets of the Plan[]."[5] According to the Plan's Form 5500s, the Board is also the Plan Administrator, controlling and managing the operation and administration of the Plan. Thus, the Board exercises discretionary authority or discretionary control with respect

---

retirement benefits to attract and retain "reliable, productive employees"). They do not excuse imprudent management of a plan's assets or investments. *See Brotherston v. Putnam Invs. LLC*, 907 F.3d 17, 28-29 (1st Cir. 2018).

[4] *See Summary Plan Description*, Exhibit A, at 42 (defining a fiduciary as "[a]n individual and entity that has discretion over the administration of the Plans and investment of the assets of the Plans," and listing "[t]he Board of Directors of the Plans" as a fiduciary).

[5] *Id.*

**COMPLAINT**

to management of the Plan, as well as discretionary authority and responsibility with respect to the administration of the Plan, and is a functional fiduciary under 29 U.S.C. § 1002(21)(A).

***Board Members***

23.    The members of the Board are employees of participating employers and representatives of participating unions, and at all times were acting within the scope of their agency with the Board. The Board Members are therefore functional fiduciaries pursuant to 29 U.S.C. § 1002(21)(A). Because the individuals who served on the Board during the statutory period are not currently known to Plaintiff, they are collectively named as John and Jane Does 1–20.

## FIDUCIARY RESPONSIBILITIES

### DUTY OF PRUDENCE

24.    ERISA imposes strict fiduciary duties upon fiduciaries of retirement plans. Among other things, the statute provides:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—
>
> > (B)    with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims . . . .

29 U.S.C. § 1104(a)(1)(B). This is commonly referred to as the "duty of prudence."

25.    The duty of prudence includes "a continuing duty to monitor [plan] investments and remove imprudent ones" that exists "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble*, 135 S. Ct. at 1828. If an investment is imprudent, the plan fiduciary "must dispose of it within a reasonable time." *Id.* (quotation omitted). Fiduciaries therefore may be held liable for failing to monitor a plan's investments to ensure that each remains prudent, in addition

1  to imprudent selection of the investments. *Patterson v. Capital Grp. Companies, Inc.*,
2  2018 WL 748104, at *4 (C.D. Cal. Jan. 23, 2018).

3      26.    The duty of prudence also includes a duty to minimize investment
4  expenses. Indeed, "[c]ost-conscious management is fundamental to prudence in the
5  investment function." *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197 (9th Cir. 2016) (en
6  banc) (quoting Restatement (Third) of Trusts § 90 cmt. b (2007)).[6] Thus, selecting
7  and retaining higher-cost investments constitutes a breach of fiduciary duties when
8  similar or identical lower-cost investments are available. *See Braden v. Wal-Mart*
9  *Stores, Inc.,* 588 F.3d 585, 596 (8th Cir. 2009).

10      27.    The Introductory Note to the Restatement's chapter on the investment of
11  trust assets further clarifies:

12      [T]he duty to avoid unwarranted costs is given increased emphasis in the
13      prudent investor rule. This is done to reflect the importance of market
14      efficiency concepts and differences in the degrees of efficiency and
15      inefficiency in various markets. In addition, this emphasis reflects the
16      availability and continuing emergence of modern investment products,
17      not only with significantly varied characteristics but also with similar
18      products being offered with significantly differing costs. The duty to be
19      cost conscious requires attention to such matters as the cumulation of
20      fiduciary commissions with agent fees or the purchase and management
21      charges associated with mutual funds and other pooled investment
22      vehicles. In addition, active management strategies involve investigation
23      expenses and other transaction costs ... that must be considered,
24      realistically, in relation to the likelihood of increased return from such
25      strategies.

26  _____
27  [6] The Supreme Court has noted that the legal construction of an ERISA fiduciary's
    duties is "derived from the common law of trusts." *Tibble*, 135 S. Ct. at 1828.
    Therefore, "[i]n determining the contours of an ERISA fiduciary's duty, courts often
28  must look to the law of trusts." *Id.*

Restatement (Third) of Trusts ch. 17, intro. note (2007).

28.     Where markets are efficient, fiduciaries are encouraged to use low-cost index funds. *Id.* § 90 cmt. h(1). While a fiduciary may consider higher-cost, actively managed mutual funds as an alternative to index funds, "[a]ctive strategies . . . entail investigation and analysis expenses and tend to increase general transaction costs . . . [T]hese added costs . . . must be justified by realistically evaluated return expectations." *Id.* § 90 cmt. h(2) (emphasis added).[7]

**CONSTRUCTION OF PRUDENT INVESTMENT MENUS IN DEFINED CONTRIBUTION PLANS**

29.     To ensure a sufficient mix of investments that meet a wide variety of participant needs, prudent fiduciaries of defined contribution plans typically create a "menu" of investment options from which participants can choose to invest. Each investment option is generally a pooled investment product (*e.g.*, a mutual fund, collective investment trust, or separate account) offering exposure to a particular asset class or sub-asset class. *See* BrightScope/Investment Company Institute, *A Close Look*

---

[7] The emphasis in trust law and under ERISA in minimizing expenses is consistent with academic and financial industry literature, which has consistently shown that the most important consideration in selecting prudent investments is low fees. Numerous scholars have demonstrated that high expenses are not correlated with superior investment management. Indeed, funds with high fees on average perform worse than less expensive funds, *even on a pre-fee basis*. Javier Gil-Bazo & Pablo Ruiz-Verdu, *When Cheaper is Better: Fee Determination in the Market for Equity Mutual Funds*, 67 J. Econ. Behav. & Org. 871, 873 (2009); *see also* Jill E. Fisch, *Rethinking the Regulation of Securities Intermediaries*, 158 U. Pa. L. Rev. 1961, 1993 (2010) (summarizing numerous studies showing that "the most consistent predictor of a fund's return to investors is the fund's expense ratio"). According to this published academic literature:

> [T]he empirical evidence implies that superior management is not priced through higher expense ratios. On the contrary, it appears that the effect of expenses on after-expense performance (even after controlling for funds' observable characteristics) is more than one-to-one, which would imply that low-quality funds charge higher fees. Price and quality thus seem to be inversely related in the market for actively managed funds.

Gil-Bazo & Ruiz-Verdu, *When Cheaper is Better*, at 883.

*at 401(k) Plans, 2016*, at 2, available at https://www.ici.org/pdf/19_ppr_dcplan_profile_401k.pdf (hereinafter "2019 BrightScope/ICI Study"); Ian Ayres & Quinn Curtis, *Beyond Diversification: The Pervasive Problem of Excessive Fees and "Dominated Funds" in 401(k) Plans*, 124 Yale L.J. 1476, 1485 (2015).

30. Asset classes within pooled investments generally include fixed investments, bonds, stocks, and occasionally real estate. Money market funds, guaranteed investment contracts, and stable value funds are examples of fixed investments. Bonds are debt securities, which are generally categorized by the issuer/borrower (U.S. Government, foreign governments, municipalities, corporations), the duration of the debt (repayable anywhere between 1 month and 30 years), and the credit risk associated with the particular borrower. Equity, or stock, investments, are generally defined by three characteristics: (1) where they invest geographically (*i.e.*, whether they invest in domestic or international companies, or both); (2) the size of company they invest in (generally categorized as small cap, mid cap, or large cap); and (3) their investment style, *i.e.* growth, value, or blend (growth funds invest in fast-growing companies, value funds look for more conservative or established stocks, and blend funds invest in a mix of both types of stocks). Balanced funds are a type of fund that invests in a mix of stocks, bonds, and occasionally other assets. Target-risk funds are balanced funds that assemble a portfolio of investments to match the risk preference of the investor. Each target-risk portfolio is typically made up of other pooled investment funds.

31. Target date funds ("TDFs") are a particularly popular investment option that many retirement plan fiduciaries use to provide tailored investment strategies for participants of all ages. TDFs invest in a diversified mix of asset classes managed towards the approximate date when the investor expects to start withdrawing money from the fund. Investment companies offer TDFs as a suite with an array of target dates staggered either 5 or 10 years apart, along with an "income" or "retirement"

fund for investors who have already retired. As the target retirement date approaches, the investment mix becomes more conservative, typically by shifting away from stock investments towards more conservative fixed income investments. However, TDFs are not limited to stocks and bonds, and often use asset classes such as commodities, real estate, inflation-linked bonds, or emerging markets stocks. TDFs are the most popular Qualified Default Investment Alternative ("QDIA")[8] selected by fiduciaries of defined contribution plans. *See* Willis Towers Watson, "QDIA evolutions — Moving defined contribution plans into the future," (April 29, 2019), available at https://www.willistowerswatson.com/en-US/Insights/2019/04/qdia-evolutions-moving-defined-contribution-plans-into-the-future.  More than $1.7 trillion of American retirement savings was invested in TDFs as of 2019. Morningstar, "2019 Target-Date Fund Landscape" (May 9, 2019), available at https://www.morningstar.com/lp/tdf-landscape?con=17137&cid=CON_DIR0071.

32.    Investment funds can be either passively or actively managed. Passive funds, popularly known as "index funds," seek to replicate the performance of a market index, such as the S&P 500, by purchasing a portfolio of securities matching the composition of the index itself. James Kwak, *Improving Retirement Savings Options for Employees*, 15 U. Pa. J. Bus. L. 483, 493 (2013). By following this strategy, index funds produce returns that are very close to the market segment tracked by the index. *Id.* Index funds therefore offer predictability, diversified exposure to a particular asset or sub-asset class, and low expenses. *Id.* Actively managed funds, on the other hand, pick individual stocks and bonds within a particular asset or sub-asset class and try to beat the market through superior investment selection. *Id.* at 485–86. Actively managed funds are typically much more expensive than index funds, but

---

[8] "A QDIA is a default investment option chosen by a plan fiduciary for participants who fail to make an election regarding investment of their account balances" as permitted under Department of Labor regulations. U.S. Employee Benefits Security Administration, "Target Date Retirement Funds: Tips for ERISA Fiduciaries," at 1 (February 2013), *available at* https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/fact-sheets/target-date-retirement-funds.pdf.

1  offer the potential to outperform the market (although this potential is typically not

2  realized). U.S. Dep't of Labor, *Understanding Retirement Plan Fees and Expenses*,

3  at 9 (Dec. 2011), available at https://www.dol.gov/sites/dolgov/files/legacy-

4  files/ebsa/about-ebsa/our-activities/resource-center/publications/understanding-

5  retirement-plan-fees-and-expenses.pdf.

6      33.    The Plan in this case offered no single-asset class options nor any multi-

7  asset class options tied to a participant's retirement date or risk tolerance. Nor did it

8  offer an index fund option. Instead, the Plan had one packaged investment that pooled

9  participants' assets and invested them on participants' behalf with an investment mix

10  determined by Defendants largely consisting of poorly performing actively managed

11  investments that carried high fees.

12                          **ERISA § 404(c)**

13      34.    ERISA § 404(c) protects a fiduciary from liability for a participant's

14  choice of investments where participants have independent control over their accounts

15  and can invest among different options on the plan's menu. 29 U.S.C. § 1104(c)(1);

16  29 C.F.R. § 2550.404c-1(d)(2)(i).[9] In order for fiduciaries to qualify for this potential

17  defense, however, participants must be given an opportunity to choose from a "broad

18  range of investment alternatives." 29 C.F.R. § 2550.404c-1(b)(1)(ii). At a minimum,

19  this requires that the plan offer "at least three investment alternatives" with

20  "materially different risk characteristics" that "enable the participant or beneficiary

21  by choosing among them to achieve a portfolio with aggregate risk and return

22  characteristics at any point within the range normally appropriate for the participant

23  or beneficiary." 29 C.F.R. § 2550.404c-1(b)(3)(i)(B); *Jenkins v. Yager*, 444 F.3d 916,

24  923 (7th Cir. 2006).

25

26

27  ───────────────
[9] Even in cases where this defense applies, fiduciaries may still be held liable for

28  imprudent construction of the plan's investment menu. *See* 29 C.F.R § 2550.404c-
1(d)(2)(iv).

35.   Because Defendants have not maintained an investment menu with multiple investment options and have not allowed participants to exercise any independent control over their accounts, Defendants do not qualify for § 404(c) protection.

### MINIMIZATION OF PLAN EXPENSES

36.   At retirement, employees' benefits "are limited to the value of their own investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Tibble*, 135 S. Ct. at 1826.

37.   Poor investment performance combined with excessive fees and costs can significantly impair the value of a participant's account. Over time, even seemingly small differences in fees and costs can result in vast differences in the amount of savings available at retirement. The United States Department of Labor has cautioned that a one percent difference in fees and costs can reduce the investor's account balance at retirement by **28 percent**. *See* U.S. Department of Labor, *A Look at 401(k) Plan Fees*, at 1–2 (2013), available at https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf. The U.S. Securities and Exchange Commission and others similarly warn that although the fees and costs associated with investment products and services may seem small, over time they can have a major impact on an investor's portfolio. *See* SEC Investor Bulletin, *How Fees and Expenses Affect Your Investment Portfolio*, at 1, 3 (2014), available at https://sec.gov/investor/alerts/ib_fees_expenses.pdf.

38.   A major category of expenses within a defined contribution plan are investment management expenses. Investment Company Institute & Deloitte Consulting LLP, *Inside the Structure of Defined Contribution/401(k) Plan Fees, 2013*, at 17 (Aug. 2014), available at https://www.ici.org/pdf/rpt_14_dc_401k_fee_study.pdf (hereinafter "ICI/Deloitte Study"). Investment management expenses are the fees that are charged by investment

managers for managing particular investments, and participants "typically pay these asset-based fees as an expense of the investment options in which they invest." *Id.*

39.     Prudent fiduciaries can minimize plan expenses by selecting low-cost investment options. This task is made significantly easier the larger a plan gets. Economies of scale allow larger plans to lower investment management fees by selecting funds only available to institutional investors, or by negotiating directly with the investment manager to obtain even lower rates.[10] Empirical evidence bears this out. In 2016, total participant-weighted plan fees in the average defined contribution plan were 0.62%, but this varied between an average of 1.29% in plans with $1 million to $10 million in assets, and an average of only 0.25% for plans with over $1 billion in assets. 2019 BrightScope/ICI Study at 47.

40.     Given the significant variation in total plan costs attributable to plan size, the reasonableness of investment expenses should be determined by comparisons to other similarly sized plans. *See* 29 U.S.C. § 1104(a)(1)(B) (requiring ERISA fiduciaries to discharge their duties in the manner "that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an *enterprise of a like character*") (emphasis added); *Tibble v. Edison Int'l*, 2010 WL 2757153, at *9, 15, 28 (C.D. Cal. July 8, 2010) (evaluating the propriety of particular fees and investment decisions in light of the size of the plan), *rev'd on other grounds*, 135 S. Ct. 1823 (2015); *Tussey v. ABB, Inc.*, 2007 WL 4289694, at *6, *6 n.5 (W.D. Mo. Dec. 3, 2007) (determining that investment expenses were unreasonable through

---

[10] *See* Consumer Reports, *How to Grow Your Savings: Stop 401(k) Fees from Cheating You Out of Retirement Money* (Aug. 2013), *available at* http://www.consumerreports.org/cro/magazine/2013/09/how-to-grow-your-savings/index.htm (instructing employees of large corporations that "[y]our employer should be able to use its size to negotiate significant discounts with mutual-fund companies"); U.S. Dep't of Labor, *Study of 401(k) Plan Fees and Expenses*, at 17 (April 13, 1998), *available at* https://www.dol.gov/sites/dolgov/files/legacy-files/ebsa/researchers/analysis/retirement/study-of-401k-plan-fees-and-expenses.pdf (reporting that by using separate accounts and similar instruments, "[t]otal investment management expenses can commonly be reduced to one-fourth of the expenses incurred through retail mutual funds").

comparisons to similar plans because "[a]t most, reasonable compensation should mean compensation commensurate with that paid by similar plans for similar services to unaffiliated third parties") (quoting Nell Hennessy, *Follow the Money: ERISA Plan Investments in Mutual Funds and Insurance*, 38 J. Marshall L. Rev. 867, 877 (2005)).

## DEFENDANTS' VIOLATIONS OF ERISA

**I.   DEFENDANTS ADOPTED AN INAPPROPRIATE ONE-SIZE-FITS-ALL INVESTMENT STRATEGY FOR THE PLAN**

41.    Rather than provide multiple investment options for participants to choose from, Defendants forced all participants into one investment pool and invested all participants' retirement assets in the same underlying investments. And unlike with a menu of investment options or a tailored portfolio such as a target-date or target-risk fund, Participants had no control over the allocation of their assets among the underlying investments.

42.    This one-size-fits-all allocation strategy was inappropriate. As noted above, the Plan had approximately 79,000 to 92,000 participants, *see supra* at ¶ 18, with a wide range of ages and financial situations.[11] Because of Defendants' limited investment strategy, participants did not have the opportunity to invest their retirement earnings based on their individual financial goals, risk preferences, and anticipated retirement dates.

43.    As a result, not only did the Plan perform poorly overall as discussed further below, but some participants fared particularly poorly. For example, participants nearing retirement may wish to preserve the capital in their retirement account rather than take risks that could deplete capital just when they need it most, while younger individuals may be more risk tolerant. Unlike a target date fund, which would have accounted for the specific needs of participants of varying ages,

---

[11] Employees are eligible for participation in the Plan after completing 400 hours of service in a year with a participating employer.

**COMPLAINT**

Defendants forced all participants into a strategy that may have directly contradicted their desired investment philosophy.

44.     Given the overall poor track record of this investment strategy, and its incompatibility with the diverse financial goals of the Plan's individual participants, it is reasonable to infer that Defendants failed to engage in a prudent process for managing the Plan's investments. *See Toomey v. DeMoulas Super Markets, Inc.*, 2020 WL 3412747, at *3 (D. Mass. Apr. 16, 2020) (denying motion to dismiss an ERISA breach of fiduciary duty claim when plaintiff alleged "that fiduciaries of the Plan were imprudent in their consideration of (or their failure to consider) the participants' varying interests and needs in the Plan's allocation structure and investment choices, and that these failures were compounded by a failure to review and revise those choices over time").

## II.   DEFENDANTS FAILED TO PRUDENTLY MONITOR UNDERLYING INVESTMENTS

45.     Defendants compounded their imprudence by investing a large percentage of Plan assets in actively managed investments that performed poorly and carried high investment management fees that detracted from participants' retirement earnings.

46.     The investment strategy that Defendants forced upon participants relied heavily on expensive actively managed funds. Throughout the statutory period, Defendants allocated up to 45% of Plan assets into mutual funds and hedge funds that carried significant investment management fees.

47.     For example, during the statutory period, the Plan included at least nine investments managed by Bridgewater Associates, a hedge fund manager. Between 15% and 17% of Plan assets—up to $689 million in a given year—were invested in these funds.

48.     Since at least 2014, an increasing number of investors have been pulling their money out of hedge funds due to their high fees and mediocre performance that

has in recent years failed to break even with the market (*e.g.* the S&P 500).[12] For example, the San Joaquin County pension plan recently removed a Bridgewater Pure Alpha series fund from its lineup because the fund charged ***3.69% of assets, or 369 basis points ("bps")***, in investment fees but received only a 3.1% annualized return over the 5-year period ending in September 2017, "meaning that Bridgewater took more than half of the money it made for the county fund in those years."[13] By contrast, a passively managed investment option that tracks the performance of the S&P 500 can cost as low as only ***0.00% –0.09% of assets, or zero to 9 bps***.[14]

49.     The Plan's payment of high investment fees for actively managed mutual funds and hedge funds did not benefit participants. On the contrary, from 2013 to 2018, the Plan's returns consistently landed it among the ***bottom 5% of 1,651 defined contribution plans*** with more than $100 million in assets on a 3-year basis, with returns of up to 6% less than the median of these plans, as shown below. Moreover, the Plan's 5-year returns and 10-year returns were similarly abysmal.

---

[12] *See* MarketWatch, "Hedge funds still can't keep up with the stock market," (Oct. 17, 2019), *available at* https://www.marketwatch.com/story/hedge-funds-still-cant-keep-up-with-the-stock-market-2019-10-15 (stating that "[s]ince the start of the recovery in financial markets in 2009, hedge funds have perennially underperformed the S&P 500 index," and noting that investors have been pulling money out of hedge funds as a result); Business Insider, "A Bridgewater Associates Alum Is Launching A No-Fee Hedge Fund," (Aug. 5, 2014), *available at* https://www.businessinsider.com/howard-wang-ditches-performance-fee-2014-8 ("Lately, it's become harder for [hedge] fund managers to justify the fee structure, especially because most funds have been underperforming the broader market.").

[13] Pensions & Investments, "San Joaquin County dumps Bridgewater fund citing fees, disappointing returns," (Jan. 24, 2019), *available at* https://www.pionline.com/article/20190124/ONLINE/190129914/san-joaquin-county-dumps-bridgewater-fund-citing-fees-disappointing-returns

[14] Bankrate, "Best index funds in July 2020," (Jul. 1, 2020), *available at* https://www.bankrate.com/investing/best-index-funds/.

**COMPLAINT**

| MPI Performance Compared to Plans Over $100M[15] | | | | | | |
|---|---|---|---|---|---|---|
| **3-year rolling returns** | **2013** | **2014** | **2015** | **2016** | **2017** | **2018** |
| **MPI Plan** | 7.09% | 6.84% | 2.35% | 2.34% | 4.34% | 4.28% |
| **Median Return** | 9.48% | 12.20% | 8.00% | 4.60% | 7.75% | 5.90% |
| **Percentile Rank** | **4.20%** | **0.70%** | **0.30%** | **1.30%** | **1.00%** | **3.50%** |
| **Rank** | **1582/1651** | **1640/1651** | **1647/1651** | **1631/1651** | **1635/1651** | **1594/1651** |
| **5-year rolling returns** | | | | | | |
| **MPI Plan** | 9.52% | 7.47% | 4.43% | 4.74% | 4.54% | 2.78% |
| **Median Return** | 12.51% | 9.37% | 6.90% | 8.65% | 9.57% | 4.81% |
| **Percentile Rank** | **6.70%** | **5.70%** | **1.90%** | **0.40%** | **0.30%** | **1.30%** |
| **Rank** | **1542/1651** | **1558/1651** | **1621/1651** | **1646/1651** | **1648/1651** | **1630/1651** |
| **10-year rolling returns[16]** | | | | | | |
| **MPI Plan** | N/A | N/A | N/A | N/A | N/A | 6.09% |
| **Median Return** | N/A | N/A | N/A | N/A | N/A | 8.59% |
| **Percentile Rank** | N/A | N/A | N/A | N/A | N/A | **2.40%** |
| **Rank** | N/A | N/A | N/A | N/A | N/A | **1613/1651** |

50.     Among plans with more than $1 billion in assets, the Plan fared even worse in the long term, as shown below. For example, the Plan landed in the ***bottom 2% of 175 plans*** on both a 5-year basis and 10-year basis in 2018, and was dead last on a five-year basis in 2017.

[15] Data derived from annual Forms 5500 filed with the Department of Labor and available                                publicly                                at https://www.efast.dol.gov/portal/app/disseminatePublic?execution=e2s1.
[16] Ten-year rolling returns are only available for 2018 as 2008 is the earliest year for which Form 5500 data is publicly available through the Department of Labor.

| MPI Performance Compared to Plans Over $1B[17] | | | | | | |
|---|---|---|---|---|---|---|
| **3-year rolling returns** | **2013** | **2014** | **2015** | **2016** | **2017** | **2018** |
| **MPI Plan** | 7.09% | 6.84% | 2.35% | 2.34% | 4.34% | 4.28% |
| **Median Return** | 9.46% | 11.99% | 7.88% | 4.69% | 7.68% | 5.93% |
| **Percentile Rank** | **8.50%** | **1.10%** | **1.10%** | **1.10%** | **2.20%** | **9.60%** |
| **Rank** | **161/175** | **174/175** | **174/175** | **174/175** | **172/175** | **159/175** |
| **5-year rolling returns** | | | | | | |
| **MPI Plan** | 9.52% | 7.47% | 4.43% | 4.74% | 4.54% | 2.78% |
| **Median Return** | 12.34% | 9.37% | 6.82% | 8.56% | 9.41% | 4.81% |
| **Percentile Rank** | **5.60%** | **7.30%** | **4.50%** | **1.10%** | **0.50%** | **2.20%** |
| **Rank** | **166/175** | **163/175** | **168/175** | **174/175** | **175/175** | **172/175** |
| **10-year rolling returns** | | | | | | |
| **MPI Plan** | N/A | N/A | N/A | N/A | N/A | 6.09% |
| **Median Return** | N/A | N/A | N/A | N/A | N/A | 8.58% |
| **Percentile Rank** | N/A | N/A | N/A | N/A | N/A | **1.70%** |
| **Rank** | N/A | N/A | N/A | N/A | N/A | **173/175** |

51.     Moreover, Defendants were aware that the Plan was performing poorly during the statutory period. In addition to the Plan, Defendants provide members with a defined-benefit pension plan that utilizes an investment strategy substantially similar to that of the Plan, investing in most of the same investments with a similar allocation of assets to those investments. In its participant communications, Defendants compared the plans' performance against two benchmarks: the MSCI World Index[18], and a more traditional investment portfolio containing 60% stocks and 40% bonds. Although Defendants reported in 2019 that the Plan tracked these benchmarks on a 20-year basis, the Plan's performance over the last 10 years on a 3-, 5-, and 10-year basis trailed Defendants' chosen benchmarks significantly, as shown

---

[17] Data derived from annual Forms 5500 filed with the Department of Labor and available publicly at https://www.efast.dol.gov/portal/app/disseminatePublic?execution=e2s1.
[18] *See* MSCI, "MSCI Developed Markets Indexes," *available at* https://www.msci.com/developed-markets (last visited July 16, 2020) (explaining that MSCI indexes are "designed to take into account variations reflecting conditions across regions, market cap segments, sectors and styles").

below. Indeed, over the last three years the Plan's returns were nearly 4% lower than a traditional 60/40 fund and *less than half* of the returns of the MSCI World Index.

| 2019 | 3-year | 5-year | 10-year |
|------|--------|--------|---------|
| **MPI Plan** | **5.77%** | **4.11%** | **5.78%** |
| Benchmark (60/40) | 9.32% | 6.65% | 7.51% |
| MSCI World NR USD | 12.57% | 8.73% | 9.46% |

52.    Yet, despite the Plan's consistent underperformance during the last decade, Defendants failed to change the Plan's investment strategy or diversify the Plan's investment options to offer participants other choices.

53.    A prudent fiduciary acting in the best interests of the Plan would not have maintained the same flawed investment strategy, and wedded participants to that strategy, despite such resoundingly poor results. To the contrary, a prudent fiduciary would have abandoned this unorthodox and unsuccessful single-pool strategy and replaced it with a menu of investment options commonly used in other large retirement plans, or at the very least investigated significantly better performing underlying investments with lower fees. If Defendants had taken these measures, they would have materially improved participants' investment options and net performance. Instead, the Plan suffered tens of millions of dollars in lost investment returns, and participants' retirement nest eggs were severely impaired.

III.    **PLAINTIFF LACKED KNOWLEDGE OF DEFENDANTS' INVESTMENT PROCESS AND OTHER MATERIAL FACTS PRIOR TO SUIT**

54.    Plaintiff did not have knowledge of all material facts (including, among other things, the asset allocation of the Plan compared to similar plans, the Plan's poor returns compared to other similar plans, Defendants' failure to re-evaluate the Plan's investment strategy after poor performance, the underlying investments utilized by the Plan, the investment management fees for those investments, and the availability of less costly and higher performing investment options) until shortly before this suit was filed. Further, Plaintiff does not have actual knowledge of the specifics of

Defendants' decision-making processes with respect to the Plan (including Defendants' processes for selecting, monitoring, and evaluating their unorthodox investment strategy and Defendants' processes for selecting, monitoring, and removing investments), because this information is solely within the possession of Defendants prior to discovery. For purposes of this Complaint, Plaintiff has drawn reasonable inferences regarding these processes based upon (among other things) the facts set forth above.

## **PLAN-WIDE RELIEF**

55.     29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to obtain for the Plan the remedies provided by 29 U.S.C. § 1109(a). Plaintiff seeks recovery on behalf of the Plan pursuant to this statutory provision.

56.     Plaintiff seeks recovery for injuries to the Plan sustained as a result of the aforementioned breaches of fiduciary duties during the statutory period commencing in 2014. *See* 29 U.S. Code § 1113(1) (setting 6-year statute of limitations for ERISA breach of fiduciary duties claims in the absence of actual knowledge).[19]

57.     Plaintiff is adequate to bring this derivative action on behalf of the Plan, and her interests are aligned with the Plan's participants and beneficiaries. Plaintiff does not have any conflicts of interest with any participants or beneficiaries that would impair or impede her ability to pursue this action. Plaintiff has retained counsel experienced in ERISA litigation, and intends to pursue this action vigorously on behalf of the Plan.

---

[19] Plaintiff seeks relief for the period from July 24, 2014 onward, as she initially filed a Demand for Arbitration against Defendants on July 24, 2020.  Defendants subsequently waived any right to arbitration of the claims in this case, and asked that Plaintiff refile her claims in federal court.  The claims asserted in this Complaint are identical to the claims originally asserted in Plaintiff's Demand.

## COUNT I

### Breach of Duty of Prudence

### U.S.C. § 1104(a)(1)(B)

58.     Defendants are fiduciaries of the Plan under 29 U.S.C. §§ 1002(21) and/or 1102(a)(1).

59.     29 U.S.C. § 1104 imposes a duty of prudence upon Defendants in their administration of the Plan and in selecting and monitoring the Plan's investments.

60.     Among other things, Defendants are responsible for maintaining investments that would meet the needs of participants, prudently selecting quality investment options, evaluating and monitoring the Plan's investments on an ongoing basis and eliminating imprudent ones, ensuring that the Plan's fees are reasonable, and taking all necessary steps to ensure that the Plan's assets are invested prudently.

61.     As described throughout this Complaint, Defendants breached their fiduciary duties and failed to employ a prudent process for selecting, monitoring, and reviewing the Plan's investments. Defendants adopted a one-size-fits-all investment strategy for the Plan without regard for participant needs and failed to prudently execute that strategy by choosing poorly performing options when better performing options would have been revealed by a reasonable investigation. Defendants also imprudently retained poorly performing investments and failed to appropriately monitor their performance. In addition, Defendants failed to investigate lower-cost investment options available to them, opting for higher-cost investments with no benefit to participants.

62.     Each of the above actions and omissions described in paragraph 61 and elsewhere in this Complaint demonstrate that Defendants failed to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like

**COMPLAINT**

character and with like aims, thereby breaching their duties under 29 U.S.C. § 1104(a)(1)(B).

63.    Each Defendant is personally liable, and jointly and severally liable, under 29 U.S.C. §§ 1109(a), 1132(a)(2), and 1132(a)(3), to make good to the Plan the losses resulting from the aforementioned breaches. In addition, Defendants are subject to other equitable relief as provided by ERISA.

**<u>PRAYER FOR RELIEF</u>**

WHEREFORE, Plaintiff, on behalf of the Plan, prays for relief as follows:

A.    A declaration that Defendants have breached their fiduciary duties under ERISA;

B.    A declaration that Defendants have no defense to liability under ERISA § 404(c);

C.    An order compelling Defendants to personally make good to the Plan all losses that the Plan incurred as a result of the breaches of fiduciary duties described above;

D.    Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate;

E.    An award of pre-judgment interest;

F.    An award of attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g) and/or the common fund doctrine;

G.    An award of such other and further relief as the Court deems equitable and just.

Dated: October 7, 2020

**ROSEN MARSILI RAPP LLP**

/s/ Jason Marsili
Jason Marsili, CA Bar No. 233980
jmarsili@rmrllp.com
ROSEN MARSILI RAPP LLP
3600 Wilshire Blvd Suite 1800
Los Angeles, CA 90010
Telephone: 213-389-6050

**COMPLAINT**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Paul J. Lukas, MN Bar No. 22084X*
lukas@nka.com
Kai H. Richter, MN Bar No. 0296545*
krichter@nka.com
Brock J. Specht, MN Bar No. 0388343*
bspecht@nka.com
Brandon T. McDonough, MN Bar No. 393259*
bmcdonough@nka.com
Jennifer K. Lee, MN Bar No. 0399012*
jlee@nka.com
NICHOLS KASTER, PLLP
4700 IDS Center
80 S 8th Street
Minneapolis, MN 55402
Telephone: 612-256-3200
Facsimile: 612-338-4878
*pro hac vice applications forthcoming

ATTORNEYS FOR PLAINTIFF

-24-
**COMPLAINT**