Nancy G. Ross, *pro hac vice*
  *nross@mayerbrown.com*
Richard E. Nowak, *pro hac vice*
  *rnowak@mayerbrown.com*
Abigail M. Bartine (SBN 326993)
  *abartine@mayerbrown.com*
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
Telephone:  (312) 782-0600
Facsimile:   (312) 701-7711

Alexander Vitruk (SBN 315756)
  *avitruk@mayerbrown.com*
MAYER BROWN LLP
350 S. Grand Ave., 25th Fl.
Los Angeles, CA 90071
Telephone:  (213) 229-9500
Facsimile:   (213) 625-0248

*Attorneys for Defendant*
*Board of Directors for the*
*Motion Picture Industry*
*Pension Plans*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| PATRICIA KLAWONN, on behalf of the Motion Picture Industry Individual Account Plan, <br><br> Plaintiff, <br><br> v. <br><br> BOARD OF DIRECTORS FOR THE MOTION PICTURE INDUSTRY PENSION PLANS, et al. <br><br> Defendants. | Case No. 2:20-cv-09194-DMG-JEM <br><br> **DEFENDANT BOARD OF DIRECTORS' NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT** <br><br> Hearing Date: April 23, 2021 <br> Hearing Time: 9:30 a.m. <br> Judge: Hon. Dolly M. Gee |

## <u>NOTICE OF MOTION AND MOTION TO DISMISS</u>

TO THE COURT AND TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD: PLEASE TAKE NOTICE that on April 23, 2021, at 9:30 a.m., or as soon as the matter may be heard in the Courtroom of the Honorable Dolly M. Gee, whether virtually or in courtroom 8C located in the United States Courthouse, 350 West 1st Street, Los Angeles, CA 90012, Defendant Board of Directors for the Motion Picture Industry Pension Plans shall move and hereby does move to dismiss *with prejudice* Plaintiff Patricia Klawonn's Amended Complaint pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. This Motion is made following the conference of counsel pursuant to Local Rule 7-3, which took place on February 4, 2021. *See* Declaration of Nancy G. Ross, ¶ 3.

The Motion is based on four independent grounds:

1.  Plaintiff has failed to meet her burden to establish that she has standing since the Amended Complaint is devoid of anything beyond conclusory allegations of injury suffered. Plaintiff has not yet triggered benefits, nor alleged that any other Motion Picture Industry Individual Account Plan ("IAP") investments would leave her better off.

2.  Plaintiff challenges the fundamental structure of a plan that has been in place for over forty years (of which she has been a participant for almost thirty years). Even assuming Plaintiff's Amended Complaint has pled a viable fiduciary breach claim (it has not), ERISA's six-year statute of repose bars it.

3.  Plaintiff fails to state a claim for an ERISA breach of fiduciary duty. Because plan design is a settlor, not a fiduciary decision, Plaintiff's allegations challenging the multi-employer, pooled-asset design of the IAP, a common structure that is permitted under ERISA, cannot state

i

a claim for breach of fiduciary duty.

4.      To the extent that Plaintiff's allegations about the IAP's investment performance and fees can be separated from her foundational challenge to the IAP's pooled-asset structure (they cannot), Plaintiff's investment- and fee-related allegations also fail to state a claim for breach of fiduciary duty under ERISA. Plaintiff's reliance on misleading and out-of-context snapshots of investment performance and unfounded contentions about excessive fees which are contradicted by her own evidence do not allege a plausible claim. Similar allegations have been rejected repeatedly by other courts within the Ninth Circuit and elsewhere.

The Motion is based on this Notice and Motion, the attached memorandum of points and authorities, the concurrently-filed Request for Judicial Notice, the Declaration of Nancy G. Ross and all exhibits attached thereto, the pleadings, papers, and records in this action, any matters of which this Court shall take judicial notice, and such further evidence or argument as Defendant may present prior to or at any hearing on this Motion.

Dated: February 12, 2021                    Respectfully submitted,

                                            By: */s/ Nancy G. Ross*
                                            Nancy G. Ross
                                            MAYER BROWN LLP

                                            *Attorneys for Defendant Board of Directors for the Motion Picture Industry Pension Plans*

ii

1

2

## <u>TABLE OF CONTENTS</u>

3

**Page(s)**

INTRODUCTION ............................................................... 1

BACKGROUND ................................................................ 3

LEGAL STANDARD ......................................................... 5

ARGUMENT .................................................................... 5

I.      PLAINTIFF LACKS ARTICLE III STANDING ........................................ 6

II.     PLAINTIFF'S CLAIM IS TIME-BARRED ................................. 7

III.    PLAINTIFF FAILS TO STATE A PLAUSIBLE CLAIM .......................... 8

    A.      Plaintiff's Challenge to the IAP's Design Cannot State a Claim
        for Breach of Fiduciary Duty ................................................ 8

        1.      ERISA permits the IAP's pooled-asset design ......................... 9

            a.      History of Multiemployer Plans ..................................... 9

            b.      Pooled-Asset Plans Are Lawful ................................... 10

        2.      IAP and 401(k) Plans Are Materially Different ..................... 11

        3.      Plaintiff's Pooled-Asset Protest Does Not Invoke a
            Fiduciary Act ............................................................ 12

        4.      ERISA Does Not Impose An Obligation To Consider
            The Individual Needs Of Plan Participants ........................... 16

    B.      Plaintiff's Investment Performance Allegations Do Not State A
        Plausible Claim ................................................................ 17

    C.      Plaintiff's Excessive Fee Allegations Do Not State a Plausible
        Claim ............................................................................. 23

IV.     DISMISSAL SHOULD BE WITH PREJUDICE ........................................ 25

i

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Abbott v. Pipefitters Local Union No. 522 Hosp., Med., & Life Ben.*
   *Plan,*
   94 F.3d 236 (6th Cir. 1996) ................................................................. 10

*Adams v. LTV Steel Mining Co.,*
   936 F.2d 368 (8th Cir. 1991) ............................................................... 15

*Aetna Health Inc. v. Davila,*
   542 U.S. 200 (2004) ............................................................................... 5

*Alas v. AT&T Inc.,*
   2018 WL 6133648 (C.D. Cal. Oct. 29, 2018) ....................................... 3

*Ameritech Ben. Plan Comm. v. Commc'n Workers of Am.,*
   220 F.3d 814 (7th Cir. 2000) ............................................................... 16

*Anderson v. Intel Corp.,*
   2021 WL 229235 (N.D. Cal. Jan. 21, 2021)  ..................... 6, 17, 19, 25

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009) ........................................................................... 5, 9

*Bannistor v. Ullman,*
   287 F.3d 394 (5th Cir. 2002) ............................................................... 13

*Barchock v. CVS Health Corp.,*
   886 F.3d 43 (1st Cir. 2018) ................................................................. 18

*Bell Atl. Corp. v. Twombly,*
   550 U.S. 544 (2007) ............................................................................... 5

*Clapper v. Amnesty Int'l, USA,*
   568 U.S. 398 (2013) ............................................................................... 7

*Cotton v. Mass. Mut. Life Co.,*
   402 F.3d 1267 (11th Cir. 2005) ........................................................... 13

ii

*Davis v. Salesforce.com, Inc.*,
  2020 WL 5893405 (N.D. Cal. Oct. 5, 2020) ...................................................... 17

*Divane v. Nw. Univ.*,
  2018 WL 2388118 (N.D. Ill. May 25, 2018) ..................................................... 16

*Doe One v. CVS Pharmacy, Inc.*,
  348 F.Supp.3d 967 (N.D. Cal. 2018)........................................................... 15, 25

*Dorman v. Charles Schwab Corp.*,
  2018 WL 6803738 (N.D. Cal. Sept. 20, 2018)................................................... 20

*Fisher v. Secchitano*,
  2020 WL 1068873 (D. Or. Feb. 3, 2020) ............................................................ 8

*Garcia v. Brockway*,
  526 F.3d 456 (9th Cir. 2008) ............................................................................... 8

*Guenther v. Lockheed Martin Corp.*,
  972 F.3d 1043 (9th Cir. 2020) ............................................................................. 7

*Hecker v. Deere & Co.*,
  556 F.3d 575 (7th Cir. 2009) ............................................................................. 24

*Heimeshoff v. Hartford Life & Acc. Ins. Co.*,
  571 U.S. 99 (2013) ............................................................................................... 5

*Hettinga v. United States*,
  2017 WL 4338537 (C.D. Cal. Aug. 21, 2017) .................................................... 5

*Hughes Aircraft Co. v. Jacobson*,
  525 U.S. 432 (1999) ..................................................................................... 13, 17

*In re JDS Uniphase Corp. ERISA Litig.*,
  2005 WL 1662131 (N.D. Cal. July 14, 2005) ................................................... 13

*Jenkins v. Yager*,
  444 F.3d 916 (7th Cir. 2006) ............................................................................. 21

*Kong v. Trader Joe's Co.*,
  2020 WL 7062395 (C.D. Cal. Nov. 30, 2020) ................................................... 17

iii

*Kwan v. SanMedica Int'l*,
  854 F.3d 1088 (9th Cir. 2017) ................................................................. 3

*Laborers Nat'l Pension Fund v. Northern Trust Quant. Advisors*,
  173 F.3d 313 (5th Cir. 1999) ................................................................. 22

*Larson v. Northrop Corp.*,
  21 F.3d 1164 (D.C. Cir. 1994) ............................................................... 8

*Lehman v. Nelson*,
  862 F.3d 1203 (9th Cir. 2017) .............................................................. 10

*Lockheed Corp. v. Spink*,
  517 U.S. 882 (1996) .............................................................. 5, 13, 14

*Marks v. Trader Joe's Co.*,
  2020 WL 2504333 (C.D. Cal. Apr. 24, 2020) ..................................... 24

*Meagher v. Int'l Ass'n of Machinists and Aerospace Workers Pension Plan*,
  856 F.2d 1418 (9th Cir.1988) ................................................................ 7

*Meiners v. Wells Fargo & Co.*,
  898 F.3d 820 (8th Cir. 2018) ............................................................... 24

*Mertens v. Hewitt Assocs.*,
  508 U.S. 248 (1993) .............................................................................. 5

*Metzler v. Graham*,
  112 F.3d 207 (5th Cir. 1997) ............................................................... 18

*Patterson v. Stanley*,
  2019 WL 4934834 (S.D.N.Y. Oct. 7, 2019) ....................................... 21

*Pegram v. Herdrich*,
  530 U.S. 211 (2000) ...................................................................... 13, 17

*Romero v. Magma Copper Co.*,
  921 F.2d 281 (9th Cir. 1990) ............................................................... 16

*Rutledge v. Pharmaceutical Care Mgmt. Assoc.*,
  141 S. Ct. 474 (2020) .................................................................... 13, 14

iv

*Somers v. Apple, Inc.*,
   729 F.3d 953 (9th Cir. 2013) ....................................................................... 5

*Spinedex Physical Therapy USA Inc. v. United Healthcare of Ariz., Inc.*,
   770 F.3d 1282 (9th Cir. 2014) ..................................................................... 6

*Spokeo, Inc. v. Robins*,
   136 S. Ct. 1540 (2016) ................................................................................ 6

*Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Ctr. Ret. Plan v. Morgan Stanley In. Mgmt.*,
   712 F.3d 705 (2d Cir. 2013) ..................................................................... 21

*Stahl v. Tony's Bldg. Materials, Inc.*,
   875 F.2d 1404 (9th Cir. 1989) ................................................................. 17

*Thole v. U.S. Bank N.A.*,
   140 S. Ct. 1615 (2020) ................................................................................ 6

*TRW Inc. v. Andrews*,
   534 U.S. 19 (2001) .................................................................................... 11

*In re Unisys Sav. Plan Litig.*,
   74 F.3d 420 (3d Cir. 1996) ....................................................................... 18

*Wehner v. Genentech, Inc.*,
   2021 WL 507599 (N.D. Cal. Feb. 9, 2021) ....................................... 17, 20

*In re WellPoint, Inc. Out-of-Network UCR Rates Litig.*,
   865 F.Supp.2d 1002 (C.D. Cal. 2011) ....................................................... 5

*White v. Chevron Corp.*,
   2016 WL 4502808 (N.D. Cal. Aug. 29, 2016) .............................. 17, 18, 21, 23

*Wilcox v. Georgetown Univ.*,
   2019 WL 132281 (D.D.C. Jan. 8, 2019) .................................................... 1

*Wildman v. Am. Century Servs., LLC*,
   362 F.Supp.3d 685 (W.D. Mo. 2019) ....................................................... 21

*Wood v. City of San Diego*,
   678 F.3d 1075 (9th Cir. 2012) ................................................................... 6

v

*Wright v. Or. Metallurgical Corp.*,
    360 F.3d 1090 (9th Cir. 2004)................................................................25

*Young v. Gen. Motors Inv. Mgmt. Corp.*,
    325 F. App'x 31 (2d Cir. 2009).........................................................21

**Statutes, Rules and Regulations**

29 C.F.R. § 2550.404a-1(b)....................................................................18

29 U.S.C. § 141 *et seq.*.........................................................................10

29 U.S.C. § 1002(37).............................................................................10

29 U.S.C. § 1101 *et seq.*.........................................................................1

29 U.S.C. § 1104(a)(1)..................................................................*passim*

29 U.S.C. § 1104(c)(1)(A)......................................................................11

29 U.S.C. § 1113.................................................................................7, 8

I.R.C.§ 401(a)........................................................................................3

ERISA PRAC. & LITIG. § 3.39...............................................................10

ERISA § 404(c)....................................................................................11

Fed. R. Civ. P. 12(b)(1).......................................................................5, 6

Fed. R. Civ. P. 12(b)(6)..........................................................................5

Labor Management Relations Act of 1947 (LMRA),
    61 Stat. 136 (June 23, 1947)................................................................10

Multiemployer Pension Plan Amendments Act of 1980,
    Pub. L. 96-364..................................................................................10

Pension Protection Act of 2006,
    Pub. L. 109-280................................................................................10

**Other Authorities**

Francis C. Amendola & Glenda K. Harnad,
    70 C.J.S. Pensions § 46 (Dec. 2020 Update)....................................16

vi

1

**INTRODUCTION**

2     Despite decades of established precedent under ERISA[1] that courts should not

3 dictate how plan sponsors design their benefit plans, Plaintiff Patricia Klawonn

4 ("Plaintiff") has filed an Amended Complaint doubling down on her request (now

5 on behalf of a putative class) that the Court dismantle the Motion Picture Industry

6 Individual Account Plan's ("IAP") pooled-asset structure in favor of her preferred

7 401(k)-type participant-directed plan. Because Plaintiff's efforts are untethered to

8 law or fact, Defendant Board of Directors for the Motion Picture Industry Pension

9 Plans ("Board") moves the Court to dismiss Plaintiff's Amended Complaint.

10     Plaintiff's Amended Complaint suffers from numerous flaws, many of which

11 flow from her attempt to improperly impose onto the IAP fiduciary standards that

12 govern single-employer 401(k) plans.[2] ERISA provides that a plan fiduciary must

13 act as "a prudent man . . . would . . . in the conduct of an enterprise of a *like character*

14 and with *like aims.*" 29 U.S.C. § 1104(a)(1)(B) (emphasis added). Plaintiff's reliance

15 on the conduct of 401(k) plan fiduciaries to allege fiduciary imprudence involving a

16 plan with a radically different character and aims results in an untenable apples-to-

17 oranges analysis. As another court recently put it, "[i]f a cat were a dog, it could

18 bark." *Wilcox v. Georgetown Univ.*, 2019 WL 132281, at *1 (D.D.C. Jan. 8, 2019),

19 *rev'd on other procedural grounds*, 2021 WL 446126 (D.C. Cir. Feb. 9, 2021).

20     While insisting that the IAP must provide a "menu" of investments for

21 participant selection, Plaintiff readily admits that the IAP's pooled-asset

22 arrangement violates no provision of ERISA. *See* Am. Compl. ¶ 7. Courts have

23 repeatedly instructed that employers are under no obligation to provide any benefits,

24

25 [1] Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1101 *et seq.*

26 [2] *See, e.g.*, Am. Compl. ¶ 31 (citing BrightScope/Investment Company Institute, *A Close Look at 401(k) Plans*), ¶ 39 (U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*), ¶ 40 (Investment Company Institute & Deloitte Consulting LLP, *Inside the Structure of Defined Contribution/401(k) Plan Fees*).

27

28

1

and, if they do so, they may design their plans as they see fit. Plaintiff may desire a participant-directed 401(k)-type savings plan, but the law does not require that she receive one, and the collective decision of the IAP's participating employers and unions to structure the IAP as an investment pool does not violate ERISA.

Similarly, Plaintiff's mistaken reliance on 401(k) fiduciary standards also fatally undermines her allegations that the IAP's fees were excessive and its performance deficient. In the context of a pooled-asset plan, Plaintiff's campaign against actively-managed investments and hedge funds and her exultation of target date funds ("TDFs") are misplaced. Her myopic focus on particular investments is contrary to modern portfolio theory—a philosophy that focuses on the portfolio as a whole rather than individual investments. Moreover, Plaintiff's own allegations and cited documents demonstrate that the IAP consistently delivered on its investment goals while Plaintiff participated in the plan. Simply put, Plaintiff's reliance on misleading and out-of-context snapshots of investment performance and threadbare allegations of excessive fees, based on inapt comparisons to 401(k) plans, do not allege an actionable claim.[3]

In addition to her failure to state a claim, Plaintiff lacks standing because the Amended Complaint is devoid of anything beyond conclusory allegations of injury. Having yet to trigger benefits, Plaintiff provides no basis to plausibly demonstrate that the plan structure or investments she prefers will leave her better off.

Finally, Plaintiff challenges the fundamental design and structure of the IAP, which has been in place for over forty years (and of which Plaintiff has been a participant for almost thirty years). Even assuming Plaintiff's Amended Complaint

---

[3] In this brief, the Board draws the Court's attention to ERISA opinions regarding breach of fiduciary duty claims involving 401(k) plans. The Board cites those cases for their underlying legal principles, not because 401(k) plans are comparable to the multiemployer pooled-asset plan at issue in this case.

pled a viable fiduciary breach claim, ERISA's six-year statute of repose bars her effort.[4]

## BACKGROUND[5]

***IAP Origins.*** The IAP was established in 1979 and is a profit-sharing plan under Section 401(a) of the Internal Revenue Code. Am. Compl. ¶ 16, n. 2 (citing Ex. A, (SPD) at 32); Ross Decl. ¶ 5, Ex. B (IAP Plan & Trust Agreement), Art. IV, § 6. The IAP is sponsored by the employer members of the Alliance of Motion Picture and Television Producers and various unions whose members work within the motion picture industry. Ex. B at 1. The IAP's Board, which is the IAP's named fiduciary, is comprised of an equal number of employer and union representatives. Am. Compl. ¶ 22; Ross Decl. ¶ 6, Ex. C, Art. IX, § 2 & Art. X § 2 (MPI Pension Plan & Trust Agreement).[6]

The IAP is one of two retirement plans the Board manages; the Board also manages a defined benefit plan, known as the MPI Pension Plan. Am. Compl. ¶ 16. Most IAP participants also participate in the Pension Plan, and the plans' benefits are intended to complement each other. Ex. A at 4 ("[I]n general, all Pension Plan Participants automatically participate in the IAP."); *id.* ("Today, retirement benefits consist of two completely Employer-Funded plans," the IAP and Pension Plan, and "[t]hese two separate retirement benefits provide broad coverage" for participants).

---

[4] All of the pleading deficiencies identified herein apply equally to the unnamed "doe" defendants, none of whom has been identified or served by Plaintiff and are thus not proper Defendants. *See Alas v. AT&T Inc.,* 2018 WL 6133648, at *7 (C.D. Cal. Oct. 29, 2018).

[5] This background information is based on the allegations in the Amended Complaint, which are presumed true solely for purposes of this motion, as well as documents the Court may consider in connection with the motion. *Kwan v. SanMedica Int'l,* 854 F.3d 1088, 1096 (9th Cir. 2017). These documents are set forth in the Board's concurrently-filed Request for Judicial Notice ("RJN").

[6] The IAP Trust Agreement incorporates the administration provisions of the MPI Pension Plan. Ex. B, Part II – Administration.

3

*IAP Structure.* IAP participants primarily work for employers in the motion picture industry who have executed a collective bargaining agreement that permits their participation in the IAP. Am. Compl. ¶ 18. The IAP is funded by employer contributions; participating employees do not contribute. *Id.* ¶ 20; Ex. A at 4.

The IAP is structured as a pooled-asset plan, whereby all contributions from participating employers are collected into a "Fund." Am. Compl. ¶ 21; Ex. B, Art. III, § 1. A "Participant Individual Account" is maintained in the name of each participant, "which is to be credited with the contributions made by Employers on behalf of" the participant. Ex. B, Art. I, § 21. Participants are annually allocated a portion of the employer contributions plus investment returns based on an established formula. Ex. A at 4 ("Contributions made on the Participant's behalf result in allocations to an individual account that shares in the investment performance of the IAP's assets."); Ex. B, Art. IV, §§ 1, 3(c), 4. This allocation formula is based on participants' hourly pay rate and hours worked. Ex. B, Art. IV, § 4. Participants' benefits are paid at retirement in the form of a lump sum or annuity benefit. *Id.*, Art. VI, § 1(a)(1).

*IAP Investments.* The IAP's pooled contributions are invested in a diverse mix of investments. Am. Compl. ¶ 35. The diverse allocation is shown in the IAP's annual Form 5500 and the 2019 Performance Report prepared by the Plan's investment advisor, Advanced Research Investment Solutions ("ARIS"). Ross Decl. ¶¶ 7-8, Ex. D (2018 Form 5500) at Schedule C & Financial Statements, Note 11 at 13-15; Ex. E ("2019 Performance Report") at 24; Am. Compl. ¶ 53. Since participants elect to retire and receive their benefit payments at different times, the IAP's "overall portfolio strategy is to protect capital while trying to earn attractive net returns," which is achieved "by diversifying the portfolio across various asset classes that respond differently to different economic environments." Ex. E at 19.

## LEGAL STANDARD

Dismissal is proper under Federal Rule 12(b)(6) if the complaint "either (1) lacks a cognizable legal theory or (2) fails to allege sufficient facts to support a cognizable legal theory." *Somers v. Apple, Inc.*, 729 F.3d 953, 959 (9th Cir. 2013). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The Court may "not accept 'threadbare recitals of the elements of a cause of action, supported by mere conclusory statements.'" *Hettinga v. United States*, 2017 WL 4338537, at *1 (C.D. Cal. Aug. 21, 2017) (quoting *Iqbal*, 556 U.S. at 678). "Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555 (citation omitted).

Dismissal is required under Federal Rule 12(b)(1) if the plaintiff does not have standing to pursue her claim. Standing is "a jurisdictional prerequisite to a federal court's consideration of any claim." *In re WellPoint, Inc. Out-of-Network UCR Rates Litig.*, 865 F.Supp.2d 1002, 1020 (C.D. Cal. 2011).

## ARGUMENT

As the Supreme Court has explained, ERISA is "a comprehensive and reticulated statute" that reflects a "careful balancing." *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 251 (1993); *Aetna Health Inc. v. Davila*, 542 U.S. 200, 215 (2004). On the one hand, Congress sought to protect the interests of participants in employee benefit plans. *See Lockheed Corp. v. Spink*, 517 U.S. 882, 887 (1996). On the other, to encourage employers to implement benefits plans, ERISA allows plan sponsors to design their plan terms "as they see fit." *Heimeshoff v. Hartford Life & Acc. Ins. Co.*, 571 U.S. 99, 108 (2013). In this suit, Plaintiff seeks to fundamentally alter the IAP's design, which was carefully crafted decades ago to provide employees in the motion picture industry retirement benefits that earn attractive returns while

5

1    protecting against significant losses. Plaintiff's claim has no legal or factual basis

2    and should be dismissed.

3    **I.    PLAINTIFF LACKS ARTICLE III STANDING**

4          Because Plaintiff has not alleged an injury-in-fact, the Court lacks subject

5    matter jurisdiction over her claims. To have standing, Plaintiff must allege an injury

6    that is "concrete and particularized . . . and actual or imminent . . ." *Spinedex*

7    *Physical Therapy USA Inc. v. United Healthcare of Ariz., Inc.*, 770 F.3d 1282, 1289

8    (9th Cir. 2014) (citations omitted); *see also Spokeo, Inc. v. Robins*, 136 S. Ct. 1540,

9    1548 (2016). "There is no ERISA exception to Article III." *Thole v. U.S. Bank N.A.*,

10   140 S. Ct. 1615, 1622 (2020); *see also Anderson v. Intel Corp.*, 2021 WL 229235,

11   at *14 (N.D. Cal. Jan. 21, 2021). A participant cannot satisfy Article III by

12   "assert[ing] standing as representative[ ] of the plan"; she must be able to assert an

13   individualized stake in each claim. *Thole*, 140 S. Ct. at 1620.

14         Plaintiff has not alleged, and she cannot show, that she has been harmed by

15   the IAP's pooled-asset structure or the underlying funds in which the IAP's assets

16   are invested. *First,* Plaintiff concedes that over the long-term—the time horizon that

17   matters when considering retirement investments—the IAP performed as well as or

18   better than its benchmarks. Am. Compl. ¶ 52 ("Defendants reported in 2019 that the

19   Plan tracked these benchmarks on a 20-year basis"). The 2019 Performance Report

20   confirms that the IAP's investment returns for every asset class have bested or

21   matched their benchmarks over the last 20 years. Ex. E at 25 ("IAP Total Plan

22   Performance Data"); *see also id.* at 23 ("Long-Term Return History (IAP)"). Indeed,

23   Plaintiff's account statements show that she has amassed a substantial IAP benefit

24   as a result of consistent healthy investment returns on her employers' contributions.

25   Ross Decl. ¶ 9, Ex. F (Plaintiff's 2014-2019 IAP Statements).[7]

26
27   [7] When assessing a plaintiff's standing under Rule 12(b)(1), the court may consider extrinsic evidence on the issue. *Wood v. City of San Diego*, 678 F.3d 1075, 1083 n.8 (9th Cir. 2012).

28                                          6

*Second,* Plaintiff's mere speculation that "her account would be worth more today than it currently is" if the Board had managed the IAP differently (Am. Compl. ¶ 15) does not present the concrete or impending injury Article III requires. Since Plaintiff's benefit will be determined when she retires (Ex. B, Art. VI, § 1(a)(1)), her reliance on the current value of her account, which undoubtedly will change over time, cannot plausibly support a claim of injury. *See Clapper v. Amnesty Int'l, USA*, 568 U.S. 398, 410 (2013) (the "threatened injury must be certainly impending" to convey standing). And Plaintiff's conclusory allegation (Am. Compl. ¶ 44) that "[i]f Defendants wished to use a single investment option, they should have considered a target-date investment" says nothing about injury, as there is no evidence that she would have earned more from the Plan's use of a TDF than from the IAP's actual investments.

## II.   PLAINTIFF'S CLAIM IS TIME-BARRED

Plaintiff's claim challenging the IAP's pooled-asset structure is also untimely. Under ERISA, a participant has, at most, six years to bring a fiduciary breach claim. *See* 29 U.S.C. § 1113(1).[8] The nature of the alleged breach guides the application of ERISA's statute of repose. *See Meagher v. Int'l Ass'n of Machinists and Aerospace Workers Pension Plan*, 856 F.2d 1418, 1422 (9th Cir.1988). The root of Plaintiff's fiduciary breach claim is her challenge to the Plan's "one-size-fits all" or pooled-asset structure.[9] *See* Am. Compl. ¶¶ 6, 7, 10, 15, 21, 35, 37, 43, 44, 56, 76; *see infra*

---

[8] ERISA's statute of repose bars fiduciary breach claims that are brought more than "six years after (A) the date of the last action which constituted a part of the breach or violation, or (B) in the case of an omission the latest date on which the fiduciary could have cured the breach or violation." 29 U.S.C. § 1113(1). Plaintiff's claim is likewise barred by ERISA's three-year statute of limitations. *See* 29 U.S.C. § 1113(2). Plaintiff had actual knowledge of the alleged breach relating to the IAP's pooled-asset investment design because she maintains that, since she became a participant in 1992, she "has never been given any choice of investments." Am. Compl. ¶ 15. Since Plaintiff has for years had actual knowledge of the IAP's design and alleged investment strategy, her claim is time-barred. *Guenther v. Lockheed Martin Corp.*, 972 F.3d 1043, 1055 (9th Cir. 2020).

[9] By asserting this defense, the Board does not concede that Plaintiff alleges a fiduciary breach.

7

Sec. III.A. Even assuming this claim were available to her—which as a settlor function it is not—the time has long passed for her to assert it. Because the IAP came into existence with its pooled-asset structure on August 1, 1979 (Am. Compl. ¶ 16 n.2), that is "the date of the last action which constituted a part of the [alleged] breach or violation"; thus, any challenge to the IAP's pooled-asset structure expired in 1985. *See* 29 U.S.C. § 1113(1); Am. Compl. ¶ 21 ("The Plan includes one overarching investment in which participants are automatically enrolled"); Ex. B, Art. IV, §§ 1, 3(c), 4 (reflecting pooled-asset arrangement); *Larson v. Northrop Corp.*, 21 F.3d 1164, 1172 (D.C. Cir. 1994) (Section 1113(1) "suggests a judgment by Congress that when six years has passed after a breach or violation . . . , the value of repose will trump . . . a plaintiff's right to seek a remedy"); *Fisher v. Secchitano*, 2020 WL 1068873, at *8 (D. Or. Feb. 3, 2020) (holding that 2018 action where "Plaintiff merely complains about the lasting effects of [2009 plan] amendments" was time-barred).[10] Plaintiff's challenge to the IAP's pooled-asset arrangement is time-barred.

## III.   PLAINTIFF FAILS TO STATE A PLAUSIBLE CLAIM

Plaintiff also fails to plausibly allege an actionable fiduciary breach.

### A.   PLAINTIFF'S CHALLENGE TO THE IAP'S DESIGN CANNOT STATE A CLAIM FOR BREACH OF FIDUCIARY DUTY

As previewed above, Plaintiff's Amended Complaint cannot stand for another fundamental reason: she challenges the basic structure of the IAP as a pooled-asset multiemployer plan. Plaintiff concedes that it is not a "per se" violation of ERISA to employ a single asset management strategy for all participants, as the IAP does. Am. Compl. ¶¶ 7, 44. Indeed, not only are pooled-asset multiemployer plans entirely

---

[10] Because Plaintiff complains about the IAP's structure, the fact that the effects of the structure continue to be felt does not give rise to independent acts to extend ERISA's statute of repose. *Garcia v. Brockway*, 526 F.3d 456, 462 (9th Cir. 2008) ("[A] continuing violation is occasioned by continual unlawful acts, not by continual ill effects from an original violation.").

legal (hence, the implementation of such an arrangement cannot violate ERISA), but plan design decisions are settlor functions, not fiduciary actions.

In alleging that the Board was imprudent by not offering a "menu" of investment options and therefore ignoring the "varying needs" of its participants (*see, e.g.*, Am. Compl. ¶¶ 43, 76), Plaintiff seeks to transform the IAP into a 401(k)-type plan, which stems from her misapprehension that plan design is a fiduciary decision. She then compounds that mistake by incorrectly assuming that the propriety of the IAP's design should be judged by whether the IAP's fiduciary considered the individual needs of every single participant. Plaintiff is wrong on both counts and thus fails to allege any fiduciary breach.

### 1.    ERISA permits the IAP's pooled-asset design

At its core, Plaintiff's Amended Complaint is a direct challenge to the pooled-asset design of a multiemployer plan. *See* Am. Compl. ¶¶ 6, 7, 10, 15, 21, 35, 37, 43, 44, 56, 76. In describing what she characterizes as a fiduciary breach, Plaintiff maintains that "Defendants . . . have not allowed participants to exercise any independent control over their accounts" and instead "forced a one-size-fits all investment portfolio upon them . . ." Am. Compl. ¶¶ 37, 43. But labeling it an "investment portfolio" does not change the fact that Plaintiff is challenging the IAP's pooled-asset design. *Iqbal*, 556 U.S. at 678 (rejecting use of labels and conclusions to try to state a plausible claim). Under Plaintiff's theory, any ERISA defined contribution plan that employs a pooled-asset arrangement gives rise to a fiduciary breach. There is no support for such a profound assault on pooled-asset multiemployer plans, which are expressly sanctioned by ERISA, applicable regulations and regulatory guidance, and judicial authority.

### a.    History of Multiemployer Plans

Multiemployer plans like the IAP were first introduced through the Taft-Hartley Act, which created a system through which the unions and employers in a

9

particular industry could band together to offer retirement benefits to unionized workers. *See* Labor Management Relations Act of 1947 (LMRA), 61 Stat. 136 (June 23, 1947); 29 U.S.C. §§ 141 *et seq*. In 1974, Congress enacted ERISA to set certain minimum standards for most voluntarily established private industry retirement plans, including multiemployer plans, to provide additional protections for participants. *See* 29 U.S.C. § 1002(37) (defining "multiemployer plan").

A fundamental principle of a multiemployer plan is that it is jointly administered by an equal number of union and management trustees. *See Abbott v. Pipefitters Local Union No. 522 Hosp., Med., & Life Ben. Plan,* 94 F.3d 236, 238 (6th Cir. 1996); *see also* Ex. C, Art. IX, § 2 & Art. X, § 2. Multiemployer plans offer a range of attractive features for employees, such as the portability of service credits between industry employers, like the motion picture industry, which has highly mobile employees. *See*, *e.g.*, ERISA PRAC. & LITIG. § 3.39. As of 2018, there were approximately 1,100 multiemployer defined contribution plans, covering over 4.2 million participants (and approximately 1,400 multiemployer defined benefit plans covering another 10.5 million participants). *See* Ross Decl. ¶ 10, Ex. G, U.S. Dep't of Labor, Private Pension Plan Bulletin, Table A6 (Jan. 2021).[11]

### b.   Pooled-Asset Plans Are Lawful

When the IAP was established in 1979, it was intended to supplement the pension benefits union members were already receiving through the MPI Pension

---

[11] Not only does ERISA expressly provide for multiemployer plans, lawmakers have gone to great lengths to promote such plans. *See*, *e.g.*, Multiemployer Pension Plan Amendments Act of 1980, Pub. L. 96-364 (changing minimum funding standards to improve the financial condition of multiemployer plans); Pension Protection Act of 2006, Pub. L. 109-280 (providing funding relief to distressed multiemployer plans and adding new funding standards). Numerous courts, including the Ninth Circuit, have recognized these efforts. *See Lehman v. Nelson,* 862 F.3d 1203, 1207 (9th Cir. 2017) ("The Pension Protection Act of 2006 is designed to help severely underfunded multiemployer pension plans recover").

Plan. *See* Ex. A at 4, 36.[12] Since its inception, the IAP's goal has been to preserve the value of the employer contributions while achieving sustainable growth for participants. *See* Ex. E at 19.

Plaintiff offers no authority that not allowing participants to select their own investments violates ERISA. In fact, ERISA establishes just the opposite. As Plaintiff acknowledges (Am. Compl. ¶ 36), ERISA § 404(c) provides an explicit safe harbor from fiduciary liability for plans that allow participants to "exercise[] control over the assets in [their] account[s]." *See* 29 U.S.C. § 1104(c)(1)(A).[13] Congress would not have created a safe harbor for plans that allow participants to choose their own investments if ERISA required *all* plans to be self-directed. Otherwise, "the express exception would be rendered insignificant, if not wholly superfluous," contrary to "a cardinal principle of statutory construction." *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001).

## 2.    IAP and 401(k) Plans Are Materially Different

An animating theme of Plaintiff's Amended Complaint is that the IAP does not follow the typical playbook of a single-employer 401(k) plan. There are good reasons for that, all of which stem from the different "character" and "aims" of these distinct plans. 29 U.S.C. § 1104(a)(1)(B). The most obvious difference is that the IAP is a multiemployer plan, whereas most employees who participant in a 401(k) plan do so through a single employer. Ex. G, Table B7. Relatedly, IAP benefits are funded exclusively by employer contributions, to compliment benefits provided by the MPI Pension Plan. Ex. A at 4, 36; Am. Compl. ¶ 20. In contrast, a 401(k) plan

---

[12] The defined benefit MPI Pension Plan benefit is based solely on hours worked, whereas the IAP benefit is based on hours worked and participants' income earned, thus providing for a potentially richer benefit. *Compare* Ex. A at 13 ("The monthly [pension] benefit will be based on the Credited Hours accrued . . . ") *with* 33 (for the IAP benefit, "[c]ontributions . . . are made for every Credited Hour worked" and "include a percentage of the covered Participant's compensation").

[13] Plaintiff's commentary on Section 404(c) in the Amended Complaint (¶¶ 36-37) is misdirected, as the Board does not assert that provision as a defense.

allows *participants* to make tax-deferred contributions from their own compensation to save for retirement. Ross Decl. ¶ 11, Ex. H (FINRA, "401(k) Basics"). The latter is an individual investment vehicle where the employee decides the amount of her contribution, while the former is a supplementary retirement benefit funded by collectively-bargained employer contributions. To ensure its participants retire with meaningful income, the IAP purposely does not leave it to the individual participants' discretion to invest the employer contributions made on their behalf.

What happens with plan benefits at the time of retirement is another crucial difference. For the IAP, the participant's benefit is determined at retirement and paid out as a lump sum or annuity. Ex. B, Art. VI, § 1(a)(1). As such, the IAP's investment strategy is to preserve the value of benefits regardless of market conditions. By contrast, while a 401(k) participant no longer makes or receives contributions after retirement, the participant's account balance can continue to grow or shrink depending on the performance of the participant's investments, the movement of the market, and the timing of her distributions.

As discussed below, these distinctions matter when comparing the structure and investment decisions of the IAP and a typical 401(k) plan.

### 3.  Plaintiff's Pooled-Asset Protest Does Not Invoke a Fiduciary Act

As explained, multiemployer pooled-asset plans that do not permit participants to select their own investments are lawful and common and, in this case, serve the specific needs and goals of a group of highly-mobile employees. Plaintiff's lawsuit is premised solely on her view that the Board breached its fiduciary duties by not complying with her personal preference for a 401(k)-type plan.

12

Plaintiff's theory flounders from the start because she has not identified any fiduciary act subject to ERISA's strictures.[14] Not all decisions concerning an ERISA plan are subject to review by the courts: "only when fulfilling certain defined functions, including the exercise of discretionary authority or control over plan management or administration, does a person become a fiduciary" for purposes of ERISA. *Lockheed*, 517 U.S. at 890 (citation omitted).

The Supreme Court, the Ninth Circuit, and myriad other courts have held that the choice of how to structure a benefit plan is a business decision of the settlor that is not subject to ERISA's fiduciary obligations. *See Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 444 (1999) ("ERISA's fiduciary duty requirement simply is not implicated where [an employer] . . . makes a decision regarding the form or structure of the Plan such as who is entitled to receive Plan benefits and in what amounts . . ."); *Pegram v. Herdrich*, 530 U.S. 211, 226 (2000) (plan's payout detail did not implicate a fiduciary act "since an employer's decisions about the content of a plan are not themselves fiduciary acts"). The Supreme Court has further instructed that the "defined functions [in the definition of fiduciary] do not include plan design." *Lockheed*, 517 U.S. at 890 (alteration in original). In fact, just this term, the Supreme Court reaffirmed that ERISA protects against efforts to force plans to structure their benefits in a particular manner. *See Rutledge v. Pharmaceutical Care Mgmt. Assoc.*, 141 S. Ct. 474, 480-82 (2020).

---

[14] Plaintiff also has not plausibly alleged that the Board is responsible for the investment of the IAP's assets. Fiduciary status is not an all-or-nothing concept—the Board's alleged role as named fiduciary does not transform it into a fiduciary regardless of its respective conduct. *See Cotton v. Mass. Mut. Life Co.*, 402 F.3d 1267, 1277 (11th Cir. 2005); *Bannister v. Ullman*, 287 F.3d 394, 401 (5th Cir. 2002). Plaintiff must plausibly allege that the Board was responsible for the conduct at issue. *In re JDS Uniphase Corp. ERISA Litig.*, 2005 WL 1662131, at *3 (N.D. Cal. July 14, 2005) (collecting cases). Plaintiff alleges only that the Board is "identified in the Plan Documents as a fiduciary under ERISA." Am. Compl. ¶ 22. Without more, Plaintiff's fiduciary breach claim fails to state a claim against the Board. *In re JDS Uniphase*, 2005 WL 1662131, at *4-5.

13

Plaintiff's allegations squarely challenge the IAP's pooled-asset structure. For example, in the Amended Complaint's first subsection, Plaintiff complains that (i) "Defendants gave no consideration to [participants'] individual needs in managing the Plan's investments, and gave them no ability to select a portfolio of investments of their own" (¶ 43), and (ii) "Defendants forced a one-size-fits all [sic] investment portfolio upon [participants] (without regard to their individual financial goals, risk preferences, and anticipated retirement dates)." *Id.*; *see also* ¶ 76 ("Defendants forced all participants into a single investment strategy that did not serve participants' varying needs . . .").[15] These allegations go to the heart of the IAP's design, which under *Lockheed* and its progeny, are not subject to ERISA's fiduciary rules. *See Lockheed*, 517 U.S. at 890.

Similarly, under the subsection "Defendants Failed To Prudently Monitor Underlying Investments And Administered One Of The Most Expensive Plans In The Country," Plaintiff alleges that "a prudent fiduciary would have abandoned this unorthodox and unsuccessful[16] ***single-pool strategy*** and replaced it with a menu of investment options commonly used in other large employer retirement plans." Am. Compl. ¶ 56 (emphasis added). But Plaintiff cites no authority allowing a fiduciary to disregard or rewrite lawful plan terms. Rather, fiduciaries may only *implement* such terms. *See* 29 U.S.C. § 1104(a)(1)(D) ("a fiduciary shall discharge his duties . . . in accordance with the [plan's] documents and instruments"). While Plaintiff selects her language carefully, she is asking the Court to rewrite the IAP's

---

[15] For example, Plaintiff explains that participants' needs may shift as they approach retirement, reflecting a wish to preserve capital and reduce risk. Am. Compl. ¶ 43, n.12. This dynamic is the motivation for the IAP's investment goal of consistent growth and low risk. *See infra* Sec. III.B.

[16] Labeling a non-participant directed investment plan as "unorthodox" belies the fact that approximately 93,000 defined contribution plans of all types are constructed in that manner. *See* Ex. G, Table D5. Similarly, a conclusory label of "unsuccessful" does not further Plaintiff's claim where the facts show that the IAP has been at least as successful as its benchmarks over the last 20 years. *See* Ex. E at 22-23, 25.

14

lawful terms to provide for a participant-directed plan rather than the single pooled-asset structure its terms require. *See Adams v. LTV Steel Mining Co.*, 936 F.2d 368, 371 (8th Cir. 1991) (court's role is "not to rewrite plan provisions").

*Doe One v. CVS Pharmacy, Inc.*, 348 F.Supp.3d 967, 1000-02 (N.D. Cal. 2018), *rev'd on other grounds*, 2020 WL 723964 (9th Cir. Dec. 9, 2020), illustrates the Board's point. In *CVS*, the court dismissed with prejudice a complaint alleging breach of fiduciary duty under ERISA that arose from the defendant employers' decision to alter the terms of a benefit plan. Finding that the complaint involved the "plan design decision" of selecting the benefits available under the plan, the court concluded that "most of the allegations against Employer Defendants relate to non-fiduciary plan design functions." *Id.* at 1000. The plaintiffs tried to plead around that fatal flaw by including allegations about "financial-self dealing" and "failure to monitor." *Id.* at 1001. But the court correctly found that such allegations were "just an attempt to challenge the design of the plan in another guise." *Id.* at 1001. The court cited the "language in the complaint," which "demonstrates this allegation concerns the form of the plan and its structuring of benefits." *Id.*

Plaintiff's Amended Complaint similarly exposes her intent. As in *CVS*, "[m]ost of the allegations" here "relate to non-fiduciary plan design functions," namely Plaintiff's quarrel with the pooled-asset design of the IAP. *Id.* at 1000. And Plaintiff's "own language in the complaint" reveals that her bare-bones allegations regarding the alleged underperformance of the IAP's investments arise out of "the form of the plan and its structuring of benefits." *Id.* at 1001. Indeed, Plaintiff admits that the "investment strategy" at issue stems from the "single-pool strategy." Am. Compl. ¶ 56. Plaintiff complains that "[t]he Plan includes one overarching investment in which participants are automatically enrolled" and that "Participants have no choice over how their money is invested." *Id.* ¶ 21. But without showing that the IAP's terms violate ERISA, Plaintiff cannot establish that adhering to them

15

constituted a fiduciary breach. *Romero v. Magma Copper Co.*, 921 F.2d 281, at *3 (9th Cir. 1990) (a plan fiduciary "must follow the plan's plain terms").

### 4. ERISA Does Not Impose An Obligation To Consider The Individual Needs Of Plan Participants

Even if designing the IAP were a fiduciary act (it is not), there is no support for Plaintiff's insistence that the IAP's fiduciary was required to structure its design in a way that responds to each individual participant's needs. To be sure, ERISA requires a fiduciary to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits" to them. 29 U.S.C. § 1104(a)(1)(A). It does not follow, however, that fiduciaries labor under an obligation to anticipate or cater to each and every participant's preferences. To do so would pose significant practical difficulties and disincentivize employers from offering plans in the first place, contrary to the intent of Congress. *See Divane v. Nw. Univ.*, 2018 WL 2388118, at *5 (N.D. Ill. May 25, 2018), *aff'd* 953 F.3d 980. As the Seventh Circuit has explained:

> A plan administrator's duty to act in the best interest of all the beneficiaries cannot mean that it must cater to the optimal needs of each individual beneficiary. All of the beneficiaries' interests will not always be aligned. The fiduciary must act as though it were a reasonably prudent businessperson with the interests of all the beneficiaries at heart.

*Ameritech Ben. Plan Comm. v. Commc'n Workers of Am.,* 220 F.3d 814, 825 (7th Cir. 2000); *see also* Francis C. Amendola & Glenda K. Harnad, 70 C.J.S. Pensions § 46 ("Prudence, generally") (Dec. 2020 Update) (citing *Ameritech*).

Plaintiff posits that the Board could have met its fiduciary duties to the IAP's participants by, for example, offering TDFs or using survey results to decide the IAP's investment options. *See* Am. Compl. ¶ 44. These suggestions are nonsense. With upwards of 92,000 participants (*id.* ¶ 43), a plan fiduciary cannot reasonably identify the specific investment needs and desires of every participant and

16

implement them through TDFs, which focus on a particular anticipated retirement date. In analogous situations, courts have recognized that it would be unworkable to impose such unwieldy fiduciary obligations. *See, e.g.*, *Stahl v. Tony's Bldg. Materials, Inc.,* 875 F.2d 1404, 1408 (9th Cir. 1989) ("A plan summary description . . . cannot violate ERISA merely because it could have included language more specifically discussing the precise situation of a particular beneficiary."). Plaintiff points to no law that required the Board to undertake the enormous burden she suggests.[17]

In sum, Plaintiff's quest to overhaul the IAP into a 401(k)-style menu of investment options invokes a settlor function that is not subject to ERISA's fiduciary duties. Accordingly, her fiduciary breach claim fails. *See Hughes Aircraft,* 525 U.S. at 444; *Pegram,* 530 U.S. at 226.

## B. **Plaintiff's Investment Performance Allegations Do Not State A Plausible Claim**

Plaintiff's investment performance allegations are part and parcel of her overall effort to undo the IAP's pooled-asset design. *See* Am. Compl. ¶¶ 42-43, 76. Even if they could stand on their own, courts have repeatedly dismissed complaints asserting an ERISA fiduciary breach based solely on investment performance.[18]

ERISA requires fiduciaries to act prudently under the circumstances then prevailing. 29 U.S.C. § 1104(a)(1)(B). "Prudence" is not "prescience"—the requirement "focus[es] on a fiduciary's conduct in arriving at an investment

---

[17] Plaintiff's challenge of the non-participant-directed nature of the IAP also cannot support a fiduciary claim because the pooled-asset design is widely used. As of 2018 (the most recent data available from the DOL), approximately *93,000* defined contribution plans did not permit their participants to direct any of their investments, and another approximately *13,500* plans permitted their participants to direct investments of only a portion of the plans' assets. *See* Ex. G, Table D5.

[18] *See, e.g.*, *Wehner v. Genentech, Inc.*, 2021 WL 507599, at *8-9 (N.D. Cal. Feb. 9, 2021); *Anderson*, 2021 WL 229235, at *6-8; *Davis v. Salesforce.com, Inc.*, 2020 WL 5893405, at *2-6 (N.D. Cal. Oct. 5, 2020); *Kong v. Trader Joe's Co.*, 2020 WL 7062395, at *3-5 (C.D. Cal. Nov. 30, 2020); *White v. Chevron Corp.*, 2016 WL 4502808, at *5-8 (N.D. Cal. Aug. 29, 2016).

17

decision, not its results, and ask[s] whether a fiduciary employed the appropriate methods to investigate and determine the merits" of a decision. *White*, 2016 WL 4502808, at \*5, 18 (quotation omitted); *accord* 29 C.F.R. § 2550.404a-1(b) (fiduciary who gives "appropriate consideration" to the facts and circumstances of an investment decision acts in accordance with ERISA). As always, fiduciary conduct is evaluated based on the conduct of a prudent fiduciary working "in a like capacity" in "an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B).

Plaintiff's theory of imprudence ignores both of these fundamental principles. With respect to the need to present allegations about the deficiency of the Board's process, the Amended Complaint has nothing to offer. Instead, Plaintiff's allegations are premised upon a deliberately incomplete snapshot comparison between the performance of the IAP and various unspecified defined contribution plans (Am. Compl. ¶¶ 50-51) and certain benchmarks (*id.* ¶ 52). But since "the test of prudence . . . is one of *conduct*, and not a test of the result of performance of the investment," *Barchock v. CVS Health Corp.*, 886 F.3d 43, 44-45 (1st Cir. 2018) (emphasis in original), it must be "evaluated at the time of the investment without the benefit of hindsight." *Metzler v. Graham*, 112 F.3d 207, 219 (5th Cir. 1997). Not only does Plaintiff say nothing about the *process* that was used to select or monitor investments for the Plan, she admits that she lacks any concrete basis for her allegations against the Board. *See* Am. Compl. ¶ 58.

Equally importantly, Plaintiff's investment allegations are based *entirely* on comparisons to the performance of investments that are typically offered by 401(k) plans. *See id.* ¶¶ 31-34. But these comparisons cannot bear the weight Plaintiff places on them because "the adequacy of a fiduciary's independent investigation . . . is evaluated in light of the 'character' and 'aims' of the *particular type of plan* he serves." *In re Unisys Sav. Plan Litig.*, 74 F.3d 420, 434-35 (3d Cir. 1996) (emphasis

18

added). And Plaintiff's allegations of imprudence ignore the crucial distinctions between the IAP's and 401(k) plans' character and aims. *See supra* Sec. III.A.2.

Plaintiff's hindsight, apples-to-oranges comparisons prove the wisdom of ERISA's conduct-based test and Plaintiff's lack of plausible allegations of imprudence. Plaintiff purports to compare the IAP's performance from 2013 to 2018 to "Plans Over $100M" and "Plans Over $1B" based on 3-year, 5-year, and 10-year rolling returns. *Id.* ¶¶ 50-51. While Plaintiff gives lip service to the bedrock principle that prudence must be measured against the conduct of similarly situated fiduciaries (*id.* ¶¶ 27, 42), she does not identify any of her comparator plans. As such, there is no telling if Plaintiff is comparing returns from similar plans or a hodge-podge mix of plans of dissimilar character and aims.

Nevertheless, "[p]oor performance, standing alone, is not sufficient to create a reasonable inference" of imprudence and Plaintiff's comparisons ring particularly hollow in light of the IAP's investment strategy. *Anderson*, 2021 WL 229235, at *5 (citations omitted). The IAP's Investment Policy Statement ("IPS") provides: "In consideration of the Plan's investment goals and time horizon available for investment and the overall risk tolerance of the Committee, an investment objective of Growth and Income has been adopted for the Plan's assets." Ross Decl. ¶ 12, Ex. I at 5. To achieve these goals, the IPS requires a "balanced investment approach that is expected to achieve a positive rate of return over the long-term" and "[d]iversif[ied] Portfolio[ ] assets in order to reduce the risk of wide swings in market value from year-to-year, or of incurring large losses that may result from concentrated position." *Id.* at 5-6.

In alleging investment underperformance, Plaintiff asks the wrong questions and points to the wrong evidence. Rather than compare the IAP to 401(k) plans or all defined contribution plans, ERISA demands that the inquiry focus on how the IAP fared in light of its particular objectives. *See Anderson*, 2021 WL 229235, at *8

19

(allegations of underperformance could not state a claim where the plaintiff failed to compare the plan's investment to comparable funds); *Wehner*, 2021 WL 507599, at *9-10 (allegations of underperformance by an actively-managed fund as compared to a passively-managed fund failed to state a claim because the two funds "'have different aims, different risks, and different potential rewards'") (citation omitted). The IAP's investment goals recognize that its participants retire at different times in the market cycle and thus are specifically designed to protect those participants who retire in the middle of a down market (*e.g.*, during the Great Recession in 2008-2009) from suffering steep losses to their benefits. *See* Ex. E at 23 ("Our goal is to generate consistent absolute returns in *all market environments*") (emphasis added); *Dorman v. Charles Schwab Corp.*, 2018 WL 6803738, at *3 (N.D. Cal. Sept. 20, 2018) (explaining that "a fiduciary considers not only modest differences in price and performance, but also other relevant factors, such as strategy, security lending practices, economic cycles, and market fluctuations" in making investment decisions). This focus on reducing the risk profile of the IAP is particularly important given that a participant's IAP benefit is locked in at retirement.

But Plaintiff asserts no facts that plausibly suggest that plans with similar structures and goals obtained better results than the IAP. In fact, Plaintiff's myopic focus on the last 10 years of the IAP's performance to suggest underperformance—during an unprecedented bull market[19]—ignores the fact that the IAP's long-term/full-business cycle performance is better than—or at least even with—its benchmarks,[20] particularly during bear markets, while experiencing significantly

---

[19] While there is no official standard by which market cycles are measured, a bull market is generally understood to be a period of market activity where stock prices are rising, whereas a bear market is characterized by declining stock prices.

[20] The benchmarks referenced in the Amended Complaint (¶ 52) and Exhibit E are the MSCI World Index (comprised of global stocks) and a 60-40 portfolio (60% MSCI World Index and 40% Merrill Lynch Domestic Master Index, which is comprised of 100% U.S. bonds). *See* Ex. E at 23.

less volatility than Plaintiff's less-diversified and inapposite comparators. *See* Ex. E at 22-23 ("Risk Analysis (IAP)" and "Long-Term Return History (IAP)"). Plaintiff can state a plausible claim only by alleging facts that are suggestive of fiduciary misconduct—not facts that have both lawful and unlawful explanations, as she has done here. *See Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Ctr. Ret. Plan v. Morgan Stanley In. Mgmt.*, 712 F.3d 705, 718-19 (2d Cir. 2013).

Thus, Plaintiff's contention that the Board acted imprudently by failing to remove allegedly underperforming investments over the short term is insufficient to raise an inference of imprudence. *See Patterson v. Stanley*, 2019 WL 4934834, at *10-11 (S.D.N.Y. Oct. 7, 2019) ("no court has ever suggested" that ERISA "compel[s] . . . fiduciaries to reflexively jettison investment options in favor of the prior year's top performers"); *Wildman v. Am. Century Servs., LLC*, 362 F.Supp.3d 685, 707 (W.D. Mo. 2019) (ERISA does not require fiduciaries to "remove a fund simply because it had not performed well in the short term"). Given the IAP's investment objectives, retaining investments that allegedly underperform in the short-term (during a bull market), but are less volatile during a bear market and perform very well over the long term (across both bull and bear markets), is consistent with the IAP's goal of protecting retirement benefits for all participants, regardless of when during the business cycle they retire. *See White*, 2016 WL 4502808, at *17 ("a fiduciary may—and often does—retain investments through a period of underperformance as part of a long-range investment strategy"); *Jenkins v. Yager*, 444 F.3d 916, 926 (7th Cir. 2006) (fiduciary could prudently select "funds with long-term growth potential and . . . stay with those . . . funds even during years of lower performance").[21] Even in the short-term, the IAP's investments have

---

[21] Much of Plaintiff's ire appears to be directed at the IAP's hedge fund investments (Am. Compl. ¶¶ 47-48, 55), and the Bridgewater funds in particular, but her outrage is misplaced. Her comparison to the San Joaquin County pension plan, a non-ERISA government plan, is inapposite, and it is also improper to consider one plan investment in a vacuum. *See Young v. Gen. Motors*

21

performed very well. In 2019, for example, the IAP earned returns of 11.1% (gross) and 10.7% (net) while being substantially less volatile than its benchmarks, a reasonable trade-off that Plaintiff ignores. *Compare* Ex. E at 19 *with* Am. Compl. ¶ 53.[22] Because Plaintiff has participated in the IAP since "at least 1992," (Am. Compl. ¶ 15), she has greatly benefited from the IAP's long-term success and stability.[23]

In addition to both dispelling Plaintiff's misleading narrative about the IAP's performance and affirmatively showing that the IAP was successfully and prudently managed, the IAP's judicially noticeable 2019 Performance Report (Ex. E)[24] also provides numerous indications that the Board's *process* for managing the IAP's investments was prudent. *First,* contrary to Plaintiff's allegation that the Board failed to adequately monitor the IAP's investments, the Report shows significant changes over the years in the investment managers retained to invest the IAP's assets and the IAP's investment portfolio. *See* Ex. E at 20 (varying years in the "Inception" column

---

*Inv. Mgmt. Corp.*, 325 F. App'x 31, 33 (2d Cir. 2009); *Laborers Nat'l Pension Fund v. Northern Trust Quant. Advisors*, 173 F.3d 313, 322 (5th Cir. 1999) (the prudence of an investment cannot be evaluated in isolation). Moreover, investments in actively-managed alternative options like hedge funds and private equity funds are common in defined benefit plans and increasingly in defined contribution plans. *See* Ross Decl. ¶ 13, Ex. J, ERISA Advisory Council, "Hedge Funds and Private Equity Investments" (Nov. 2011). In fact, in June 2020, the DOL issued an opinion letter recognizing the utility that actively-managed alternative investments can play in the portfolio of a defined contribution plan. *See* Ross Decl. ¶ 14, Ex. K, DOL Opinion Letter 06-03-2020. Although Plaintiff contends that hedge funds are more expensive than passively-managed investments (Am. Compl. ¶ 48) and their performance is in decline (*id.* ¶ 55), the DOL's own publications (*see* Exs. J & K) show that it can be appropriate to consider and invest in hedge funds.

[22] Plaintiff's inappropriate focus on the short-term returns of the IAP is highlighted by ¶ 53. Plaintiff focuses on a segment of the IAP's investment performance for 2020, an unprecedented year of market turbulence. Without the context of the IAP's broader portfolio of investments and on an exceedingly short timeline, both faults with Plaintiff's argument, it is impossible to objectively evaluate the performance of the two investments identified.

[23] Unlike the single-employer plan that Plaintiff references in her Amended Complaint (Am. Compl. ¶ 7) that allegedly was invested in only 70% fixed income investments and 30% equities, *see Toomey v. Demoulas Super Markets, Inc.*, 19-cv-11633 (D. Mass.), Dkt. No. 1 ¶ 5, the IAP is comprised of dozens of diverse investment components. *See* Ex. E at 20.

[24] The IAP's investment consultant (ARIS) provides a quarterly investment review. *See* Ex. E.

---

22

for investment managers). *Second*, the Report demonstrates that the IAP's investments were well diversified across asset classes in accordance with the IAP's approach of a balanced, diversified portfolio that prioritizes income and growth. *See id.* at 24 ("IAP Market Values and Allocations"); *White*, 2016 WL 4502808, at *5-8 (plan investments consistent with the investment policy statement did not state a claim for imprudence). *Third*, the investment managers' fee structures show a careful consideration of appropriate compensation, generally incorporating reductions in fees as assets grow. Ex. E at 37-41. *Fourth*, the Report carefully describes the profile of each investment manager and how it serves the goals of the IAP. *Id.* at 42-51. Even a cursory review of the Report demonstrates that Plaintiff's allegations fall far short of raising a plausible inference of fiduciary imprudence.

## C.   Plaintiff's Excessive Fee Allegations Do Not State a Plausible Claim

Plaintiff also alleges in conclusory fashion that the IAP's fees were excessive. *See* Am. Compl. ¶¶ 46-50, 57. After the Board explained in its first motion to dismiss that the IAP's investment fees (0.64%) were in line with the alleged industry average of 0.62% which Plaintiff acknowledged (*see* Dkt. No. 37 at 21), Plaintiff amended her allegations with a revised claim that the IAP's fees are actually nearly double that amount (1.18%).[25]

The faults with Plaintiff's conclusory allegations are many. To start, Plaintiff's allegation that the IAP's fees (administrative fees, asset-based investment management fees, and performance-based investment management fees) total

---

[25] It is far from clear whether Plaintiff complains about the amount of the IAP's costs overall or is focused solely on the cost of the IAP's investment fees. *Compare id.* ¶ 49 & n.16 (describing "total fees" as approximately 1.18% of IAP's assets) *with id.* ¶ 46 (noting that IAP "allocated up to 45% of Plan assets into mutual funds and hedge funds that carried significant investment management fees"), ¶ 48 (discussing "high fees" of hedge funds), ¶ 50 (focusing on the "Plan's payment of high investment fees for actively managed mutual funds and hedge funds"), ¶ 57 (allegations about "the high cost and consistently poor track record of [the IAP's] investment strategy").

23

"approximately 1.18%" of IAP's assets is little more than speculation. In footnote 16, Plaintiff describes her "methodology" as adding together administrative fees from the IAP's 2019 Form 5500 and three-year averages of asset-based management fees and performance-based fees from the 2019 Performance Report. *See* Am. Compl. ¶ 49 n.16. But because the Report does not include all data that would be necessary to calculate investment managers' performance-based fees, it is difficult to understand how Plaintiff purportedly calculated the IAP's overall fees.[26] Merely guessing the amount of fees incurred by the IAP is insufficient to state a claim. *See Marks v. Trader Joe's Co.*, 2020 WL 2504333, at *6 (C.D. Cal. Apr. 24, 2020) (a plaintiff cannot state a fiduciary-breach claim for fees if she does "not actually know how much the . . . fees are").

The deficiencies in Plaintiff's fee allegations do not stop there. Whether it be administrative fees or investment fees, Plaintiff's myopic focus on using the cheapest options available is contrary to law. "[N]othing in ERISA requires every fiduciary to scour the market to find and offer the cheapest possible fund" or service provider regardless of other considerations. *Hecker v. Deere & Co.*, 556 F.3d 575, 586 (7th Cir. 2009); *see also Meiners v. Wells Fargo & Co.*, 898 F.3d 820, 823-24 (8th Cir. 2018) ("existence of a cheaper fund does not mean that a particular fund is too expensive . . . [or] imprudent").

And therein lies the fundamental problem with Plaintiff's fees claim. When different plans have different pricing, there are numerous possible explanations—

---

[26] For instance, the Report does not state the threshold at which an investment manager is eligible to receive a performance fee. Presumably, when Plaintiff saw that an investment manager had a fee structure of "1.50% Base Fee plus Performance Fee of 20% of returns" (Ex. E at 40), she always added 20% of returns in her calculation of investment fees. This would be incorrect. Performance fees, as their name implies, are paid only when investment managers beat a pre-set level of performance for the assets under their management. Plaintiff also fails to appreciate that it may be preferable for the performance-based investment fee she attempted to calculate to be high. As the name of these fees suggests, an investment manager only earns performance-based fees when its performance exceeds expectations.

24

one might be more complex, it might provide additional services, or its investment fees might be necessary to achieve a particular performance objective. To account for these variations, the reasonableness of administrative and investment fees must be assessed in the context of the services or value provided for those fees—context which is sorely missing from Plaintiff's allegations. *See Anderson*, 2021 WL 229235, at *8-9 (excessive fees allegations were insufficient where plaintiff did not use appropriate benchmarks). And Plaintiff's reliance on fee data from dissimilar 401(k) plans (*see* Am. Compl. ¶¶ 41, 49) leaves her without a relevant basis for comparison. Plaintiff's inaccurate and out-of-context allegations about the IAP's fees fail to suggest, much less state, a plausible claim of imprudence.[27]

## IV.   DISMISSAL SHOULD BE WITH PREJUDICE

Because Plaintiff's fundamental challenge is to the IAP's design and she has already had a chance to amend her allegations, any further amendment would be futile. *See CVS*, 348 F. Supp. 3d at 1000-02. Dismissal should be with prejudice.

Dated: February 12, 2021                    Respectfully submitted,

By: */s/ Nancy G. Ross*
Nancy G. Ross
MAYER BROWN LLP

*Attorneys for Defendant Board of Directors for the Motion Picture Industry Pension Plans*

---

[27] In addition to her failure to allege a fiduciary act or breach of duty, Plaintiff's lack of injury defeating her standing similarly defeats her fiduciary breach claim. *See Wright v. Or. Metallurgical Corp.*, 360 F.3d 1090, 1099 (9th Cir. 2004); *supra* Sec. I. Her speculative allegations of harm cannot support a fiduciary breach.