Nancy G. Ross, *pro hac vice*
 nross@mayerbrown.com
Richard E. Nowak, *pro hac vice*
 rnowak@mayerbrown.com
Abigail M. Bartine (SBN 326993)
 abartine@mayerbrown.com
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
Telephone:   (312) 782-0600
Facsimile:    (312) 701-7711


Naama Shemesh (SBN 328370)
nshemesh@mayerbrown.com
MAYER BROWN LLP
350 S. Grand Ave., 25th Fl.
Los Angeles, CA 90071
Telephone:   (213) 229-9500
Facsimile:    (213) 625-0248

*Attorneys for Defendant Board
of Directors for the Motion
Picture Industry Pension Plans*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| PATRICIA KLAWONN, on behalf of the Motion Picture Industry Individual Account Plan,<br><br>Plaintiff,<br><br>v.<br><br>BOARD OF DIRECTORS FOR THE MOTION PICTURE INDUSTRY PENSION PLANS, et al.<br><br>Defendants. | Case No. 2:20-cv-09194-DMG-JEM<br><br>**DEFENDANT BOARD OF DIRECTORS' NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT**<br><br>Hearing Date: January 7, 2022<br>Hearing Time: 9:30 a.m.<br>Judge: Hon. Dolly M. Gee |

## **NOTICE OF MOTION AND MOTION TO DISMISS**

TO THE COURT AND TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD: PLEASE TAKE NOTICE that on January 7, 2022, at 9:30 a.m., or as soon as the matter may be heard by the Honorable Dolly M. Gee, whether virtually or in courtroom 8C, located in the United States Courthouse, 350 West 1st Street, Los Angeles, CA 90012, Defendant Board of Directors for the Motion Picture Industry Pension Plans (the "Board") shall move and hereby does move to dismiss with prejudice Plaintiff Patricia Klawonn's Second Amended Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  This Motion is made following the conference of counsel pursuant to Local Rule 7-3, which took place on October 12, 2021.  *See* Ross Decl., ¶ 3.

The Motion is based on the grounds that Plaintiff's further attempt to allege that the Board breached its fiduciary duties by inadequately monitoring the IAP's investments fails to raise an inference of imprudence.  As in her First Amended Complaint, which was dismissed by the Court, Plaintiff has again failed to identify any facts, including adequate comparators, sufficient to plausibly claim that the Board should have caused the IAP to invest in allegedly cheaper, better performing investments purportedly capable of achieving its purpose of providing a meaningful, stable benefit for all participants, regardless of the market conditions at the time of their retirement.

The Motion is based on this Notice and Motion, the attached memorandum of points and authorities, the concurrently-filed Request for Judicial Notice, the Declaration of Nancy G. Ross and all exhibits attached thereto, the pleadings, papers, and records in this action, any matters of which this Court shall take judicial notice, and such further evidence or argument as the Board may present prior to or at any hearing on this Motion.

1

Dated: October 19, 2021

Respectfully submitted,

2

By: */s/ Nancy G. Ross*
Nancy G. Ross
Richard E. Nowak
Abigail M. Bartine
Naama Shemesh
MAYER BROWN LLP

3

4

5

*Attorneys for Defendant Board of Directors for the Motion Picture Industry Pension Plans*

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................. 1

PROCEDURAL HISTORY ................................................................. 2

BACKGROUND .................................................................................. 4

LEGAL STANDARD .......................................................................... 6

I.    PLAINTIFF'S AMENDED ALLEGATIONS ABOUT
      INVESTMENT PERFORMANCE AND FEES STILL DO NOT
      STATE A PLAUSIBLE CLAIM OF A FAILURE TO MONITOR ........... 6

      A.    Plaintiff's "Comparator" Plans Fail to Plausibly State a Claim
            of Imprudent Investment Monitoring ................................... 9

      B.    Plaintiff's "Comparator" Investments Likewise Fail to
            Plausibly State a Claim of Imprudent Investment Monitoring .......... 15

      C.    Plaintiff's Complaints About the IAP's Particular Investments
            Also Do Not State a Plausible Claim of Imprudent Investment
            Monitoring ...................................................................... 17

II.   THE SAC SHOULD BE DISMISSED WITH PREJUDICE ...................... 22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alas v. AT&T Inc.*,
  2018 WL 6133648 (C.D. Cal. Oct. 29, 2018), *reconsideration
  denied*, 2019 WL 1744847 (C.D. Cal. Feb. 25, 2019) .......................................22

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ........................................................................................6

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ........................................................................................6

*Braden v. Wal-Mart Stores, Inc.*,
  588 F.3d 585 (8th Cir. 2009).........................................................................21

*Chao v. Merino*,
  452 F.3d 174 (2d Cir. 2006) ............................................................................9

*Cho v. Prudential Ins. Co. of Am.*,
  2021 WL 4438186 (D.N.J. Sept. 27, 2021).................................................16

*Davis v. Salesforce.com, Inc.*,
  2020 WL 5893405 (N.D. Cal. Oct. 5, 2020) ................................................6

*Davis v. Washington Univ. in St. Louis*,
  960 F.3d 478 (8th Cir. 2020).........................................................................21

*Forman v. TriHealth, Inc.*,
  2021 WL 4346764 (S.D. Ohio Sept. 24, 2021)...........................................16

*Hadley v. Kellogg Sales Co.*,
  243 F. Supp. 3d 1074 (N.D. Cal. 2017) .......................................................18

*Hettinga v. United States*,
  2017 WL 4338537 (C.D. Cal. Aug. 21, 2017)..............................................6

*Kong v. Trader Joe's Co.*,
  2020 WL 7062395 (C.D. Cal. Nov. 30, 2020)..............................................7

*Kwan v. SanMedica Int'l*,
  854 F.3d 1088 (9th Cir. 2017) ..................................................................... 4

*Meiners v. Wells Fargo & Co.*,
  898 F.3d 820 (8th Cir. 2018) ..................................................................... 21

*Patterson v. Morgan Stanley*,
  2019 WL 4934834 (S.D.N.Y. Oct. 7, 2019) .......................................... 14

*Smith v. CommonSpirit Health*,
  2021 WL 4097052 (E.D. Ky. Sept. 8, 2021) ......................................... 17

*Somers v. Apple, Inc.*,
  729 F.3d 953 (9th Cir. 2013) ....................................................................... 6

*Terraza v. Safeway Inc.*,
  241 F. Supp. 3d 1057 (N.D. Cal. 2017) ........................................... 17, 21

*In re Unisys Sav. Plan Litig.*,
  74 F.3d 420 (3d Cir. 1996) ....................................................................... 12

*White v. Chevron Corp.*,
  2016 WL 4502808 (N.D. Cal. Aug. 29, 2016) (*White I*) .......... 6, 7, 16, 20

*White v. Chevron Corp.*,
  2017 WL 2352137 (N.D. Cal. May 31, 2017) (*White II*).......................... 22

*White v. Chevron Corp.*,
  752 F. App'x 453 (9th Cir. 2018)............................................................... 20

**Statutes**

29 U.S.C. § 1101 *et seq.* ................................................................................. 7

29 U.S.C. § 1104(a)(1)(B) ............................................................................. 7

Internal Revenue Code Section 401(a) .......................................................... 4

**Other Authorities**

29 C.F.R. § 2550.404a-1(b)(1) ...................................................................... 7

29 C.F.R. § 2550.404c-5 .............................................................................. 10

Federal Rule 12(b)(6) ..................................................................................... 6

**INTRODUCTION**

As a supplement to their pension benefits, participants in the Motion Picture Industry Individual Account Plan ("IAP") receive an additional benefit at retirement that is based exclusively on the contributions their employers make on their behalf. Defendant Board of Directors for the Motion Picture Industry Pension Plans ("Board") invests those employer contributions on a pooled basis in a carefully structured, diversified investment portfolio designed to provide a meaningful benefit to all participants regardless of the market conditions at the time of their retirement.

The IAP is governed by the Employee Retirement Income Security Act ("ERISA"). Pursuant to ERISA, the IAP's investments are monitored by the Board acting as a fiduciary, with a duty to act as would a reasonable individual "in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B).

In dismissing Plaintiffs' prior complaint, the Court has recognized what this standard requires to raise an inference of imprudence sufficient to state a plausible claim that the Board breached its duty to monitor the IAP's investments: specific factual allegations that the Board's monitoring process was materially out of step with similarly-situated fiduciaries acting with respect to similar plans with similar goals. ECF No. 53 at 10-12.

Plaintiff's third iteration of her complaint fails yet again to meet this standard. The new complaint admits that Plaintiff knows nothing about the Board's monitoring process, and the few guesses she alleges to draw an inference of imprudence are easily refuted based on judicially-noticeable documents that demonstrate the Board's robust monitoring process.[1] And Plaintiff has failed to heed the Court's directive to identify "comparable" plans or investments that demonstrate

---

[1] The Court took judicial notice of these documents in its August 9, 2021 order granting the Board's motion to dismiss the First Amended Complaint. ECF No. 53 at 1-2 (taking judicial notice of the IAP's Form 5500, 2019 Performance Report, MPI IAP and Trust Agreement, among others).

that the IAP's investment portfolio falls below the standards of its peers.  As a result, Plaintiff yet again fails to plausibly allege that the Board imprudently monitored the IAP's investments.  This is not surprising, as judicially-noticeable documents show that the IAP has been successful over its lifetime at achieving its goal of consistent, sustainable growth of its assets in all market environments.  This success has inured to the benefit of all IAP participants who, as a result, receive meaningful benefits without respect to the unpredictable fluctuations of the market.  These same documents also show numerous examples of the Board's active monitoring of the IAP's investments.

From the inception of this lawsuit and again in her second amended complaint, Plaintiff has challenged the IAP's fundamental structure and investment approach in an attempt to recast them to meet her preferences.  But as this Court has already held, Plaintiff's desire for a different type of plan does not plausibly state a claim that the Board's approach to investments was imprudent.  After a third unsuccessful bite at the apple, Plaintiff's complaint should be dismissed with prejudice.

## PROCEDURAL HISTORY

On October 7, 2020, Plaintiff Patricia Klawonn filed this lawsuit against the Board alleging a claim for breach of fiduciary duty under the Employee Retirement Income Security Act ("ERISA").  ECF No. 1.  In her complaint, Plaintiff alleged that the IAP's pooled-asset, trustee-directed investment structure was improper and that the IAP's investments were too expensive and underperformed.  *Id.*  The Board moved to dismiss the Complaint on December 15, 2020.  ECF No. 37.  In response, Plaintiff filed a First Amended Complaint ("FAC") on January 5, 2021.  ECF No. 41.  On February 12, 2021, the Board moved to dismiss the FAC, which Plaintiff opposed.  ECF Nos. 44-50.

On August 9, 2021, the Court granted Defendants' motion to dismiss the FAC.  ECF No. 53.  Specifically, the Court ruled that Plaintiff's claim that the Board

breached its fiduciary duties through the IAP's pooled-asset, trustee-directed investment structure invoked a settlor function that could not form the basis of a breach of fiduciary claim under ERISA. *Id.* at 8-9. As such, the Court dismissed that facet of Plaintiff's claim with prejudice.[2] *Id.* at 9. The Court also granted the Board's motion to dismiss Plaintiff's breach of fiduciary duty claim alleging that the Board imprudently selected and monitored the IAP's investments. *Id.* at 9-12. With respect to Plaintiff's challenge of the selection of the IAP's investments, the Court found that Plaintiff could not state a breach of fiduciary duty claim concerning that conduct because the Board delegated those decisions to investment managers. *Id.* at 9.[3] With respect to Plaintiff's claim challenging the Board's monitoring of the IAP, the Court found that Plaintiff had not alleged adequate comparators showing "significantly better performing underlying investments with lower fees" or any "other indications that the plan fiduciaries' 'decision-making process was flawed,'" and, therefore, had not stated a plausible claim of imprudence for failure to monitor the IAP's investments. *Id.* at 10 (citation omitted). The Court granted Plaintiff leave to file another amended complaint only with respect to an alleged breach of fiduciary duty for failure to monitor the IAP's investments. *Id.* at 12.

Plaintiff filed her Second Amended Complaint on September 9, 2021. ECF No. 56.

---

[2] Although the Court dismissed Plaintiff's claim about the structure of the IAP with prejudice, her SAC continues to raise these allegations, which she represents is "solely for purposes of preserving her rights in the event of any appeal." SAC p. 19 n. 11. Based on the Court's Order and Plaintiff's representation, the Board does not respond to these allegations in this motion other than to note that they have been dismissed with prejudice.

[3] The SAC does not attempt to amend Plaintiff's allegations to state a claim against the Board for initial investment selection.

3

# BACKGROUND[4]

***IAP Origins.***  The IAP was established in 1979 and is a profit-sharing plan under Section 401(a) of the Internal Revenue Code.  SAC ¶ 17, n. 2 (citing Ross Decl. ¶ 4, Ex. A, (SPD) at 32); Ross Decl. ¶ 5, Ex. B (IAP Plan & Trust Agreement), Art. IV, § 6.  The IAP is sponsored by the employer members of the Alliance of Motion Picture and Television Producers and various unions whose members work within the motion picture industry.  Ex. B at 1.  The IAP's Board, which is the IAP's named fiduciary, is comprised of an equal number of employer and union representatives.  SAC ¶¶ 23, 25; Ross Decl. ¶ 6, Ex. C, Art. IX, § 2 & Art. X § 2 (MPI Pension Plan & Trust Agreement).[5]

The IAP is one of two retirement plans the Board manages; the Board also manages a defined benefit plan, known as the MPI Pension Plan.  SAC ¶ 17.  Most IAP participants also participate in the Pension Plan, and the plans' benefits are intended to complement each other.  Ex. A at 4 ("[I]n general, all Pension Plan Participants automatically participate in the IAP."); *id.* ("Today, retirement benefits consist of two completely Employer-Funded plans," the IAP and Pension Plan, and "[t]hese two separate retirement benefits provide broad coverage" for participants).

***IAP Structure.***  IAP participants primarily work for employers in the motion picture industry who have executed a collective bargaining agreement that permits employees' participation in the IAP.  SAC ¶ 19.  The IAP is funded by employer contributions; participating employees do not contribute.  *Id.* ¶ 21; Ex. A at 4.

The IAP is structured as a pooled-asset plan, whereby all contributions from participating employers are collected into a "Fund."  SAC ¶ 22; Ex. B, Art. III, § 1.

---

[4] This background information is based on the well-pleaded allegations in the SAC, which are presumed true solely for purposes of this motion, as well as documents the Court may consider in connection with the motion.  *See Kwan v. SanMedica Int'l*, 854 F.3d 1088, 1096 (9th Cir. 2017).  These documents are set forth in the Board's concurrently-filed Request for Judicial Notice ("RJN").

[5] The IAP Trust Agreement incorporates the administration provisions of the MPI Pension Plan. Ex. B, Part II – Administration.

4

A "Participant Individual Account" is maintained in the name of each participant, "which is to be credited with the contributions made by Employers on behalf of" the participant. Ex. B, Art. I, § 21. Participants are annually allocated a portion of the employer contributions plus investment returns based on an established formula. Ex. A at 4 ("Contributions made on the Participant's behalf result in allocations to an individual account that shares in the investment performance of the IAP's assets."); Ex. B, Art. IV, §§ 1, 3(c), 4. This allocation formula is based on participants' hourly pay rate and hours worked. Ex. B, Art. IV, § 4. Participants' accrued benefits are paid at retirement in the form of a lump sum or annuity benefit. *Id.*, Art. VI, § 1(a)(1).

*IAP Investments.* Relying on the expertise of carefully selected investment managers, the IAP invests its pooled contributions in a diverse mix of investments. SAC ¶¶ 22, 40, Ex. B, Art. X, § 2(h). The IAPs' diverse investment allocation, which is adjusted as needed, is shown in its annual Form 5500 and the 2019 and 2020 Performance Reports prepared by the IAP's investment advisor, Advanced Research Investment Solutions ("ARIS"). Ross Decl. ¶¶ 7-8, Ex. H-I (2018 and 2019 Form 5500) at Schedule C; Ross Decl. ¶ 7, Ex. D ("2019 Performance Report") at 24; Ross Decl. ¶ 8, Ex. E ("2020 Performance Report") at 25; SAC ¶¶ 58-59. Since the IAP's participants elect to retire and receive their benefits at different times, the IAP's "overall portfolio strategy is to protect capital while trying to earn attractive net returns," which is achieved "by diversifying the portfolio across various asset classes that respond differently to different economic environments." Ex. D at 19. In response to fluctuating market conditions, the IAP's portfolio is adjusted periodically to achieve its overall strategy and mission. Ex. D at 26-31; Ex. E at 28-33.

**LEGAL STANDARD**

Dismissal is proper under Federal Rule 12(b)(6) if the complaint "either (1) lacks a cognizable legal theory or (2) fails to allege sufficient facts to support a cognizable legal theory." *Somers v. Apple, Inc.*, 729 F.3d 953, 959 (9th Cir. 2013). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The Court may "not accept 'threadbare recitals of the elements of a cause of action, supported by mere conclusory statements.'" *Hettinga v. United States*, 2017 WL 4338537, at *1 (C.D. Cal. Aug. 21, 2017) (quoting *Iqbal*, 556 U.S. at 678). "Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555 (citation omitted).

## I.   PLAINTIFF'S AMENDED ALLEGATIONS ABOUT INVESTMENT PERFORMANCE AND FEES STILL DO NOT STATE A PLAUSIBLE CLAIM OF A FAILURE TO MONITOR

As a threshold matter, Plaintiff's complaint fails to identify any lapses in the Board's conduct with respect to monitoring the IAP's investment managers and their selected investments. That alone is grounds for dismissal. *See, e.g.*, *Carter v. San Pasqual Fiduciary Tr. Co.*, 2016 WL 6803768, at *5 (C.D. Cal. Apr. 18, 2016). And in fact, the 2019 Performance Report itself contradicts Plaintiff's monitoring claim, as it reflects ongoing changes in both investment managers and investments over the past 25 years. Ex. D at 26-31. Unable to point to any direct evidence of a lack of monitoring, Plaintiff focuses on the IAP's investment performance and fees in an attempt to show an inference of imprudence in monitoring the IAP. But like so many other cases asserting a fiduciary breach based solely on hindsight investment performance, Plaintiff has not, and cannot, state a claim. *See*, *e.g.*, *Davis v. Salesforce.com, Inc.*, 2020 WL 5893405, at *2-7 (N.D. Cal. Oct. 5, 2020); *White v. Chevron Corp.*, 2016 WL 4502808, at *5-12 (N.D. Cal. Aug. 29, 2016) (*White I*);

6

*Kong v. Trader Joe's Co.*, 2020 WL 7062395, at *3-5 (C.D. Cal. Nov. 30, 2020). As in her First Amended Complaint, Plaintiff once again fails to draw the Court's attention to adequate, specific comparators that raise an inference that the Board did not prudently monitor the IAP's investments.

ERISA requires fiduciaries to act prudently under the circumstances then prevailing. 29 U.S.C. § 1104(a)(1)(B). Of utmost importance, as the Court recognized in its prior dismissal order (ECF No. 53, the "Order"), fiduciary conduct is evaluated based on the conduct of a prudent fiduciary working "in a like capacity" in "an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B). Moreover, "[p]rudence" is not "prescience"—the requirement "focus[es] on a fiduciary's conduct in arriving at an investment decision, not on its results, and ask[s] whether a fiduciary employed the appropriate methods to investigate and determine the merits" of a decision. *White*, 2016 WL 4502808, at *5, 8 (quotations omitted); *accord* 29 C.F.R. § 2550.404a-1(b)(1) (fiduciary who gives "appropriate consideration" to the facts and circumstances of an investment decision acts in accordance with ERISA).

Plaintiff's theory of imprudence ignores these fundamental principles, as well as the Order's directive that she identify specific comparators that raise a plausible inference that the Board failed to monitor the IAP's investments. With respect to the need to present allegations about the deficiency of the Board's monitoring process, the SAC again has nothing to offer. For instance, Plaintiff does not allege that the Board did not meet to review the IAP's investment lineup and performance, or that it did not monitor the investments to ensure that they were meeting the IAP's goals and target asset allocations. *See In re Calpine Corp*, 2005 WL 1431506, at *6 (N.D. Cal. Mar. 31, 2005) (dismissing failure to monitor claim where the plaintiff did not allege failure to "review the performance of its appointees at reasonable intervals in such a manner as may be reasonably expected to ensure compliance with

1   the terms of the plan and statutory standards").  Further, Plaintiff does not—and

2   cannot—allege that the Board failed to commission analyses about the IAP's

3   performance, since Plaintiff herself relies on the annual performance reports that are

4   prepared by the IAP's investment manager, ARIS.  *See* Exs. D-E.  Not only does

5   Plaintiff say nothing about the *process* that was used to monitor the IAP's

6   investments, she admits that she lacks any concrete basis for her failure-to-monitor

7   allegations against the Board.  *See* SAC ¶ 81.

8         Instead, Plaintiff's theory of imprudent monitoring is premised entirely on an

9   inference of imprudence that she claims arises from the IAP's alleged

10  underperformance and high fees.  But without any allegations explaining what the

11  Board did or did not do to monitor the IAP, Plaintiff's claim is nothing more than an

12  attempt to hold the Board strictly liable for the investments' performance, which

13  ERISA does not permit. *See Lauderdale v. NFP Retirement, Inc. et al.*, 2021 WL

14  3828646, at *12 (C.D. Cal. Aug. 18, 2021) (dismissing duty to monitor claim where

15  the complaint did "not contain any factual allegations relating to whether [the

16  defendants] fell short of their obligation to monitor" and "fail[ed] to identify any

17  particular flaws in [the defendants'] process for monitoring" the challenged

18  investment); *Carter*, 2016 WL 6803768, at *5 (dismissing a monitoring claim where

19  the plaintiffs failed to allege facts "regarding whether, when, and to what extent

20  Defendants monitored either" of the other plan fiduciaries); *White I*, 2016 WL

21  4502808, at *19 (dismissing a monitoring claim where the plaintiff "allege[d] no

22  facts showing how the monitoring process was deficient"); *Romero v. Nokia, Inc.*,

23  2013 WL 5692324, at *5 (N.D. Cal. Oct. 15, 2013) (dismissing a monitoring claim

24  where the plaintiff did not "present any specific facts regarding the monitoring

25  process or how it was deficient"); *In re McKesson HBOC, Inc. ERISA Litig.*, 2002

26  WL 31431588, at *15–16 (N.D. Cal. Sept. 30, 2002) (claim rested on "wholly

27  conclusory" allegations rather than specific facts about a failure to monitor).

28

8

Equally problematic is Plaintiff's attempt to state a claim by simply comparing the IAP's investments to a hand-selected "peer group" of other defined contribution plans that are either (i) apples-to-oranges comparisons, or (ii) fall far short of plausibly alleging that the Board acted imprudently.  Because "the test of prudence . . . is one of conduct, and not a test of the result of the performance of the investment" it "cannot be measured in hindsight." *Barchock v. CVS Health Corp.*, 886 F.3d 43, 44-45 (1st Cir. 2018) (citations omitted).  Rather, prudence must be "evaluated at the time of the investment without the benefit of hindsight." *Metzler v. Graham*, 112 F.3d 207, 209 (5th Cir. 1997).

As demonstrated below, Plaintiff has not plausibly alleged that similarly-situated fiduciaries chose different investments with better results.  And even if she had done so, courts regularly recognize that fiduciaries can make different decisions in administering a plan without violating ERISA, since there are rarely one-size-fits-all solutions. *See Chao v. Merino*, 452 F.3d 174, 182 (2d Cir. 2006) (ERISA imposes on fiduciaries no "duty to take any particular course of action if another approach seems preferable") (internal quotation marks omitted).

### A.   Plaintiff's "Comparator" Plans Fail to Plausibly State a Claim of Imprudent Investment Monitoring

Despite the Court's clear instruction that Plaintiff must provide "specific comparators" that plausibly state what a prudent fiduciary in similar circumstances would have done differently (ECF No. 53 at 12), Plaintiff relies on a purported universe of 12 so-called "peer defined contribution plans of comparable size that employ a similar structure to the Plan" (SAC ¶ 69) that is anything but comparable.

Although Plaintiff claims to have identified 12 comparable plans (*id.*), she only identifies four by name in the SAC: (1) Building Service 32BJ Retirement Savings Plan ("Building Service Plan"); (2) Bricklayers and Trowel Trades International Retirement Savings Plan ("Bricklayers Savings Plan"); (3) Boilermakers National Annuity Trust ("Boilermakers Trust"); and (4) Southern New

9

England Carpenters Annuity Plan, previously known as the Connecticut Carpenters Annuity Fund ("Southern New England Plan").  *Id.* ¶¶ 66-70.

Two of these four "comparator" plans are  immediately distinguishable.  First, the Building Service Plan is a traditional self-directed 401(k) "defined contribution plan designed to give [participants] an opportunity to save and invest for retirement." Ross Decl. ¶ 9, Ex. F at 6.  Participants' "money is in an individual account in [their] name and is invested in the investment fund or funds that [they] choose from a menu of investment options selected by the Trustees."  *Id.* at 7.  This is in direct contrast to the IAP, which is a pooled-asset, trustee-directed plan to which participants do not contribute or choose their own investment options.  SAC ¶ 22; Ex. B, Art. III, § 1; Ex. A at 4; Ex. B, Art. IV, §§ 1, 3(c), 4.  In an attempt to bridge this unbridgeable gap, Plaintiff alleges that the Building Service Plan's "uses a single default investment"—the Vanguard Wellesley Income Fund.  SAC ¶¶ 66-67.  However, the Vanguard Wellesley Income Fund is simply the plan's qualified default investment alternative ("QDIA"), *see* Ex. F at 7, which is a feature of participant-directed 401(k) plans that provides for a chosen investment to serve as the default option when a participant fails to select her investments.  29 C.F.R. § 2550.404c-5.  Thus, a participant only invests in the Vanguard Wellesley Income Fund if she does not otherwise choose to invest in any of "the investment fund or funds" contained in the plan's "menu of investment options selected by the Trustees."  Ex. F at 7.[6]

The Bricklayers Savings Plan is also an inapt comparator to the IAP.  The Bricklayers Savings Plan is structured and administered as a hybrid plan, composed of an annuity retirement benefit that depends on a pooled-asset investment arrangement, plus an additional participant-directed 401(k) benefit in which "[p]articipants can change the way their contributions are invested at any time and

---

[6] As the Building Service Plan's Form 5500 puts it succinctly: "The Plan provides participants with a participant-directed program whereby participants are provided with a diversified group of individual investment options in which they can invest their account balances and on-going contributions made on their behalf."  Ex. K (Form 5500, Notes to Financial Statements at 4).

DEFENDANT BOARD OF DIRECTORS' MOTION TO DISMISS
PLAINTIFF'S SECOND AMENDED COMPLAINT
CASE NO. 2:20-CV-09194-DMG-JEM

can invest both new and existing contributions in any of 21 investment funds available." Ex. G at 14. Like the Building Service Plan, the Bricklayers Savings Plan does not share materially similar characteristics with or have the same mission as the IAP.

As the Board discussed at length in its prior motion to dismiss (*see* ECF No. 44 at 11-12), there are myriad differences between the "character" and "aims" of trustee-directed, pooled-asset multiemployer plans like the IAP and participant-directed 401(k) plans. These material differences are significant when comparing the IAP's structure and investment decisions with other 401(k) plans. In brief summary, IAP benefits are funded exclusively by employer contributions, to complement benefits provided by the MPI Pension Plan. Ex. A at 4, 36; SAC ¶ 21. In contrast, a 401(k) plan allows *participants* to make tax-deferred contributions from their own compensation to save for retirement. Ross Decl. ¶ 13, Ex. J (FINRA, "401(k) Basics"). The latter is an individual investment vehicle where the employee decides the amount of her contribution, while the former is a supplementary retirement benefit funded by collectively-bargained employer contributions. To ensure all participants retire with meaningful income, the IAP purposely does not leave it to the individual participants' discretion to invest the employer contributions made on their behalf.

What happens with a participant's benefits at the time of retirement is another crucial difference. For the IAP, the participant's benefit is determined at retirement and paid out as a lump sum or annuity. Ex. B, Art. VI, § 1(a)(1). As such, the IAP's investment strategy is to preserve the value of the participant's benefits regardless of market conditions. By contrast, while a 401(k) participant no longer makes or receives contributions after retirement, the participant's account balance can continue to grow or shrink depending on the performance of the participant's investments, the movement of the market, and the timing of her distributions. An

apples-to-oranges comparison of plans, such as Plaintiff is attempting with the Building Service Plan and Bricklayers Savings Plan, does not support a claim for imprudence because "the adequacy of a fiduciary's independent investigation . . . is evaluated in light of the 'character' and 'aims' of the *particular type of plan* he serves." *In re Unisys Sav. Plan Litig.*, 74 F.3d 420, 434-35 (3d Cir. 1996) (emphasis added). Plaintiff's allegations ignore the crucial distinctions between the IAP's and 401(k) plans' character and aims.

All four of Plaintiffs' "comparator" plans are also distinguishable from the IAP because they are materially smaller with respect to the number of participants and/or total assets held. As of the end of 2019, the IAP had over 97,000 participants and over $5 billion in assets. Ex. I at PDF pp. 3, 31. Although Plaintiff herself alleges that plan size is relevant to determining the prudence of the IAP's investments (SAC ¶ 48), her self-identified "peer" plans were only a fraction of the IAP's size as of 2019:

- Building Service Plan had 95,563 participants but only $1.8 billion in assets (Ross Decl. ¶ 14, Ex. K at PDF pp. 3, 19);

- Bricklayers Savings Plan had 19,826 participants and only $109 million in assets  (Ross Decl. ¶ 15, Ex. L at PDF pp. 3, 18);

- Boilermakers Trust had 22,552 participants and only $1.3 billion in assets (Ross Decl. ¶ 17, Ex. N at PDF pp. 3, 36); and

- Southern New England Plan had 14,258 participants and only $550 million in assets  (Ross Decl. ¶ 19, Ex. P at PDF pp. 3, 29).

Plaintiff provides no explanation of how these plans with such significantly less assets and participants are meaningful comparators to the IAP, or that the participant populations of these plans that cover entirely different industries are similar.

Additionally problematic is that Plaintiff has still not plausibly alleged that the IAP's investment fees or performance were materially worse than her

comparator plans to state a claim of imprudent monitoring.  As a threshold matter, Plaintiff's allegation that the IAP incurs investment fees of 1.18% of plan assets (SAC ¶¶ 10, 54) is nothing more than speculation.[7]  And the fee disclosures from the allegedly comparator plans' Form 5500s, which Plaintiff relies on throughout her analysis (*e.g.*, SAC ¶¶ 54 n.13, 55 n. 14-15, 69 n. 29), show that the IAP's fees were, in fact, materially similar to those plans' fees.  Based on an apples-to-apples comparison of the plans' reported value of "general investments" and reported amount of "investment advisory and management fees," the IAP's investment management fees were 0.30%, which is on par with the 0.35% for the Boilermakers Trust and 0.22% for the Southern New England Plan.[8]  Presumably because the IAP's fees are in line with the fees of Plaintiff's comparator plans, she opts to compare her speculative guess about the IAP's fees to the average fees of *401(k) plans* (*see* SAC ¶ 73 (citing 2020 BrightScope/ICI Study at 57)), which, as discussed above, are designed and administered differently and not an appropriate basis for comparison.

Plaintiff's comparison of the IAP to her chosen "peer group" falls flat for still additional reasons.  Significantly, her deeply-flawed analysis relies on inappropriate five-year and ten-year performance and volatility comparisons.  *See* SAC ¶ 70. Fundamentally, these short-term comparisons ignore the IAP's sound long-term investment objectives.  *See* Order at 11 ("The Plan's conservative approach is not necessarily imprudent, since '[a] fiduciary may reasonably select an investment

---

[7] As explained in the Board's prior motion to dismiss, Plaintiff has not pointed to any information (and the Board is aware of none) supporting her calculation of the IAP's investment fees. *See* ECF No. 44 at 24 and n. 26.  Given her absence of any explanation, Defendants' own forensic efforts to identify the basis for her claim reflect that Plaintiff's calculation inappropriately included the IAP's overall administrative fees. *See id.* at 23 n.25.

[8] To calculate these amounts, the Board added up all "general investments" reported in Schedule H ("Financial Information") for each plan's Form 5500 from 2018 (i.e., the beginning balance for 2019) and 2019 (i.e., the ending balance for 2019) and divided by two to derive the average for 2019.  *See* Ross Decl. ¶ 20, Ex. Q. The Board then divided that averaged number by the total amount of reported "investment advisory and management fees" for 2019 to determine the percentage of investment fees for each plan in 2019.  *Id.*

13

alternative in view of its different risks and features, even if that investment option turns out to yield less than some other option.'") (quoting *White v. Chevron Corp.*, 2017 WL 2352137, at *9 (N.D. Cal. May 31, 2017) (*White II*)).[9]  Plaintiff's myopic focus on the last 10 years of the IAP's performance to suggest underperformance— during an unprecedented bull market[10]—ignores the fact that the IAP's long-term/full-business cycle performance is better than—or at least even with—its benchmarks,[11] particularly during bear markets, while experiencing lower volatility than its benchmarks and similar volatility to her comparators.  *Compare* Ex. D at 22-23 ("Risk Analysis (IAP)" and "Long-Term Return History (IAP)") *with* SAC ¶ 70.  Moreover, the IAP's alleged underperformance of one percentage point or less against the twelve plans that Plaintiff has identified (SAC ¶ 70) "is certainly insubstantial compared" to the magnitude of underperformance found to state a claim of imprudent monitoring in other cases.  *Patterson v. Morgan Stanley*, 2019 WL 4934834, at *10 (S.D.N.Y. Oct. 7, 2019) ("This difference of less than one percentage point is certainly insubstantial compared to the nine-point differential in *Jacobs*.  Even assuming the truth of these allegations, such a small disparity in performance relative to its benchmark does not support the inference that Defendants were imprudent to retain the Mid Cap Fund in the set of Plan offerings.").[12]

---

[9] For this reason, Plaintiff's argument that it is inappropriate to focus on 20-year performance (SAC ¶ 60) presumably seeks to bury critical evidence showing that the IAP's achieved its mission. As Plaintiff implicitly recognizes, the first decade of the 2000s was one of the worst decades of market performance on record, while the second decade of the 2000s was one of the best on record. *Id.*  The IAP's returns over both decades were not materially different (*see* Ex. D at 23), which is the ideal pattern of return based on the IAP's investment goal of providing stable benefits to participants in all market environments.  *Id.*

[10] While there is no official standard by which market cycles are measured, a bull market occurs when stock prices are rising, whereas a bear market is characterized by declining stock prices.

[11] The benchmarks referenced in the SAC (¶ 58) and Exhibits D and E are the MSCI World Index (comprised of global stocks) and a 60-40 portfolio (60% MSCI World Index and 40% Merrill Lynch Domestic Master Index, which is comprised of 100% U.S. bonds).  *See* Ex. D at 23; Ex. E at 24.

[12] Plaintiff has not plausibly alleged a claim based on these "comparator" plans even when taking her conclusory allegations about their performance and volatility at face value.  But there is reason to doubt their reliability.  Significantly, Plaintiff has not explained in any detail how she calculated

14

### B.   Plaintiff's "Comparator" Investments Likewise Fail to Plausibly State a Claim of Imprudent Investment Monitoring

Aside from the default investment option of the Building Services Plan, which is not a comparable plan as discussed above, Plaintiff has failed to "specify what 'significantly better performing underlying investments with lower fees' the Board should have investigated." Order at 10. Plaintiff claims to have found eight mutual fund investment options (SAC ¶¶ 74-76) that the IAP *could* have used, but she makes no attempt to show that similarly-situated fiduciaries (*i.e.*, fiduciaries with the similar goals for similarly-sized plans with similar participant populations) have ever used these eight mutual funds to invest all or the majority of the assets in their pooled-asset plans. Instead, Plaintiff only offers weakly that she has identified "plan[s] with more than $50 million in assets and with more than half of the plan's assets invested in a single mutual fund managed in a style similar to the Plan." *Id.* ¶ 74. But in addition to other faults with such cherry-picking, and ignoring the law that recognizes there is more than one way to structure a plan's investments, Plaintiff has not shown that these unidentified plans with "more than $50 million in assets" are in the same league as the IAP *with over $5 billion in assets*.[13]

Plaintiff's reliance on her self-selected universe of eight mutual funds is fatally flawed for other reasons. For one, because ERISA's prudence test evaluates the information that a fiduciary has access to at the time it made its decisions, Plaintiff's allegations that certain mutual funds had better returns over a 20-year period (SAC ¶ 76) are based on impermissible hindsight outcomes. *See White I*,

---

the performance or volatility of these twelve plans. There is no detailed information in the publicly-available sources that permit the calculations that would be necessary to establish these plans' performance or volatility. As such, these are nothing more than conclusory allegations that are meaningless in trying to withstand dismissal. *See Navajo Nation v. Dep't of the Interior*, 876 F.3d 1144, 1163 (9th Cir. 2017) ("Conclusory allegations and unreasonable inferences . . . are insufficient to defeat a motion to dismiss.").

[13] Plaintiff appears to recognize this disconnect as, in other parts of the SAC, she compares the IAP to other defined contribution plans with assets over $100 million and $1 billion, *see* SAC ¶¶ 55-56, and alleges that "the reasonableness of investment expenses should be determined by comparisons to other similarly sized plans." *Id.* ¶ 48.

15

2016 WL 4502808, at *6, 8.  Moreover, a comparison fund is only a meaningful benchmark for purposes of pleading imprudence if it is materially similar to the challenged funds.  *See Cho v. Prudential Ins. Co. of Am.*, 2021 WL 4438186, at *8 (D.N.J. Sept. 27, 2021) (citing *Meiners v. Wells Fargo & Co.*, 898 F.3d 820, 824 (8th Cir. 2018) (finding that the plaintiff failed to provide a meaningful benchmark by alleging that "cheaper alternative investments with *some* similarities exist in the marketplace") (emphasis in original); *see also id.* at 823 ("The fact that one fund with a different investment strategy ultimately performed better does not establish anything about whether the [challenged funds] were an imprudent choice").  Here, the IAP is diversified across dozens of market segments and asset classes, with significantly less than 50% of assets invested in any one mutual fund.  *See* Ex. D at 24 ("IAP Market Values and Allocations").  Had the opposite been true, Plaintiff undoubtedly would have complained that the IAP was not properly diversified.

Aside from offering statements about the investment goals of the eight mutual funds she has selected, Plaintiff provides no additional support for her claim that their approaches are similar to the IAP's to allow for an apples-to-apples comparison.  *See Forman v. TriHealth, Inc.*, 2021 WL 4346764, at *7 (S.D. Ohio Sept. 24, 2021) ("Plaintiffs have not actually identified a meaningful benchmark. Sure, they identified several funds that they characterize as 'the lower-cost share classes' and state that the only difference was the fees—but they offer no further information to permit the Court to conclude that the funds were, in fact, similar enough to permit an 'apples-to-apples' comparison.  They have offered no allegations regarding the funds, their investment strategy, the services to the funds in exchange for the fees, etc.  Because Plaintiffs have failed to plead facts sufficient to show a meaningful benchmark, their claim is not plausible.").  The mere fact that a small number of very different defined contribution plans invested at least half of their assets in a single mutual fund tells us nothing about those plans' goals and

objectives or how they compare to those of the IAP. Indeed, these passively-managed mutual funds are *by definition* not comparable to the IAP's approach (*see* Ex. D at 24) of mixing passively managed and actively managed investment options. *See Smith v. CommonSpirit Health*, 2021 WL 4097052, at *6-8 (E.D. Ky. Sept. 8, 2021) (rejecting a comparison of passively-managed and actively-managed investments).

In addition, Plaintiff's self-serving comparisons to much smaller plans that invest the majority of their assets in one mutual fund offer no insights into whether the Board acted prudently in monitoring the investment of the IAP's vast assets. Indeed, investing all or substantially all of the IAP's $5 billion in assets in one mutual fund flies in the face of the generally-accepted view that prudent investment involves diversification across funds. *See Terraza v. Safeway Inc.*, 241 F. Supp. 3d 1057, 1070 (N.D. Cal. 2017) (citing 29 U.S.C. § 1104(a)(1)(C) and *In re Unisys Sav. Plan Litig.*, 74 F.3d 420, 438 (3d Cir. 1996)). Plaintiff is apparently alleging that the Board should have scrapped its entire diversified investment portfolio in favor of investing all of the IAP's assets into one of Plaintiff's preferred mutual funds, rather than plausibly explaining how certain of the IAP's investments are imprudent compared to these eight mutual funds. Nothing in ERISA compels the Board to take such an approach and the Court has already ruled that Plaintiff cannot force the Board to alter the fundamental structure of the IAP to suit her desired investment format. *See* Order at 8-9.

## C. Plaintiff's Complaints About the IAP's Particular Investments Also Do Not State a Plausible Claim of Imprudent Investment Monitoring

To the extent Plaintiff challenges any particular investments by the IAP, her critiques are based on mischaracterizations of their performance or the Board's management of those investment options. In addition, she does not offer any

comparable benchmarks to show that those options were imprudent and that the Board breached its monitoring duty by retaining them.

Plaintiff chiefly complains about the IAP's investment in hedge funds. *See* SAC ¶¶ 39-40, 46, 55, 57, 59, 64, 66, 78. As the Court has already recognized, "general allegations about an entire category of investment managers or investments do not sufficiently demonstrate that the Board acted imprudently." Order at 10. And Plaintiff's generic SAC allegations about the IAP's investment in hedge funds are riddled with errors.[14] For example, Plaintiff alleges that the Board "allocated over 90% of the IAP's assets into actively managed investment options that carried significant base investment management fees" with "seven of the Plan's investment options charg[ing] fees averaging over 2% per year." SAC ¶ 53. In reality, as of the end of 2019, 23.5% of the IAP's assets were invested with index funds or active managers with base fees of 0.20% or less. *See* Ex. D at 20 ("Summary of Key Portfolio Data (IAP)"), 24 ("IAP Market Values and Allocations"). An additional 18.9% were invested with active managers with base fees of 0.37% or less. *Id.* Only two investment options—not the seven that Plaintiff alleges—charged base investment management fees of 2% or higher and, together, these investments only represent 3.3% of IAP's portfolio. *Id.*

Plaintiff also incorrectly alleges that the Board has "doubl[ed] down on [its] misguided" "reliance on high-priced active managers" by "fail[ing] to make any changes to their approach." SAC ¶ 57. Despite Plaintiff's conclusory allegations to the contrary, judicially-noticeable documents that Plaintiff relies on throughout the SAC indisputably demonstrate that the Board is actively engaged in continuous monitoring of the IAP's investment lineup, making changes as needed. In fact, as of the end of 2019, the IAP had 11 equity managers, six of whom had been added in

---

[14] Although the Court must generally view the SAC's allegations as true in resolving a motion to dismiss, it need not accept as true allegations that are contradicted by judicially-noticeable facts. *Hadley v. Kellogg Sales Co.*, 243 F. Supp. 3d 1074, 1085 (N.D. Cal. 2017).

the prior four years.  Ex. D at 26-27.  And two of the 11 equity managers were for low-cost Vanguard index funds, of the ilk that Plaintiff claims she approves, and two other equity managers added in the prior four years (DFA US Large Cap Value Portfolio and Arrowstreet Global Equity ACWI) had low base fees (0.27% and 0.15%, respectively).  *Id.* at 20, 26-27.  These changes alone conclusively refute Plaintiff's argument that the Board did not prudently monitor the IAP's investments.

Moreover, as Plaintiff recognizes, the Board added eight new alternative investment funds in 2020 (not seven), but not all were hedge funds.  Of the eight newly-added funds, three are hedge funds (D.E. Shaw Orienteer, D.E. Shaw Composite International, Viking Global Equities III), one is a low-cost liquid alternative investment with 0.35% total fees (PanAgora Diversified Risk), and the remaining four (Oberland Capital Healthcare Solutions, King Street Global Drawdown, Kennedy Lewis Capital, and Sixth Street Fundamental Strategies) are investments in private assets.  *See* Ex. E (2020 Performance Report) at 21, 44-55.[15] And while the hedge fund Renaissance Institutional Diversified Alpha did incur losses in 2020 (SAC ¶ 59), the IAP cut its asset allocation materially in 2020. *Compare* Ex. D at 24 (2019 allocation at 4.6%) *with* Ex. E at 25 (2020 allocation at 3.5%).

This correction of Plaintiff's misstatements about the Board's management of the IAP exposes the implausibility of her fiduciary breach claim and affirmatively demonstrates the serious and active approach that the Board takes in monitoring the IAP's investments and making changes as needed, all in light of the IAP's overall strategic goals.  The IAP's judicially noticeable 2019 (Ex. D) and 2020 (Ex. E) Performance Reports[16] provide numerous indications that the Board's active *process*

---

[15] Although not specifically named, the SAC incorporates the IAP's 2020 Performance Report in its allegations regarding the IAP's investment lineup changes in 2020 (SAC ¶ 57) and investment performance (*id.* ¶¶ 59, 61).  *See* RJN at 5-6.

[16] The IAP's investment consultant (ARIS) provides a quarterly investment review.  *See* Exs. D-E.

for monitoring the IAP's investments was prudent. *First,* contrary to Plaintiff's allegation that the Board failed to adequately monitor the IAP's investments, the Performance Reports show significant changes over the years in the investment managers retained to invest the IAP's assets and the IAP's investment portfolio. *See* Ex. D at 20 (varying years in the "Inception" column for investment managers); Ex. E at 21 (same). *Second*, the Performance Reports demonstrate that the IAP's investments were well diversified across asset classes in accordance with the IAP's approach of a balanced, diversified portfolio that prioritizes income and growth. Ex. D at 24 ("IAP Market Values and Allocations"); Ex. E at 25 (same); *White I*, 2016 WL 4502808, at \*5-8 (plan investments consistent with the investment policy statement did not state a claim for imprudence). *Third*, the investment managers' fee structures reported in the Performance Reports show a careful consideration of appropriate compensation, generally incorporating reductions in fees as assets grow and performance-based fees for exceptional returns. Ex. D at 37-41; Ex. E at 39-43. *Fourth*, the Performance Reports carefully describe the profile of each investment manager and how it serves the goals of the IAP. Ex. D at 42-51; Ex. E at 44-55.

Even a cursory review of the Performance Reports demonstrates that Plaintiff's allegations fall far short of raising a plausible inference of fiduciary imprudence in monitoring the IAP's investments.

\*     \*     \*

To state a claim for imprudent investment monitoring, Plaintiff must do more than point to other cherry picked investment options that the Board "could have" chosen because they are slightly cheaper or performed marginally better. *See White v. Chevron Corp.*, 752 F. App'x 453, 455 (9th Cir. 2018) (affirming dismissal of amended complaint because "allegations . . . that [the defendant] could have chosen different vehicles for investment that performed better during the relevant period, or sought lower fees for administration of the fund" were insufficient to state a claim).

20

ERISA "fiduciaries are not required to pick 'the *best* performing fund,'" "[n]or are they required to pick the *lowest*-cost fund." *Davis v. Washington Univ. in St. Louis*, 960 F.3d 478, 486 (8th Cir. 2020) (emphasis in original). "[N]othing in ERISA requires every fiduciary to scour the market to find and offer the cheapest possible fund" and "the existence of a cheaper fund does not mean that a particular fund is too expensive *in the market generally* or that it is otherwise an imprudent choice." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 596 n.7 (8th Cir. 2009); *Meiners*, 898 F.3d at 823. To move forward with her breach of fiduciary duty claim, Plaintiff must show that the Board's investment choices were substantially worse than similar options or there are other indicia of imprudent monitoring, such as allegations of disloyalty. *See Terraza*, 241 F. Supp. 3d at 1076-77.

Here, in light of all the relevant circumstances, Plaintiff's allegations fall far short of plausibly alleging that the Board acted imprudently in monitoring the IAP's investments. Plaintiff has not been able to point the Court to meaningful comparator plans or investment options that were significantly better such that they give rise to an inference of imprudence. And the Court has already rejected the generalized complaints that Plaintiff continues to assert about the IAP's use of hedge funds and other actively-managed investments, as well as Plaintiff's distorted interpretation of the IAP's performance against its own benchmarks. *See* Order at 10-11. In fact, judicially-noticeable documents—in particular, the IAP's 2019 and 2020 Performance Reports—show that the Board actively monitors the IAP's performance and its specific investments and implements necessary changes in response to market developments. That Plaintiff prefers different investment options—or has cherry picked a handful of dissimilar plans—does not plausibly suggest that the Board failed to engage in a deliberate, contemplative process in seeking to achieve its mission of providing a meaningful benefit for all participants.

## II.     THE SAC SHOULD BE DISMISSED WITH PREJUDICE

Because Plaintiff has now made *three* attempts to state a plausible claim and failed, dismissal with prejudice is warranted.  *See White II*, 2017 WL 2352137, at *23, *aff'd*, 752 F. App'x 453 (9th Cir. 2018) (dismissing breach of fiduciary duty claim with prejudice because a third attempt to amend the complaint would be futile).  In addition, all of the pleading deficiencies identified herein apply equally to the unnamed "doe" defendants, none of whom have been identified or served by Plaintiff and are thus not proper Defendants.  *See Alas v. AT&T Inc.,* 2018 WL 6133648, at *7 (C.D. Cal. Oct. 29, 2018), *reconsideration denied*, 2019 WL 1744847 (C.D. Cal. Feb. 25, 2019).

Dated: October 19, 2021                    Respectfully submitted,

By: */s/ Nancy G. Ross*
Nancy G. Ross
Richard E. Nowak
Abigail M. Bartine
Naama Shemesh
MAYER BROWN LLP

*Attorneys for Defendant Board of Directors for the Motion Picture Industry Pension Plans*