Jason Marsili, CA Bar No. 233980
jmarsili@rmrllp.com
ROSEN MARSILI RAPP LLP
11150 W. Olympic Blvd., Suite 990
Los Angeles, CA 90064
Telephone: 213-389-6050

Paul J. Lukas, MN Bar No. 22084X*
lukas@nka.com
Kai H. Richter, MN Bar No. 0296545*
krichter@nka.com
Brock J. Specht, MN Bar No. 0388343*
bspecht@nka.com
Brandon T. McDonough, MN Bar No. 393259*
bmcdonough@nka.com
Jennifer K. Lee, MN Bar No. 0399012*
jlee@nka.com
Patricia C. Dana, MN Bar No. 400803*
pdana@nka.com
NICHOLS KASTER, PLLP
4700 IDS Center
80 S 8th Street
Minneapolis, MN 55402
Telephone: 612-256-3200
Facsimile: 612-338-4878
*admitted *pro hac vice*

ATTORNEYS FOR PLAINTIFF

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Patricia Klawonn, on behalf of the Motion Picture Industry Individual Account Plan,<br><br>Plaintiff,<br><br>v.<br><br>Board of Directors for the Motion Picture Industry Pension Plans, et al.,<br><br>Defendants. | Case No. 2:20-cv-09194-DMG-JEM<br><br>**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT**<br><br>Date: January 7, 2022<br>Time: 9:30 a.m.<br>Judge: Hon. Dolly M. Gee |

# <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................ 1

FACTUAL BACKGROUND............................................................................. 3

   I.    THE PLAN AND ITS SINGLE-INVESTMENT STRUCTURE AND "GOALS" .......... 3

   II.   DEFENDANTS' IMPRUDENT MONITORING OF THE PLAN'S INVESTMENT POOL.. 4

      A. High Fees and Underperformance Relative to Stated Benchmarks and
          Peers ........................................................................................................ 4

      B. Underperformance and Excessive Fees Compared to Similar Plans and
          Investments with Like Aims and Risks...................................................... 5

ARGUMENT...................................................................................................... 9

   I.    STANDARD OF REVIEW ............................................................................... 9

   II.   PLAINTIFF HAS PLAUSIBLY ALLEGED THAT DEFENDANTS BREACHED THEIR

      DUTY OF PRUDENCE UNDER ERISA ............................................................ 11

      A. Defendants Failed to Prudently Monitor Expenses ................................ 11

         1.  The Plan Was One of the Most Expensive Plans in the Country ....... 12

         2.  The Plan's Investment Management Fees Exceeded Those for
            Comparable Plans and Investments ..................................................... 13

      B. Defendants Failed to Prudently Monitor Investment Performance ......... 15

         1.  The Plan Consistently Underperformed Similarly Sized Plans and
            Plans With Similar Investment Objectives ......................................... 15

         2.  The Plan's Pooled Investment Underperformed Comparable
            Investments with Similar Objectives ................................................... 20

         3.  The Plan Underperformed Its Own Investment Benchmarks and
            Peer Groups......................................................................................... 22

      C. Defendants Have Imprudently Failed to Change Course ........................ 24

CONCLUSION................................................................................................... 25

1

## <u>TABLE OF AUTHORITIES</u>

2

<u>Cases</u>

3

*Ambromovage v. United Mine Workers*,

4

    726 F.2d 972 (3d Cir. 1984) ................................................................ 20

5

*Ashcroft v. Iqbal*,

6

    556 U.S. 662 (2009) ......................................................................... 10

7

*Becker v. Wells Fargo & Co.*,

8

    2021 WL 1909632 (D. Minn. May 12, 2021) ...................................... 23

9

*Bell Atlantic Corp. v. Twombly*,

10

    550 U.S. 544 (2007) ......................................................................... 10

11

*Bouvy v. Analog Devices, Inc.*,

12

    2020 WL 3448385 (S.D. Cal. June 24, 2020) ............................... 10, 11

13

*Braden v. Wal-Mart Stores, Inc.*,

14

    588 F.3d 585 (8th Cir. 2009) ........................................................ 9, 10

15

*Brotherston v. Putnam Invs, LLC*,

16

    907 F.3d 17 (1st Cir. 2018) ............................................................... 20

17

*Chavez v. Blue Sky Nat. Beverages Co.*,

18

    340 Fed. App'x 359 (9th Cir. 2009) ..................................................... 9

19

*Cunningham v. Cornell Univ.*,

20

    2017 WL 4358769 (S.D.N.Y. Sept. 29, 2017) .................................... 17

21

*Davis v. Magna Int'l of Am., Inc.*,

22

    2021 WL 1212579 (E.D. Mich. Mar. 31, 2021) ................................. 17

23

*Davis v. Wash. Univ.*,

24

    960 F.3d 478 (8th Cir. 2020) ............................................................. 25

25

*Donovan v. Bierwirth*,

26

    680 F.2d 263 (2d Cir. 1982) .............................................................. 11

27

*Falberg v. Goldman Sachs Group, Inc.*,

28

    2020 WL 3893285 (S.D.N.Y. July 9, 2020) ....................................... 20

*Fernandez v. Franklin Res., Inc.*,

    2018 WL 1697089 (N.D. Cal. Apr. 6, 2018) ...................................................... 10

*Force v. Advanced Structural Techs., Inc.*,

    2020 WL 4539026 (C.D. Cal. Aug. 6, 2020) .................................................... 10

*Henderson v. Emory Univ.*,

    252 F. Supp. 3d 1344 (N.D. Ga. 2017) ............................................................ 17

*Howard v. Shay*,

    100 F.3d 1484 (9th Cir. 1996) .......................................................................... 11

*Hurtado v. Rainbow Disposal Co., Inc.*,

    2018 WL 3372752 (C.D. Cal. July 9, 2018) .................................................... 10

*In re Countrywide Fin. Corp. Mortg.-Backed Sec. Litig.*,

    2013 WL 5614294 (C.D. Cal. Sept. 30, 2013) ................................................ 10

*In re MedStar ERISA Litig.*,

    2021 WL 391701 (D. Md. Feb. 4, 2021) ...................................................... 2, 17

*In re Meridian Funds Grp. Sec. & ERISA Litig.*,

    917 F. Supp. 2d 231 (S.D.N.Y. 2013) .............................................................. 11

*In re Prime Healthcare ERISA Litig.*,

    2021 WL 3076649 (C.D. Cal. July 16, 2021) ................................. 2, 10, 16, 24

*In re Toyota Motor Corp.*,

    790 F. Supp. 2d 1152 (C.D. Cal. 2011) ............................................................ 10

*Johnson v. Fujitsu Tech. & Bus. of Am., Inc.*,

    250 F. Supp. 3d 460 (N.D. Cal. 2017) .............................................................. 12

*Kong v. Trader Joe's Co.*,

    2020 WL 7062395 (C.D. Cal. Nov. 30, 2020) ................................................ 25

*Miller v. AutoZone, Inc.*,

    2020 WL 6479564 (W.D. Tenn. Sept. 18, 2020) ............................................ 17

*Nicolas v. Princeton Univ.*,

    2017 WL 4455897 (D.N.J. Sept. 25, 2017).........................................................17

*Patterson v. Morgan Stanley*,

    2019 WL 4934834 (S.D.N.Y. Oct. 7, 2019) ...............................................20, 23

*Sacerdote v. New York Univ.*,

    2017 WL 3701482 (S.D.N.Y. Aug. 25, 2017) .................................................17

*Short v. Brown Univ.*,

    320 F. Supp. 3d 363 (D.R.I. 2018) ....................................................................17

*Sonoma Cnty. Ass'n of Retired Emp. v. Sonoma County*,

    708 F.3d 1109 (9th Cir. 2013) ...........................................................................10

*Starr v. Baca*,

    652 F.3d 1202 (9th Cir. 2011) .............................................................................9

*Terraza v. Safeway, Inc.*,

    241 F. Supp. 3d 1057 (N.D. Cal. 2017)...........................................10, 11, 2, 24

*Tibble v. Edison Int'l*,

    575 U.S. 523 (2015) ....................................................................................11, 12

*Tibble v. Edison Int'l*,

    843 F.3d 1187, 1197 (9th Cir. 2016) ...........................................................11, 12

*Toomey v. DeMoulas Super Markets, Inc.*,

    2020 WL 3412747 (D. Mass. Apr. 16, 2020)...........................................1, 20, 24

*Urakhchin v. Allianz Asset Mgmt. of Am., L.P.*,

    2016 WL 4507117 (C.D. Cal. Aug. 5, 2016) ....................................................12

*Vellali v. Yale Univ.*,

    308 F. Supp. 3d 673 (D. Conn. 2018) ...............................................................17

*Williams v. Gerber Prods. Co.*,

    552 F.3d 934 (9th Cir. 2008) ...............................................................................9

**<u>Rules, Regulations, and Statutes</u>**

29 U.S.C. § 1002(21)(A) .............................................................................................3

29 U.S.C. § 1102(a) ..................................................................................... 3

29 U.S.C. § 1104(a)(1)(B) ......................................................................... 11

29 U.S.C. § 1113(1) .................................................................................... 23

*Rules and Regulations for Fiduciary Responsibility; Investment of Plan Assets*

    *Under the "Prudence" Rule*, 44 Fed. Reg. 37221 (June 26, 1979) .................. 11

Uniform Prudent Investor Act § 7 ............................................................... 12

**<u>Other Authorities</u>**

HFRI Indices - Index Descriptions, available at https://www.hfr.com/hfri-indices-

    index-descriptions .................................................................................. 4

Restatement (Third) of Trusts § 90(c)(3) (2007) ....................................... 12

Restatement (Third) of Trusts § 90 cmt. h(2) ............................................ 15

U.S. Department of Labor, *A Look at 401(k) Plan Fees* (2013),

    https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-

    center/publications/a-look-at-401k-plan-fees.pdf ............................... 20

**INTRODUCTION**

In connection with Defendants' first motion to dismiss, this Court rejected Defendants' argument that Plaintiff lacked standing, *see ECF No. 53 at 6*, and also rejected Defendants' argument that the action was not timely filed, *id. at 6–7*. Further, the Court held that "[t]he Plan terms [which call for a single pooled investment] do not necessarily foreclose Klawonn's claim that the Board acted imprudently by choosing investment managers that charge overly-high fees and have poor recent performance." *Id. at 9*. Although the Court found that Plaintiff had not stated her breach of prudence claim in sufficient detail due to a "lack of specific comparators," the Court noted that "this deficiency potentially can be addressed by amendment," and granted Plaintiff leave to file an amended complaint. *Id. at 12*. Consistent with the Court's order, Plaintiff has now done so, identifying both comparator plans and comparator investments that further demonstrate Defendants' imprudence. While Defendants remain unsatisfied, Plaintiff's allegations, "taken together, plausibly allege a claim of imprudence." *See Toomey v. DeMoulas Super Markets, Inc.*, 2020 WL 3412747, at *2 (D. Mass. Apr. 16, 2020) (denying motion to dismiss similar claim regarding failure to monitor pooled investment, where Plaintiff alleged Defendants "failed to meet their own [investment targets]," "failed to undertake . . . efforts to generate meaningful returns," and "failed . . . to choose better performing options to achieve the Plan's conservative investment goals, which . . . would have been revealed by a reasonable investigation.").

In her Second Amended Complaint ("SAC"), *ECF No. 56*, Plaintiff alleges that

- The Plan was "one of the five most expensive plans in the country" among similarly sized defined contribution plans, *SAC ¶ 54*, while its returns ranked at or near the bottom of those same plans, *id. ¶ 56; see also id. ¶ 55*; **and**
- The Plan was excessively costly and performed poorly in comparison to peer plans with similar investment objectives, while exhibiting greater volatility in returns (*i.e.*, investment risk), *id. ¶ 69–72*; **and**

-1-

- The Plan's investment pool was excessively costly and performed poorly in comparison to other diversified investments that comprise all or most of other plans' assets, *id. ¶ 73–76*; **and**

- The Plan chronically underperformed its own stated investment benchmarks and peer groups during the period at issue, *id. ¶¶ 58–59*; and even over a longer 20+ year basis through 2020, *id. ¶ 61.*

Plaintiff's detailed and thorough allegations go far beyond the boilerplate allegations that were dismissed in the cases upon which Defendants rely. While Defendants quibble with the nuances of Plaintiff's comparators and even their own self-selected benchmarks, such arguments are not appropriate for resolution on a motion to dismiss. *See In re Prime Healthcare ERISA Litig.*, 2021 WL 3076649, at *6 & n.7 (C.D. Cal. July 16, 2021) ("[C]ourts have specifically held that the determination of the appropriate benchmark for a fund is not a question properly resolved at the motion to dismiss stage.") (citing *In re MedStar ERISA Litig.*, 2021 WL 391701, at * 6 (D. Md. Feb. 4, 2021) (collecting cases)); *see also infra* at 16–17 (citing additional cases).[1]

By any measure—whether compared to (1) similarly sized plans, (2) plans with similar investment objectives, (3) alternative diversified investments utilized for large participant populations; or (4) Defendants' own investment benchmarks—Defendants' investment strategy was imprudent. Defendants' efforts to shield themselves from any of these comparisons boils down to a *reductio ad absurdum*: That their plan is so unique it cannot be compared to anything but itself. However, the pleading standard under ERISA does not require a search for unicorns. Where, as here, the complaint sets forth *reasonable* comparisons that support an inference of imprudence, this is sufficient to allege a breach of fiduciary duty claim at the pleading stage.

---

[1] Defendants' reliance on 17 exhibits extrinsic to the SAC (including a demonstrative made by Defendants), only serves to highlight that the disputed issues are not appropriate for resolution at the pleading stage.

# FACTUAL BACKGROUND

## I.   THE PLAN AND ITS SINGLE-INVESTMENT STRUCTURE AND "GOALS"

The Motion Picture Industry Individual Account Plan ("Plan" or "IAP") is a "defined contribution plan" for purposes of ERISA. *SAC ¶ 18*. The Plan covers eligible employees of motion picture industry employers in the Los Angeles area that have executed a collective bargaining agreement containing a participation provision approved by the Board of Directors for the Motion Picture Industry Pension Plans ("Board"). *Id. ¶ 19.* From the end of 2014 through 2019, the Plan had between 79,000 and 92,000 participants, and between $3.7 billion and $5.1 billion in assets. *Id. ¶ 20.*

The Board is the Plan Sponsor and Plan Administrator of the Plan. *Id. ¶¶ 23–24.* The Board is both a named fiduciary and a functional fiduciary with respect to the Plan and the investment of Plan assets for purposes of ERISA. *Id.* (citing 29 U.S.C. §§ 1102(a),1002(21)(A)). As currently structured, the Plan includes one overarching pooled investment in which participants are automatically enrolled. *Id. ¶ 22.* The Board and its members ("Defendants") are responsible for selecting the underlying investments and investment managers for this single pooled investment. *Id.*

The Plan's "overall portfolio strategy is to protect capital while trying to earn attractive net returns." *ECF No. 63-6 ("2020 Report") at 19*. The Plan aims to achieve this "balancing of risk and return" "by diversifying the portfolio across various asset classes that respond differently to different economic environments." *Id.* The Plan's Investment Policy Statement ("IPS") states that "an investment objective of Growth and Income has been adopted for the Plan's assets." *ECF No. 44-10 ("IPS") at 5*. In order to achieve this goal, the IPS requires a "balanced investment approach that is expected to achieve a positive rate of return over the long-term," *id.* and "[d]iversif[ies] Portfolio[] assets in order to reduce the risk of wide swings in market value from year-to-year, or of incurring large losses that may result from concentrated positions," *id. at 6.*

## II.   DEFENDANTS' IMPRUDENT MONITORING OF THE PLAN'S INVESTMENT POOL

### A.   High Fees and Underperformance Relative to Stated Benchmarks and Peers

Defendants have caused the Plan to be one of the five most expensive plans in the country among the 950 defined contribution plans governed by ERISA that had over $1 billion in assets as of the end of 2019. *SAC ¶¶ 10, 52–56.* This was largely driven by their heavy reliance on high-fee hedge funds and private equity investments with mediocre performance. *Id. ¶ 53–56.* While the average plan with over $1 billion in assets has a total plan cost of approximately 0.26% per year, and more than 90 percent of plans of that size have expenses of 0.46% per year or less, the Plan (which now has more than $5 billion in assets), charges fees averaging 1.18% per year—four to five times higher than the average plan of similar size. *Id. ¶ 54.*

These excess fees were not justified by enhanced investment returns. *Id. ¶ 55.* To the contrary, the Plan has consistently ranked at or near the bottom among similarly sized plans with $1 billion in assets or more. *Id. ¶ 56; see also id. ¶ 55* (same when compared to plans with $100 million or more). Indeed, Defendants *knew* the Plan was consistently underperforming based on their own metrics. *Id. ¶ 58.* Defendants used two benchmarks to evaluate the Plan's performance: the MSCI World Index and a hypothetical investment portfolio containing 60% stocks and 40% bonds.[2] *Id.* The Plan's 3-, 5-, and 10-year performance failed to meet Defendants' chosen benchmarks significantly, as illustrated by the chart below. *Id.*

| 2019 | 3-year | 5-year | 10-year |
|------|--------|--------|---------|
| **MPI Plan** | **5.77%** | **4.11%** | **5.78%** |
| **Benchmark (60/40)** | 9.32% | 6.65% | 7.51% |
| **MSCI World NR USD** | 12.57% | 8.73% | 9.46% |

[2] The 60/40 benchmark actually understates the level of underperformance. Thirty percent of the 60/40 benchmark is made up of the HFRI Fund Weighted Composite Index, which measures the performance of "1,400 single-manager funds" and their "net of all fees performance." https://www.hfr.com/hfri-indices-index-descriptions (quoted in *SAC ¶ 58 n.18*). The SEC prohibits the use of net-of-fees benchmarks for purposes of measuring mutual fund performance. *SAC ¶ 58 n.18.*

Taking the Plan's abysmal 2020 performance into account, its performance over a longer 20+ year period also fares poorly. *SAC ¶¶ 59, 61.*

| 2020 | 1-year return | 5-year avg returns | 10-year avg returns | 21-year avg returns[3] |
|---|---|---|---|---|
| **MPI Plan** | **5.13%** | **5.68%** | **5.07%** | **4.93%** |
| **Benchmark (60/40)** | 13.37% | 9.38% | 7.72% | 5.43% |
| **MSCI World NR USD** | 15.90% | 12.19% | 9.87% | 5.02% |

This was partly due to the tremendous losses suffered by the Bridgewater Pure Alpha and Renaissance Institutional Diversified Alpha hedge funds, which made up nearly 10% of the Plan's assets in 2020 and underperformed the Plan's investment benchmark by 24.5% to 47.8% during the pandemic-related market downturn (precisely when the Plan's unorthodox investment strategy was supposed to prevail). *Id. ¶ 59; see also 2020 Report at 35, 38.*

Further, the Plan's returns also lagged its own self-defined peer group. Among that group, in 2019 the Plan performed at the 90th percentile over the past three years, at the 93rd over the last five, and at the 87th over the past decade. *SAC ¶ 59.*

Yet, despite evidence that their strategy of relying on high-fee investments was failing, Defendants doubled down on that strategy. Defendants added *eight* new alternative investments to the Plan's investment lineup in 2020 alone, seven of which were high-fee and/or illiquid. *See id. ¶ 57; 2020 Report at 41; see also infra* at 24.

## B.   Underperformance and Excessive Fees Compared to Similar Plans and Investments with Like Aims and Risks

The Plan's underperformance and excessive fees are evident not only by comparing it to its own self-selected benchmarks and peer groups. Heeding the Court's order, Plaintiff investigated other plans and investment options to identify additional comparators that have similar aims and risks as the Plan. Stacked against

---

[3] Plaintiff is displaying the returns over 21 years because the 20-year returns shown in the Plan's 2019 annual report do not delineate annual performance for 2000 through 2002, and therefore Plaintiff is not able to calculate the performance of the 20-year time period beginning in 2001. *SAC ¶ 61, n.21.*

these peer plans and investments, the Plan also consistently underperformed while incurring greater expenses than necessary. These comparisons show that other fiduciaries seeking to manage a plan in a manner similar to the IAP—minimizing risk through diversification in order to meet the needs of participants of varying ages and financial circumstances in all market environments—were able to prudently utilize investments that yielded greater returns at substantially less expense.

**Comparator Plans:** As explained in the SAC, Plaintiff's peer group of plans was created as follows: Using two different databases (the Department of Labor's E-FAST database of Form 5500s and BrightScope), Plaintiff identified (1) all defined contribution plans with over $100 million in assets and 10,000 participants that indicated on the 5500 that they do not qualify for ERISA § 404(c) status, or that provide participants only limited control of their investments, and (2) every collectively bargained defined contribution plan with over 10,000 participants and less than 5% of the plan's assets in target-date funds. *SAC ¶ 69, n.29*. After reviewing the 5500s of each such plan, Plaintiff identified those plans that have a similar structure to the Plan. The plans in this peer group have at least 70% of the plan's assets in a single pooled investment that is managed by the plan's fiduciaries, with participants' performance determined by the investment performance of that pool, and with volatility levels (as measured by standard deviation) between 2010 and 2019 *within one percent of the Plan's volatility* during the period. *Id. ¶ 69*. Applying these objective criteria yielded a group of twelve plans with like aims and risks. *Id.*

In her SAC, Plaintiff highlights certain of these peer plans. For example, the Building Service 32BJ Retirement Savings Plan ("Building Service Plan") has 95,000 participants and uses a default investment option in which more than two-thirds of the plan's assets are invested. *Id.* That default investment, much like the Plan's single pooled investment, seeks to "*minimize the risk of large losses*, and is designed to provide long-term appreciation and capital preservation through a mix of equity and fixed income exposures consistent with a target level of *risk appropriate for*

-6-

*participants of the Plan as a whole*." *Id. ¶ 66* (emphasis added). And, like the Plan, the Building Service Plan's default investment seeks to minimize volatility and thus "*may not make as much money as more aggressively invested funds when the market is rising, but … also may not lose as much money as riskier funds when the market is falling*." *Id.* (emphasis added). Plaintiff also highlights the Bricklayers and Trowel Trades International Retirement Savings Plan, which invests assets "in a mixture of equities, fixed income and real estate equity and debt with the primary goal of *earning a reasonable rate of return without incurring unreasonable risk*." *Id. ¶ 70* (emphasis added). This broad diversification is intended "to generate a *reasonable rate of return for its members, while reducing the risk of large investment losses*." *Id*. Similarly, the Boilermakers National Annuity Trust "assets are invested in a manner intended to generate long-term rates of return consistent with the Trust's investment objectives and risk tolerance." *Id*. Accordingly, "[t]he primary investment objectives are to *preserve assets and generate an appropriate level of risk-adjusted return*." *Id.* (emphasis added). Finally, the Southern New England Carpenters Annuity Plan's investment policy "specifies that Fund investments be diversified among various asset classes, such as fixed income, equities, real estate, and alternatives, and permits *a level of risk that is reasonable for a long-term perspective*." *Id.* (emphasis added).

Compared to the average of this universe of twelve plans with similar aims and risks, the Plan was more expensive, more volatile, and underperformed. *SAC ¶¶ 71, 73*. The Plan's 10-year performance ending 2019 was 0.82% worse, while its volatility was 0.35% greater. *Id. ¶ 70*. Meanwhile, the Plan's expenses were 0.80% higher than the fees associated with the average plan between $500 million and $1 billion in assets, which is also size of the median plan in this custom peer group. *Id. ¶ 73*.

**Comparator Investments:** Plaintiff further identified comparable investments that similarly situated fiduciaries utilize to serve the same purpose as the Plan's single pooled investment—to meet the needs of a substantial number of participants of varying ages and with varying financial circumstances. *SAC ¶ 74*. To do so, Plaintiff

searched publicly available data from 2015 and identified every plan with more than $50 million in assets and with more than half of the plan's assets invested in a single mutual fund managed in a style similar to the Plan. *Id*. In order to meet the needs of such a large number of participants, these investment options, like the Plan, maximize diversification in order to reduce overall risk. *Id*.

Comparing these comparator funds with the Plan's IPS highlights the like aims and risks of the comparator funds. For example, the Plan's IPS states that the Plan has adopted "an investment objective of Growth and Income" that "is expected to achieve a positive rate of return over the long-term" and "[d]iversifies the Portfolio's assets in order to reduce the risk of wide swings in market value." *SAC ¶ 75*. The Vanguard Wellesley Income Fund likewise "seeks to provide *long-term growth of income* and a high and sustainable level of current income, along with *moderate long-term capital appreciation*." *Id.* (emphasis added). The Fidelity Balanced Fund similarly seeks "*income and capital growth consistent with reasonable risk*." *Id.* (emphasis added).

As shown below, the Plan had worse returns than each of the comparator funds, including on a 20-year basis, and was more expensive than those funds. *SAC ¶ 76*.

| | Volatility | 20-Year Avg Return as of 12/31/19 | Annual Expenses |
|---|---|---|---|
| **Vanguard Life Strategy Income (A)** | 4.2 | 4.92% | 0.11% |
| **Fidelity Asset Manager 20% (B)** | 4.5 | 4.64% | 0.51% |
| **Vanguard Wellesley Income Fund (C)** | 5.7 | 7.55% | 0.16% |
| **MPI Plan (MPI)** | **6.9** | **4.92%** | **1.18%**[4] |
| **Oakmark Equity and Income (D)** | 9.2 | 8.82% | 0.54% |
| **American Funds American Balanced (E)** | 9.4 | 8.06% | 0.26% |
| **Blackrock Global Allocation (F)** | 9.9 | 7.33% | 0.74% |
| **T. Rowe Price Capital Appreciation (G)[5]** | 10.2 | 10.55% | 0.55% |
| **Fidelity Balanced (H)** | 10.4 | 7.58% | 0.32% |

[4] The 1.18% includes 0.15% in administrative expenses. The Plan's administrative expenses are reported on page 4 of Plan's Form 5500 Notes to Financial Statements. *See SAC ¶ 54 n.13.* For 2019, the reported amount was $7.783 million, *ECF No. 63-10 at 41 of 154* (reported in thousands) while the Plan's year-end assets were $5.123 billion, *id.* Thus, administrative expenses were 0.15% of Plan assets.

[5] Though the T. Rowe Price Capital Appreciation mutual fund was closed to new investors in 2014, T. Rowe Price began offering a collective investment trust version of the fund in 2015 employing the identical investment strategy, and with the same underlying investments, that remains open to new retirement plan investors. *Id. n.36.*

-8-

Moreover, the lower returns were not justified by reduced volatility, as shown in the following graphic. *Id. ¶ 76.*

In sum, whether comparing the Plan to all other similarly sized plans, to Defendants' own hand-picked benchmarks and peer groups, or to Plaintiff's objectively identified comparator plans and mutual funds with like aims and risks, the



Plan underperformed, even on a risk-adjusted basis, while paying significantly higher fees. Taken together, these meaningful comparisons more than plausibly support an inference of imprudence.

## ARGUMENT

### I.   STANDARD OF REVIEW

A motion to dismiss "is not a procedure for resolving a contest between the parties about the facts or the substantive merits of the plaintiff's case." *Chavez v. Blue Sky Nat. Beverages Co.*, 340 Fed. App'x 359, 360 (9th Cir. 2009) (citation omitted); *Williams v. Gerber Prods. Co.*, 552 F.3d 934, 938 (9th Cir. 2008). "If there are two alternative explanations, one advanced by defendant and the other advanced by plaintiff, both of which are plausible, plaintiff's complaint survives a motion to dismiss under Rule 12(b)(6)." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011); *see also Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 596 (8th Cir. 2009) ("Rule 8 does not require a plaintiff to plead facts tending to rebut all possible lawful explanations for a defendant's conduct."). All that is required is that the complaint state sufficient

factual content that, when accepted as true, "state[s] a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *Force v. Advanced Structural Techs., Inc.*, 2020 WL 4539026, at *7 (C.D. Cal. Aug. 6, 2020).

Defendants misapprehend the standard for stating a plausible breach of fiduciary duty claim under ERISA in three important respects. ***First***, "a complaint does not need to contain factual allegations that refer directly to the fiduciary's knowledge, methods, or investigations at the relevant times," because "these facts will frequently be in the exclusive possession of the breaching fiduciary." *In re Prime Healthcare ERISA Litig.*, 2021 WL 3076649, at *5 (first quoting *Terraza v. Safeway, Inc.*, 241 F. Supp. 3d 1057, 1070 (N.D. Cal. 2017); and then quoting *Bouvy v. Analog Devices, Inc.*, 2020 WL 3448385, at *3 (S.D. Cal. June 24, 2020)); *see also Concha v. London*, 62 F.3d 1493, 1503 (9th Cir. 1995).[6] It is sufficient if the complaint pleads facts from which a reasonable inference of an imprudent process can be drawn. *Terraza*, 241 F. Supp. 3d at 1067. ***Second***, the complaint must be read "as a whole," *see Sonoma Cnty. Ass'n of Retired Emp. v. Sonoma County*, 708 F.3d 1109, 1116 (9th Cir. 2013), and should "not [be] parsed piece by piece to determine whether each allegation, in isolation, is plausible," *In re Toyota Motor Corp.*, 790 F. Supp. 2d 1152, 1164 (C.D. Cal. 2011) (quoting *Braden*, 588 F.3d at 594); *In re Countrywide Fin. Corp. Mortg.-Backed Sec. Litig.*, 2013 WL 5614294, at *2 (C.D. Cal. Sept. 30, 2013). ***Finally***, "the determination of the appropriate benchmark for a fund is not a question properly resolved at the motion to dismiss stage." *In re Prime Healthcare ERISA*

---

[6] *See also Braden*, 588 F.3d at 598 ("If plaintiffs cannot state a claim without pleading facts which tend systematically to be in the sole possession of defendants, the remedial scheme of the statute will fail, and the crucial rights secured by ERISA will suffer."); *Hurtado v. Rainbow Disposal Co., Inc.*, 2018 WL 3372752, at *13 (C.D. Cal. July 9, 2018) ("[A] plaintiff is not required to plead specific facts about the fiduciary's internal processes because such information is typically in the exclusive possession of a defendant.") (quoting *Fernandez v. Franklin Res., Inc.*, 2018 WL 1697089, at *7 (N.D. Cal. Apr. 6, 2018)).

*Litig.*, 2021 WL 3076649, at *6 n.7 (citation omitted) (collecting cases); *see also infra* at 16–17 (citing additional cases). Because the prudence inquiry is "fact intensive," "rarely will such a determination be appropriate on a motion for summary judgment, let alone a motion to dismiss." *Terraza*, 241 F. Supp. 3d at 1078 (citation and quotation marks omitted).

## II.   PLAINTIFF HAS PLAUSIBLY ALLEGED THAT DEFENDANTS BREACHED THEIR DUTY OF PRUDENCE UNDER ERISA

ERISA's fiduciary duties are the "highest known to the law." *Howard v. Shay*, 100 F.3d 1484, 1488 (9th Cir. 1996) (quoting *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982)). Among other things, ERISA requires fiduciaries to act "[w]ith the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent [person] acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims." 29 U.S.C. § 1104(a)(1)(B). This includes a "duty to exercise prudence in selecting investments" as well as a "continuing duty to monitor [plan] investments and remove imprudent ones." *Tibble v. Edison Int'l*, 575 U.S. 523, 529 (2015) ("*Tibble I*"). Plaintiff plausibly alleges that Defendants breached their duty of prudence here.[7]

### A.   Defendants Failed to Prudently Monitor Expenses

"Cost-conscious management is fundamental to prudence in the investment function, and should be applied not only in making investments but also in monitoring and reviewing investments." *Bouvy*, 2020 WL 3448385, at *8 (quoting *Tibble v.*

---

[7] In keeping with ERISA's strict fiduciary duties, the applicable prudence standard does not require merely the level of care expected of a layperson, but rather that of a prudent fiduciary with experience dealing with a similar enterprise. Thus, in evaluating investment decisions involving a multi-billion-dollar plan such as this, "prudence is measured against hypothetical sophisticated and prudent investment professionals." *In re Meridian Funds Grp. Sec. & ERISA Litig.*, 917 F. Supp. 2d 231, 239-40 (S.D.N.Y. 2013); *see also Rules and Regulations for Fiduciary Responsibility; Investment of Plan Assets Under the "Prudence" Rule*, 44 Fed. Reg. 37221, 37224 (June 26, 1979) ("[A] fiduciary of a plan with assets of $50,000" is not expected to use "the same investment management techniques as would a fiduciary of a plan with assets of $50,000,000.").

*Edison Int'l*, 843 F.3d 1187, 1197 (9th Cir. 2016) ("*Tibble II*")). Pursuant to trust law's prudent investor rule,[8] Defendants must "incur only costs that are reasonable in amount and appropriate to [their] investment responsibilities." Restatement (Third) of Trusts § 90(c)(3) (2007). As the Ninth Circuit put it simply in *Tibble*: "Wasting beneficiaries' money is imprudent." *Tibble II*, 843 F.3d at 1198 (quoting Uniform Prudent Investor Act § 7). "In devising and implementing strategies for the investment and management of trust assets, trustees are obliged to minimize costs." *Id.* (same).

### 1.     The Plan Was One of the Most Expensive Plans in the Country

Defendants failed to prudently minimize the Plan's costs. Instead, Defendants caused the Plan to become one of the most expensive plans in the country. As noted above, the Plan's total expenses in 2019 were 1.18% of Plan assets, approximately 4½ times the average expense level (0.26%) for all plans with $1 billion or more in assets, and approximately 2½ times the 90th percentile. *SAC ¶ 54.* These allegations of exorbitant fees compared to other similar plans support Plaintiff's breach of prudence claim. *See, e.g.*, *Urakhchin v. Allianz Asset Mgmt. of Am., L.P.*, 2016 WL 4507117, at *1, *6–7 (C.D. Cal. Aug. 5, 2016) (denying motion to dismiss where Plaintiff alleged total plan costs were 0.77%, when average plan cost among comparably sized plans was 0.44%); *Johnson v. Fujitsu Tech. & Bus. of Am., Inc.*, 250 F. Supp. 3d 460, 467 (N.D. Cal. 2017) (denying motion to dismiss where plaintiffs alleged that the challenged plan "was the most expensive 'mega plan' in the country in 2013 and 2014, with expenses three times higher than average for similarly-sized plans," concluding that "[o]n these facts alone, the Court can draw a plausible inference that defendants failed to act prudently").

Defendants argue that Plaintiff's calculation of the Plan's expenses "is nothing more than speculation." *Defs' Mot. at 13.* However, the Court previously rejected this argument in connection with Defendants' first motion to dismiss. *See ECF No. 53*

---

[8] Since ERISA is derived from the law of trusts, courts regularly look to trust law for guidance on ERISA's fiduciary duties. *See Tibble I*, 575 U.S. at 528–29.

*at 10 n.5* ("Although the Board argues that Klawonn's calculation of this fee percentage is based on incomplete data . . . [f]or the purpose of deciding this MTD, the Court takes this calculation as true."). Plaintiff has described the methodology for her calculation in detail in footnote 13 of the SAC. *SAC ¶ 54 n.13*. In summary, the calculation of Plan expenses is based on the sum of three components: (1) administrative fees, (2) asset-based investment management fees, and (3) performance-based investment management fees. *Id.* The SAC also cites the sources for all three of these components. *Id.* Based on those underlying sources, the administrative fees for 2019 amounted to 0.15% of the Plan's total expenses,[9] and the remainder—1.03%—constituted the Plan's investment management fees (both asset-based and performance based).

Defendants' alternative calculation of 0.30% for the Plan's investment management fees is grossly incomplete and misleading. The Plan's own 2019 Performance Report states that the Plan's investment management fees were 0.64%. *ECF No. 63-5 ("2019 Report") at 20*. That report also advises that the 0.64% amount "do[es] not include any applicable performance fee components," which 18 of the Plan's underlying investments charge. *Id.; see also id. at 37–41* (listing performance fees of investment managers). Some of these performance fees are significant. For example, King Street Capital charges 25% on all returns. *Id. at 39*. Further, Defendants' calculation of fees based on the Plan's Form 5500 includes direct compensation paid to investment managers, but notably does not include indirect compensation. *See Defs' Mot. at 13 n.8* (noting that Defendants' calculations included only "reported 'investment advisory and management fees'"); *see also Plaintiff's Response to Defendants' Request for Judicial Notice at 3 & n.4*.

### 2. The Plan's Investment Management Fees Exceeded Those for Comparable Plans and Investments

When the fees for the Plan's investments (1.03%) are compared to other peer

---

[9] *See supra* n.4.

plans and alternative investments as identified in the SAC, the Plan fares exceedingly poorly. For example, Defendants concede that the investment management fees were only "0.35% for the Boilermakers Trust and 0.22% for the Southern New England Plan." *Defs' Mot. at 13.* Based on these figures, Plaintiff's estimate of 0.38% for the median investment management fee for the peer group (based on plan size) is more than plausible. *See SAC ¶ 73.* Further, the Plan's investment management fees far exceeded the fees for each of the comparable investment alternatives cited by Plaintiff, ranging from nearly double the fees of the T. Rowe Price Capital Appreciation Fund (0.55%) to nearly **ten times** the fees of the Vanguard LifeStrategy Income Fund (0.11%). *Id. ¶ 76.* These comparisons, which were added to the SAC in response to the Court's order inviting such comparisons, further support Plaintiff's allegation that the Plan's fees were excessive.

Defendants claim that in 2019, "23.5% of the [Plan's] assets were invested with index funds or active managers with base fees of 0.20% or less." *Defs' Mot. at 18.* However, only 7.3% of the Plan's assets were invested in low-cost index funds, *see 2019 Report at 24* (listing percent allocation of the Plan in the two Vanguard funds as 5.5% and 1.8%), and more than half of the remaining 16.2% were invested with active managers whose *base fees* may have been 0.20% or less, but which also charged hefty performance fees. *Id. at 41, 44* (showing 20% performance fees for Arrowstreet Global Equity and PIMCO TIPS, both included among Defendants' "low fee" managers).[10] More fundamentally, Defendants miss the larger picture. Even if these funds actually were "low fee" funds (which they are not), they hold less than 25% of the Plan's assets. The remaining 75% of the Plan's assets are held in investments with significantly higher fees, some with base fees as high as 3.00% and with total fees as

---

[10] Along the same lines, Defendants assert that only two funds charge "*base* investment management fees" of 2% or higher. *Defs' Mot. at 18* (emphasis added). This does not contradict Plaintiff's allegation that seven funds charged fees "averaging over 2% per year," consisting of "significant base investment management fees" **and** "hefty performance fees on top of that." *SAC ¶ 53.*

high as 4.18% including performance fees. *See 2020 Report at 39* (Bridgewater Pure Alpha II); *see also id. at 33, 40* (base fee of 1.50% and performance fees of 2.675% in 2020 given net return) (Elliott International). The fact that Defendants omit any mention of the underlying funds' performance fees and focus on a small fraction of the Plan's total investments only serves to highlight the adequacy of Plaintiff's expense allegations.

### B.     Defendants Failed to Prudently Monitor Investment Performance

While it is not *per se* imprudent to utilize high-fee actively managed investment options, prudent fiduciaries will do so only after a thorough "investigation and analysis" demonstrates that the added expense will be "justified by *realistically evaluated return expectations*." Restatement (Third) of Trusts § 90 cmt. h(2) (emphasis added).[11] That was not the case here. By any measure, Defendants' strategy of relying on high-cost investment managers and hedge funds was a consistent failure.

#### 1.     The Plan Consistently Underperformed Similarly Sized Plans and Plans With Similar Investment Objectives

As noted above, the Plan's investment performance consistently ranked at or near the bottom among similarly sized plans. For example, the following chart shows the Plan's investment performance compared to other Plans with $1 billion in assets or more based on available data from 2009 through 2018:

| MPI Performance Compared to Plans Over $1B | | | | | | |
|---|---|---|---|---|---|---|
| 3-year rolling returns | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 |
| MPI Plan | 7.09% | 6.84% | 2.35% | 2.34% | 4.34% | 4.28% |
| Median Return | 9.46% | 11.99% | 7.88% | 4.69% | 7.68% | 5.93% |
| Percentile Rank | 8.50% | 1.10% | 1.10% | 1.10% | 2.20% | 9.60% |
| Rank | 161/175 | 174/175 | 174/175 | 174/175 | 172/175 | 159/175 |

---

[11] The CFA Institute Research Foundation likewise explains that the use of high-fee active managers is appropriate only when fiduciaries can reasonably conclude that (1) the asset class is inefficient and therefore "[a]ctive managers who can add value (after fees) exist in the asset category"; (2) "[t]he committee can identify and hire those managers"; and (3) "[t]he committee can adequately monitor and, when necessary, replace poorly performing managers." *SAC ¶ 38* (citation omitted).

| 5-year rolling returns | | | | | | |
|---|---|---|---|---|---|---|
| **MPI Plan** | 9.52% | 7.47% | 4.43% | 4.74% | 4.54% | 2.78% |
| **Median Return** | 12.34% | 9.37% | 6.82% | 8.56% | 9.41% | 4.81% |
| **Percentile Rank** | **5.60%** | **7.30%** | **4.50%** | **1.10%** | **0.50%** | **2.20%** |
| **Rank** | **166/175** | **163/175** | **168/175** | **174/175** | **175/175** | **172/175** |
| 10-year rolling returns | | | | | | |
| **MPI Plan** | N/A | N/A | N/A | N/A | N/A | 6.09% |
| **Median Return** | N/A | N/A | N/A | N/A | N/A | 8.58% |
| **Percentile Rank** | N/A | N/A | N/A | N/A | N/A | **1.70%** |
| **Rank** | N/A | N/A | N/A | N/A | N/A | **173/175** |

*SAC ¶ 56.* When compared to a broader group of Plans with $100 million in assets or more, the Plan's returns were similarly abysmal. *Id. ¶ 55.*

Although the Court noted in its prior order that a "conservative approach is not necessarily imprudent," *ECF No. 53 at 11*, the additional allegations in the SAC show that the Plan's consistently lagging investment returns cannot be justified based on investment philosophy. To address this issue, Plaintiff identified 12 peer plans with similar investment philosophies and levels of risk that were structured in a similar manner (with all or most assets invested in a single pooled investment with diversified underlying holdings to reduce volatility). *SAC ¶¶ 69–70.* Compared to this focused peer group, the Plan's 10-year performance from 2010 to 2019 was -0.82% lower and its 5-year performance ending 2015 was -1.08% lower. *SAC ¶ 70.* All the while, the Plan had *greater* volatility over the same periods—0.35% higher over the 10-year period ending 2019 and 0.99% higher over the 5-year period ending 2015. *Id.*[12]

Defendants raise various factual issues with respect to Plaintiff's peer group comparisons. However, these issues are not properly resolved on a motion to dismiss. *See In re Prime Healthcare ERISA Litig.*, 2021 WL 3076649, at *6 n.7 (citing *In re*

---

[12] Contrary to Defendants' argument, *Defs' Mot. at 14 n.12*, Plaintiff explained her methodology for calculating the performance and volatility of the 12 peer plans in the *SAC ¶ 69 n.29*. The returns of every peer plan was drawn from the plan's Form 5500 dating back to 2009. Each plan's volatility, a common metric used to measure the risk of an investment, was calculated by the standard deviation from the plan's mean performance. *See SAC ¶ 62 n.22.* This methodology is more than adequate and satisfies Rule 12's plausibility standard.

1   *MedStar ERISA Litig.*, 2021 WL 391701, at * 6 (collecting cases)); *accord Davis v.*

2   *Magna Int'l of Am., Inc.*, 2021 WL 1212579, at *7 (E.D. Mich. Mar. 31, 2021) ("To

3   the extent that Defendants argue the merits of Plaintiffs' comparisons, such arguments

4   are premature in a motion to dismiss."); *Miller v. AutoZone, Inc.*, 2020 WL 6479564,

5   at *4 (W.D. Tenn. Sept. 18, 2020) ("AutoZone's argument that the Court should give

6   limited weight to fee comparisons between actively managed GoalMaker funds and

7   low-cost Vanguard index funds invites the kind of factual analysis that is

8   inappropriate at the pleading stage."); *Cunningham v. Cornell Univ.*, 2017 WL

9   4358769, at *7 (S.D.N.Y. Sept. 29, 2017) ("[D]efendants' argument that plaintiffs

10  used inappropriate benchmarks to assess the performance of the challenged options

11  raises factual questions that are not properly addressed on a motion to dismiss");

12  *Vellali v. Yale Univ.*, 308 F. Supp. 3d 673, 684 (D. Conn. 2018); *Short v. Brown Univ.*,

13  320 F. Supp. 3d 363, 372 (D.R.I. 2018); *Nicolas v. Princeton Univ.*, 2017 WL

14  4455897, at *5 (D.N.J. Sept. 25, 2017); *Sacerdote v. New York Univ.*, 2017 WL

15  3701482, at *10 (S.D.N.Y. Aug. 25, 2017), *vacated and remanded on other grounds*,

16  9 F.4th 95, 108 (2d Cir. 2021); *Henderson v. Emory Univ.*, 252 F. Supp. 3d 1344,

17  1352 (N.D. Ga. 2017).

18        In any event, Defendants' criticisms do not render Plaintiff's allegations

19  implausible. For example, Defendants argue that some of the comparator plans are

20  "materially smaller with respect to the number of participants and/or total assets held."

21  *Defs' Mot. at 12*. However, these plans were not flyweights—all of them had *at least*

22  10,000 participants and $100 million in assets. *SAC ¶ 69*. Indeed, the size of the

23  Building Service Plan is particularly comparable to the Plan, as it had over 95,000

24  participants and $1.8 billion in assets as of 2019. *Defs' Mot. at 12*. There is no reason

25  to believe that the Plan would have fared materially better against a peer group that

26  was limited to plans in the $1 billion+ range instead of the $100 million+ range.

27  Plaintiff's broader set of comparisons to all plans showed similar results regardless of

28  whether a $100 million or $1 billion cutoff was used. *SAC ¶¶ 55–56*. And within the

1    peer group itself, the Plan underperformed the Building Service Plan just as it did the
2    peer group as a whole. *See id. ¶ 68* ("[T]he Building Service Plan has achieved greater
3    returns with lower volatility than the Plan for a fraction of the investment management
4    expense"). Regardless, the Plan's large size should have put the Plan at a comparative
5    *advantage*, as larger plans have access to less expensive investment options and can
6    negotiate directly with the investment manager to obtain lower fees (thereby
7    enhancing net returns). *See id. ¶ 47*. Thus, to the extent that the Plan is larger than the
8    plans in the peer group, Plaintiff's comparisons likely *favor* the Plan.

9        Defendants note that the Building Service Plan offers participants multiple
10   investment options. *Defs' Mot. at 10*. However, more than two-thirds of the plan's
11   $1.8 billion in assets are similarly invested in a single pooled investment option that
12   also seeks to "minimize the risk of large losses, and is designed to provide long-term
13   appreciation and capital preservation . . . with a target level of risk appropriate for
14   *participants of the Plan as a whole*." *SAC ¶ 66* (emphasis added). Thus, the Building
15   Service Plan is quite similar to the IAP with respect to how participants' assets are
16   invested. *Compare id.* (quoting Building Service Plan's summary plan description
17   stating that default investment "may not make as much money as more aggressively
18   invested funds when the market is rising, but it also may not lose as much money as
19   riskier funds when the market is failing."), *with Defs' Motion to Dismiss First Am.
20   Compl., ECF No. 44, at 20* ("The IAP's investment goals recognize that its
21   participants retire at different times in the market cycle and thus are specifically
22   designed to protect those participants who retire in the middle of a down market . . .
23   from suffering steep losses to their benefits.").

24       Defendants similarly argue that the Bricklayers Savings Plan is an "inapt
25   comparator to the IAP" because it is "composed of an annuity retirement benefit that
26   depends on a pooled-asset investment arrangement, plus an additional participant-
27   directed 401(k) benefit[.]" *Defs' Mot. at 10* (citing *ECF No. 63-8 at 14*). However,
28   the participant-directed 401(k) benefit holds only 2.25% of the Bricklayers Savings

-18-

Plan's total assets. *See ECF No. 63-8 at 13* (reporting that as of 12/31/2019, the pooled asset portion of the Bricklayers Savings Plan held $187 million in assets, while the 401(k) assets were $4.3 million). Thus, the pooled-asset benefit of the Bricklayers Savings Plan constitutes almost the entirety of the assets in that plan. Moreover, similar to the IAP, the investment guidelines of the annuity benefit provide for "a broad diversification of the Plan's investments in order to generate a reasonable rate of return for its members, while reducing the risk of large investment losses." *Id. at 12*; *see also SAC ¶ 70*. The presence of an ancillary 401(k) benefit does not change the fiduciaries' obligations in managing the pooled asset, nor does it change the reality that in managing the pooled-asset benefit, the fiduciaries had similar aims and risks as Defendants have in managing the IAP.

Defendants then perplexingly argue that a "crucial difference" with the IAP is that "the participant's benefit is determined at retirement and paid out as a lump sum or annuity." *Defs' Mot. at 11*. However, ***all four*** of the comparator plans highlighted in the SAC offer this feature. *See id. at 10* (explaining the Bricklayers Savings Plan offers an "annuity retirement benefit that depends on a pooled-asset investment arrangement"); *ECF No. 63-12 at 31* (Building Service Plan Form 5500 explaining that upon retirement, a participant can receive "the value of his or her individual account in the form of a single lump sum payment, equal monthly installments . . . , or a combination of both"); *ECF No. 63-17 at 39* (Southern New England Plan Form 5500 explaining that "Participants can request distributions of account balances in the form of lump sum . . . , installment, or a combination. . ."); Boilermakers National Annuity Trust Summary Plan Description (SPD) (July 2019) at 18, available at http://www.bnat.retirepru.com/_assets/docs/bnat-spd.pdf ("A beneficiary may elect to receive payment in the form of a Single Lump Sum Payment, Partial Distribution, or Installment Payments.").

Defendants make a similarly weak argument that "IAP benefits are funded exclusively by employer contributions[.]" *Defs' Mot. at 11*. The fact that the Plan is

-19-

funded by employer contributions does not diminish the Board's fiduciary duty to prudently monitor the Plan's pooled investment. *See Toomey*, 2020 WL 3412747, at *3 (declining to dismiss similar claim relating to pooled investment "funded solely by employer contributions"). ERISA's legal duties apply equally to the investment of assets in a retirement plan regardless of the source of those assets. *See Brotherston v. Putnam Invs, LLC*, 907 F.3d 17, 28–29 (1st Cir. 2018); *accord Ambromovage v. United Mine Workers*, 726 F.2d 972, 984 (3d Cir. 1984) ("[U]nder settled principles of trust law, a settlor-trustee cannot set off the amount of his gifts to the trust against his liability for a subsequent breach of trust.").

Finally, Defendants argue that "underperformance of one percentage point or less ... is certainly insubstantial[.]" *Defs' Mot. at 14* (internal quotation marks and citation omitted).[13] However, their attempt to trivialize the differences in returns only highlights their failure to appreciate their fiduciary duties. "[E]ven a 1% difference in net returns each year can reduce a participant's savings by over a fourth by retirement." *Falberg v. Goldman Sachs Grp., Inc.*, 2020 WL 3893285, at *9 (S.D.N.Y. July 9, 2020).[14] And in the aggregate, these differences amount to tens of millions of dollars *per year* for a multi-billion-dollar plan such as the IAP.

### 2. The Plan's Pooled Investment Underperformed Comparable Investments with Similar Objectives

In response to the Court's order, Plaintiff also specifically identified "what other investment options were available [that] could satisfy the Plan's strategy." *See ECF No. 53 at 11*. Indeed, the SAC identifies no less than eight separate mutual funds that were similarly diversified and designed for broad-based participant populations, all of which were less costly and most of which offered superior returns on both a

---

[13] Defendants cite *Patterson v. Morgan Stanley*, 2019 WL 4934834 (S.D.N.Y. Oct. 7, 2019). However, even that case acknowledged that "allegations of consistent, ten-year underperformance may support a duty of prudence claim." *Id.* at *10.

[14] *See also* U.S. Department of Labor, *A Look at 401(k) Plan Fees*, at 1-2 (2013), https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf.

nominal basis and risk-adjusted basis after accounting for volatility. *See supra* at 8.[15]

For example, the Vanguard Wellesley Income Fund (the pooled investment in the Building Service Plan) has an expense ratio of only 0.16%, far below the Plan's investment management fee of over 1%. *SAC ¶ 67*. During the 20-year period from 2000 through 2019, the returns of the Vanguard Wellesley Income Fund were 7.55% per year, compared to the Plan's 4.9%. *Id*. Over the same period, the volatility for the Vanguard Wellesley Income Fund was only 5.68% compared to the Plan's 6.9%. *Id*. To put this underperformance in context, a person whose account had $100,000 invested in the Vanguard Wellesley Income Fund at the end of 1999 would have approximately $465,000 at the end of 2020, while a person whose account had $100,000 invested in the Plan at the end of 1999 would have only $275,000. *Id. ¶ 68.*

Defendants' attempts to distinguish these comparator investments also fall flat. Like the Plan's pooled investment, the comparator investments include actively managed funds.[16] Moreover, these mutual funds are diversified, investing in multiple asset classes and securities. *See SAC ¶ 74* ("To meet the varying needs of such a large group of participants, these investment options maximize diversification in order to reduce overall risk."); *see also id. n.35* ("Plaintiff included funds invested in multiple asset classes …. Target-date funds and single-asset-class funds were excluded."). Thus, Defendants' suggestion that utilizing a mutual fund would have violated any diversification best practices is meritless. *See Defs' Mot. at 17*; *see also* Fidelity Asset Manager 20% (FASIX) Fund Fact Sheet at 1, available at

---

[15] These investment comparators were not cherry-picked based on hindsight. Rather, Plaintiff set objective criteria to identify relevant investment comparators (*see supra* at 7–8) and included all funds that met the stated criteria. *See SAC ¶ 74* ("Every fund meeting these objective criteria . . . was included in Plaintiff's analysis"). The same is true for the plan-based comparators discussed above. *See id. ¶ 69 n.29* ("The annual returns of every plan meeting those criteria were calculated using the plan's Form 5500s . . ."). In any event, Defendants knew that the Plan was underperforming its own benchmarks and peer groups. *See infra* at § II.B.3; *ECF No. 53 at 10.*

[16] The Vanguard LifeStrategy Income Fund has underlying holdings in certain index funds (as does the Plan, *see supra* at 14).

https://fundresearch.fidelity.com/mutual-funds/fundfactsheet/316069400 (stating it is an "all-in-one investment strateg[y] delivering broad, diversified asset-class exposure aligned with client risk objectives" and "[a]ssets are divided among several specialized Fidelity central funds."). The only difference between the comparator funds and the Plan's pooled investment is that the comparator funds are managed by investment professionals at Fidelity, Vanguard, and T. Rowe Price, among others, while Defendants have taken it upon themselves to select the underlying investment managers for the Plan's pooled investment.

Finally, Defendants are incorrect to assert that Plaintiff made "no attempt to show" that these mutual funds are similarly used by fiduciaries of other large retirement plans. *See Defs' Mot. at 15.* To the contrary, Plaintiff limited her investment comparators to investments that held over half the assets of a plan with at least $50 million, *SAC ¶ 74*, and specifically noted that the Vanguard Wellesley Income Fund is used by the Building Service Plan (which has $1.8 billion in assets). *Id. ¶ 67; see also Defs' Mot. at 12.*

As noted above, a motion to dismiss is not the proper vehicle for making fact-based arguments regarding the weight to be afforded to Plaintiff's investment comparisons. *See supra* at 2, 16–17. At this stage, Plaintiff has met her obligation under the Court's order to identify "specific comparators," *ECF No. 53 at 12*, and any disputes relating to the appropriateness or "fit" of those comparisons should be left for summary judgment or trial, following discovery and expert testimony. Regardless, the detailed allegations supporting Plaintiff's comparators in this case are distinguishable from the cases upon which Defendants rely. *See Defs' Mot. at 16.*

### 3. The Plan Underperformed Its Own Investment Benchmarks and Peer Groups

Whatever criticisms Defendants may have of Plaintiff's comparators (similarly sized plans, plans with similar investment objectives, and similarly diversified investments), Defendants cannot escape comparisons to their own self-selected

benchmarks and peer groups. *See Terraza*, 241 F. Supp. 3d at 1076 (denying motion to dismiss where the plaintiff alleged that the investment options "underperformed compared to their benchmark"); *Becker v. Wells Fargo & Co.*, 2021 WL 1909632, at *5 (D. Minn. May 12, 2021) (plaintiff plausibly alleged imprudence "by using the very benchmarks that Defendants themselves selected for comparison").

As noted above, the Plan significantly trailed its own benchmarks (by 1.73% and 3.68%) during the 10-year period from 2010 to 2019,[17] and fared even worse on a 3-year and 5-year basis. *See supra* at 4. Indeed, the Plans' returns were ***less than half*** the returns of one of those benchmarks (the MSCI World Index) on both a 3-year and 5-year basis, and also multiple percentage points behind its other benchmark. *Id.*

Similarly, among its self-defined universe of peers, the Plan's annual report shows that it performed at the 90th percentile during the three-year period from 2017–2019, at the 93rd percentile from 2015 – 2019, and at the 87th percentile over the prior decade from 2010–2019. *SAC ¶ 59* (citing *ECF No. 44-6 at 25*). And despite claims that the Plan's investment management was designed to weather market turbulence, these performance numbers remained quite poor in 2020. *Id.*

Although the Court noted in its prior order that the "the Plan's 20-year returns are comparable" to its benchmarks, *ECF No. 53 at 11*, Plaintiff has addressed this issue in the SAC. When returns for 2020 are included, the Plan also underperformed both benchmarks over the two decades from 2000–2020. *SAC ¶ 61*. Thus, even when measured against its own benchmarks, the Plan has performed poorly over *all* time periods, and particularly poorly over the relevant statutory period. *See* 29 U.S.C. § 1113(1) (six-year limitations period); *SAC ¶ 86* (defining class period).

The IAP's consistent underperformance against its own benchmarks and peer groups, *taken together* with the Plan's investment underperformance relative to comparable plans and investments, is more than sufficient to support an inference that

---

[17] This is far worse than in *Patterson*, where the fund in question came within 0.74% of its benchmark over a ten-year period. 2019 WL 4934834, at *10.

Defendants failed to prudently monitor the Plan's investment portfolio. *See, e.g.*, *In re Prime Healthcare ERISA Litig.*, 2021 WL 3076649, at *4 (denying motion to dismiss where the plaintiffs alleged the challenged investment options "trailed their respective benchmarks over their respective lifetimes" and had "significantly higher expense ratio than the Index [comparator]"); *Terraza*, 241 F. Supp. 3d at 1077 ("When viewed collectively, the Court can reasonably infer from these allegations that the Defendants engaged in a flawed decision-making process by selecting and retaining the challenged investment options."); *Toomey*, 2020 WL 3412747, at *3; *ECF No. 53 at 11* ("[G]eneral allegations of high fees and underperformance compared to other large pension funds are indicia of imprudence.").

### C.    Defendants Have Imprudently Failed to Change Course

Defendants object that "Plaintiff says nothing about the *process* that was used to monitor the IAP's investments[.]" *Defs' Mot. at 8.* However, such allegations are not required at this stage. *See supra* at 10 & n.6 (citing cases).

In any event, Plaintiff alleges that Defendants imprudently "failed to make any changes to their approach, instead doubling down on their misguided decisions." *SAC ¶ 57.* For example, despite the poor performance of the expensive hedge funds and other alternative investments in the portfolio, Defendants added seven high-cost alternative investments to the Plan's investment lineup in 2020 alone. *Id.* Defendants' own motion papers confirm this. Defendants admit that the Board added eight new investment funds in 2020, and of these, "three are hedge funds" and four are "investments in private assets." *Defs' Mot. at 19.*[18] Notably, <u>*six*</u> of the new funds have performance fees charged on top of base fees, including one fund (D.E. Shaw Composite) that charges an alarming 3.00% base fee plus a 30% performance fee on *all returns*. *2020 Report at 40–43*.

Churning through the underlying funds without revisiting the overall strategy

---

[18] The other new investment, the PanAgora Diversified Risk fund, is not "liquid." *See id. at 19*. It can be traded only on a monthly basis. *See 2020 Report at 41*.

is hardly indicative of a prudent and thoughtful investment process. "To the contrary, a prudent fiduciary would have abandoned this unorthodox and unsuccessful approach, or at the very least investigated significantly better performing underlying investments with lower fees." *SAC ¶ 79.* Even aside from the high fees and poor performance, the illiquid and highly leveraged nature of many of the underlying funds is contrary to the Plan's objective of minimizing investment risk.[19] *SAC ¶ 63.* Given the inherent difficulties associated with evaluating such unorthodox investments, *see ECF No. 44-11 at 13* ("[L]ack of transparency may make it more difficult to evaluate how investments in such funds [hedge funds and private equity] fit within the pension plan's overall investment strategy."), and Defendants' demonstrated lack of skill at doing so, *SAC ¶ 78 & n.37,* Defendants should have changed course.[20] Far from prudently tweaking a conservative investment approach, Defendants have troublingly churned through alternative investments that charge exorbitant fees, have performed poorly, and come with greater risk than perhaps even Defendants realize.

## CONCLUSION

For all of the above reasons, Defendants' motion to dismiss should be denied.

Respectfully submitted,

Dated: November 16, 2021

/s/ Kai Richter

Kai Richter
NICHOLS KASTER, PLLP

ATTORNEY FOR PLAINTIFF

---

[19] As of the end of 2020, more than half (26) of the Plan's 42 holdings do not provide daily liquidity, and four of them (all added in 2020) are completely illiquid. *SAC ¶ 63, 2020 Report at 39–43.* More than a third of the Plan's assets (35.8%) are in these illiquid investments. *2020 Report at 26.*

[20] Those courts that have held that it is not *per se* imprudent to offer such illiquid investment options have done so where the plan offered a menu of investment options, including some higher-fee illiquid options alongside more traditional low-cost mutual funds. *See Davis v. Wash. Univ.,* 960 F.3d 478, 486–87 (8th Cir. 2020); *Kong v. Trader Joe's Co.,* 2020 WL 7062395, at *4 (C.D. Cal. Nov. 30, 2020). That was not the case here.