Nancy G. Ross, *pro hac vice*
 nross@mayerbrown.com
Richard E. Nowak, *pro hac vice*
 rnowak@mayerbrown.com
Abigail M. Bartine (SBN 326993)
 abartine@mayerbrown.com
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
Telephone:   (312) 782-0600
Facsimile:    (312) 701-7711


Naama Shemesh (SBN 328370)
nshemesh@mayerbrown.com
MAYER BROWN LLP
350 S. Grand Ave., 25th Fl.
Los Angeles, CA 90071
Telephone:   (213) 229-9500
Facsimile:    (213) 625-0248

*Attorneys for Defendant Board
of Directors for the Motion
Picture Industry Pension Plans*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| PATRICIA KLAWONN, on behalf of the Motion Picture Industry Individual Account Plan,<br><br>Plaintiff,<br><br>v.<br><br>BOARD OF DIRECTORS FOR THE MOTION PICTURE INDUSTRY PENSION PLANS, et al.<br><br>Defendants. | Case No. 2:20-cv-09194-DMG-JEM<br><br>**DEFENDANT BOARD OF DIRECTORS' REPLY IN SUPPORT OF ITS MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT**<br><br>Hearing Date: January 7, 2022<br>Hearing Time: 9:30 a.m.<br>Judge: Hon. Dolly M. Gee |

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .........................................................................................ii

I.    APPLICABLE LEGAL STANDARD ..........................................................2

II.   PLAINTIFF'S AMENDED ALLEGATIONS ABOUT
     INVESTMENT PERFORMANCE AND FEES STILL DO NOT
     STATE A PLAUSIBLE CLAIM OF A FAILURE TO MONITOR .............3

     A.    Plaintiff Offers No Allegations About the Board's Allegedly
         Flawed Monitoring.............................................................................4

     B.    Plaintiff's "Comparator" Plans Fail to Plausibly State a Claim
         of Imprudent Investment Monitoring ...................................................6

         1.    Plaintiff's "Comparator" Plans Are Easily
             Distinguishable ...........................................................................6

         2.    Plaintiff's Allegations About the IAP's Fees Do Not
             Raise a Plausible Inference of Imprudence ..............................8

          3.    Plaintiff's Allegations that the IAP Underperformed the
             12 "Comparator" Plans Fail to Raise a Plausible
             Inference of Imprudence...........................................................11

     C.    Plaintiff's "Comparator" Investments Likewise Fail to
         Plausibly State a Claim of Imprudent Investment Monitoring..........12

     D.    Plaintiff's Claims That the IAP Underperformed Its Own
         Benchmarks Do Not Save Her Imprudent Monitoring Claim...........14

CONCLUSION.................................................................................................15

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Anderson v. Intel Corp.*,
2021 WL 229235 (N.D. Cal. Jan. 21, 2021) ........................................................ 8

*Barchock v. CVS Health Corp*.,
886 F.3d 43 (1st Cir. 2018) ................................................................................. 4

*Bouvy v. Analog Devices, Inc.*,
2020 WL 3448385 (S.D. Cal. June 24, 2020) ...................................................... 2

*Braden v. Wal-Mart Stores, Inc.*,
588 F.3d 585 (9th Cir. 2009) .............................................................................. 11

*Carter v. San Pasqual Fiduciary Tr. Co.*,
2016 WL 6803768 (C.D. Cal. Apr. 18, 2016) ...................................................... 5

*Chao v. Merino*,
452 F.3d 174 (2d Cir. 2006) ................................................................................. 3

*Cho v. Prudential Ins. Co. of Am.*,
2021 WL 4438186 (D.N.J. Sept. 27, 2021) ........................................................ 13

*Cook v. City of Fremont*,
2020 WL 6318712 (N.D. Cal. Oct. 28, 2020) ...................................................... 9

*Davis v. Salesforce.com, Inc.*,
2020 WL 5893405 (N.D. Cal. Oct. 5, 2020) ........................................................ 8

*Enos v. Adidas America, Inc.*,
2021 WL 5622121 (D. Or. Aug. 26, 2021) ........................................................ 16

*Forman v. TriHealth, Inc.*,
2021 WL 4346764 (S.D. Ohio Sept. 24, 2021) .................................................... 8

*Hurtado v. Rainbow Disposal Co., Inc.*,
2018 WL 3372752 (C.D. Cal. July 9, 2018) ........................................................ 2

*Kong v. Trader Joe's Co.*,
2020 WL 7062395 (C.D. Cal. Nov. 30, 2020) .................................................... 11

ii

*Lauderdale v. NFP Retirement, Inc. et al.*,
   2021 WL 3828646 (C.D. Cal. Aug. 18, 2021) ..................................................... 5

*In re McKesson HBOC, Inc. ERISA Litig.*,
   2002 WL 31431588 (N.D. Cal. Sept. 30, 2002) .................................................. 5

*In re MedStar*,
   2021 WL 391701 (D. Md. Feb. 4, 2021) ............................................................. 8

*Meiners v. Wells Fargo & Co.*,
   898 F.3d 820 (8th Cir. 2018) ...................................................................... 11, 13

*Patterson v. Morgan Stanley*,
   2019 WL 4934834 (S.D.N.Y. Oct. 7, 2019) ................................................. 11, 12

*In re Prime Healthcare ERISA Litig.*,
   2021 WL 3076649 (C.D. Cal. July 16, 2021) .................................................... 8

*Romero v. Nokia, Inc.*,
   2013 WL 5692324 (N.D. Cal. Oct. 15, 2013) .................................................... 5

*Smith v. CommonSpirit Health*,
   2021 WL 4097052 (E.D. Ky. Sept. 8, 2021) ..................................................... 10

*Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Ctr. Ret.*
   *Plan. v. Morgan Stanley Inv. Mgmt. Inc.*,
   712 F.3d 705 (2d Cir. 2013) ............................................................................. 2

*Sweda v. Univ. of Penn.*,
   923 F.3d 320 (3d Cir. 2019) ............................................................................ 15

*Terraza v. Safeway Inc.*,
   241 F. Supp. 3d 1057 (N.D. Cal. 2017) ............................................................ 8

*Toomey v. DeMoulas Super Markets, Inc.*,
   2020 WL 3412747 (D. Mass. Apr. 16, 2020) ................................................. 3, 4

*White v. Chevron Corp.*,
   2016 WL 4502808 (N.D. Cal. Aug. 29, 2016) .............................................. 5, 15

*White v. Chevron Corp.*,
   2017 WL 2352137 (N.D. Cal. May 31, 2017), *aff'd*, 752 F. App'x
   453 (9th Cir. 2018) ........................................................................................ 16

iii

*White v. Chevron Corp.*,
     752 F. App'x 453 (9th Cir. 2018).........................................................................15

**Other Authorities**

29 C.F.R. § 2550.404c-5.............................................................................................7

Restatement (Third) of Trusts § 90 (2007)................................................................15

iv

In dismissing Plaintiff's First Amended Complaint ("FAC"), the Court cogently explained that, to state a claim of imprudence against the Board, Plaintiff needed to identify "specific comparators" demonstrating that the IAP's investments were deficient when compared to similar plans with similar investments.  ECF No. 53 at 12.  In its renewed motion to dismiss, the Board thoroughly dispelled any notion that the Second Amended Complaint ("SAC") adequately set forth the requisite "specific comparators."   Contrary to Plaintiff's characterization that the Board "quibble[s] with the nuances of Plaintiff's comparators," Opp. 2, the Board has shown that Plaintiff's new allegations point to inapt comparator plans with a fraction of the assets held by the IAP and provide for self-selection among myriad investment options unlike the IAP.   And Plaintiff's preferred investments offer apples-to-oranges comparisons that as a matter of law fall well short of establishing a plausible inference that the Board's chosen investment strategy and process was imprudent.  And while Plaintiff repeats her claim that she has plausibly alleged that the Board's investments failed to meet their own benchmarks and the performance of its self-styled group of peers, the Court specifically rejected that theory of liability when it dismissed the FAC.  ECF No. 53 at 11.  Neither Plaintiff's SAC nor her opposition—which consists primarily of repetition of inadequate allegations from the SAC—offers any new bases for the Court to revisit its clear holding.

As this Court and others have recognized many times, apples-to-oranges comparisons and mere suggestions that alternative investments exist, such as those advanced by Plaintiff, cannot and do not create any inference of wrongdoing that warrants the intense and one-sided burdens of discovery for defendants in these cases.  This is especially true for prudent fiduciaries such as the Board who engaged an experienced third-party investment advisor who, by all accounts, understood the mission of the IAP and helped the Board achieve and maintain its goals.  Even the limited record shows that the Board engaged in a robust review process to ensure

that all IAP participants were well-positioned for retirement.  Because Plaintiff once again fails in her third bite at the apple to state a plausible claim against the Board, her complaint should be dismissed with prejudice.

## I.      APPLICABLE LEGAL STANDARD

There is no ERISA exception to the requirements of *Twombly* and *Iqbal*. Although a plaintiff need not allege detailed evidence of a plan fiduciary's process, she must at least set forth adequate circumstantial evidence of a fiduciary breach to state a plausible claim.  *See Bouvy v. Analog Devices, Inc.*, 2020 WL 3448385, at *3 (S.D. Cal. June 24, 2020) (citation omitted); *Hurtado v. Rainbow Disposal Co., Inc.*, 2018 WL 3372752, at *13 (C.D. Cal. July 9, 2018).  This requires a plaintiff to specifically allege facts that are suggestive of fiduciary misconduct—not merely facts that have both lawful and unlawful explanations.  *See Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Ctr. Ret. Plan. v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 718 (2d Cir. 2013).

Here, Plaintiff concedes that she has no direct evidence of the Board's fiduciary process (SAC ¶ 81), leaving her to rely entirely on purported circumstantial evidence of alleged imprudence.  As a threshold matter, Plaintiff's opposition arguments ignore the detailed 2019 and 2020 Performance Reports (ECF No. 63, Exs. D & E) that she indisputably relies on in her SAC.  Although Plaintiff wishes otherwise, those reports plainly show the Board's constant monitoring of the IAP's investments and its fund managers, making changes as appropriate in an effort to achieve consistently strong returns for participants. Mot. 17-21.  Rather than address this direct evidence of a prudent process, Plaintiff tellingly focuses her efforts to generate  circumstantial inferences on inapt "comparator" plans which allegedly had lower investment fees, used different investments, and provided different returns. But as shown below and in the Board's opening brief, these allegations fail to support plausible claims of imprudence both because Plaintiff points to no pooled-

2

investment plan of comparable size and mission, and Plaintiff's alternative preferences do not show imprudence by the Board in selecting and monitoring the IAP's investment lineup.

## II. PLAINTIFF'S AMENDED ALLEGATIONS ABOUT INVESTMENT PERFORMANCE AND FEES STILL DO NOT STATE A PLAUSIBLE CLAIM OF A FAILURE TO MONITOR

Whether standing alone or taken together, Plaintiff's allegations that the Board purportedly failed to monitor the IAP's costs and investments fail to state a plausible claim.  As with the FAC, Plaintiff's SAC (¶¶ 32-40, 49-51) and her opposition brief (Opp. 15-22) again expose the true motivation for this lawsuit: Plaintiff seeks through any means possible to force a fundamental settlor design change to turn the IAP into a self-directed plan filled with passive investments.  But ERISA does not require a plan fiduciary to take any particular course of action.  *See Chao v. Merino*, 452 F.3d 174, 182 (2d Cir. 2006) (ERISA imposes on fiduciaries no "duty to take any particular course of action if another approach seems preferable") (internal citation marks omitted).

As in her complaints and her response to the Board's prior motion to dismiss, Plaintiff relies on *Toomey v. DeMoulas Super Markets, Inc.*, 2020 WL 3412747 (D. Mass. Apr. 16, 2020), where the court denied the defendant's motion to dismiss a complaint challenging the plan's investment strategy.  Importantly, in doing so, the court expressly noted that "[t]he Court's denial is not a ruling that an ERISA plan must follow any specific path." *Id.* at *3.  *DeMoulas* presents materially different facts from the circumstances here.  First and foremost, the plan at issue in *DeMoulas* was not, as here, a multi-employer plan with billions in assets and hundreds of thousands of participants that was administered by a diverse board of trustees comprised of union and employer representatives.  *See* ECF No. 53 at 2.  Rather, it was a single plan with $580 to $756 million in assets and 11,000 to 13,000 participants, where the plan sponsor and named fiduciary was the plaintiff's

3

employer. *DeMoulas*, 2020 WL 3412747, at *1. Second, the *DeMoulas* plan's investment policy called for 70% of assets to be invested in fixed income and 30% in equities. *Id.* Not only did that plan not present the tremendous diversification of assets reflected in the IAP, it failed to comply with the allocations stated in its investment policy, allegedly allocating "as much as 86% to fixed income options, with the remainder (14%) to equities." *Id.* at *2. Third, the court found unpersuasive the defendants' argument that plaintiffs' case "was on all fours" with a case dismissed by the First Circuit (*Barchock v. CVS Health Corp.*, 886 F.3d 43 (1st Cir. 2018)). *Id.* at *3. The court said "[c]ontrary to Defendants' contention, especially at this stage of the proceedings, *Barchock*'s application to this case is premature because it addressed a seemingly different context," as it was not a dispute over the prudence of offering a stable value fund. *Id.* at *4. The court ultimately found a plausible claim based on allegations that the defendants, among other mishaps, failed to seek meaningful investment returns from its fixed income investments by investing, for example, 58% of plan assets in cash and money market accounts earning 0.01% interest or less, and also left millions of dollars of plan assets in bank accounts uninvested. *Id.* at *1-2. Plaintiff here alleges nothing more than that some of the IAP investments did not perform to her satisfaction and the IAP was too expensive. Nor can she allege anything close to the facts in *DeMoulas*, as judicially noticeable documents that Plaintiff herself relies upon show the Board's care and consideration in managing the IAP as a vehicle for providing meaningful benefits to all of its participants, both now and in the future.

### A. Plaintiff Offers No Allegations About the Board's Allegedly Flawed Monitoring

As a threshold matter, the SAC does not identify any lapses in the Board's conduct with respect to its monitoring of the IAP's investment managers and their selected investments. Instead, Plaintiff's imprudent monitoring theory is premised entirely on her belief that the IAP underperformed and had high fees. But without

4

any allegations even attempting to explain what the Board did or did not do to monitor the IAP, Plaintiff's claim is simply a veiled attempt to hold the Board strictly liable in hindsight for the IAP's investments' performance, which ERISA does not permit. *See Lauderdale v. NFP Retirement, Inc. et al.*, 2021 WL 3828646, at *12 (C.D. Cal. Aug. 18, 2021) (dismissing monitoring claim where the complaint did "not contain any factual allegations relating to whether [the defendants] fell short of their obligation to monitor" and "fail[ed] to identify any particular flaws in [the defendants'] process for monitoring" the challenged investment); *Carter v. San Pasqual Fiduciary Tr. Co.*, 2016 WL 6803768, at *5 (C.D. Cal. Apr. 18, 2016). (dismissing monitoring claim where the plaintiffs alleged no facts "regarding whether, when, and to what extent Defendants monitored either" of the other plan fiduciaries); *White v. Chevron Corp.*, 2016 WL 4502808, at *19 (N.D. Cal. Aug. 29, 2016) (dismissing monitoring claim where the plaintiff "allege[d] no facts showing how the monitoring process was deficient"); *Romero v. Nokia, Inc.*, 2013 WL 5692324, at *5 (N.D. Cal. Oct. 15, 2013) (dismissing monitoring claim where the plaintiff did not "present any specific facts regarding the monitoring process or how it was deficient"); *In re McKesson HBOC, Inc. ERISA Litig.*, 2002 WL 31431588, at *15–16 (N.D. Cal. Sept. 30, 2002) (dismissed monitoring claim rested on "wholly conclusory" allegations).

Plaintiff's opposition does not respond to these authorities nor does it point to any factual allegations in the SAC showing the Board's purportedly inadequate monitoring of the IAP. In fact, Plaintiff *admits* that she lacks any concrete factual basis for her failure-to-monitor allegations against the Board. *See* SAC ¶ 81. This is reason alone to dismiss the SAC, whose sole claim is directed at the Board's allegedly deficient monitoring.

### B.     Plaintiff's "Comparator" Plans Fail to Plausibly State a Claim of Imprudent Investment Monitoring

In its prior dismissal order, the Court explicitly held that, to state a plausible monitoring claim, Plaintiff needed to identify comparator plans with "significantly better performing underlying investments with lower fees" or specially allege "other indications that the plan fiduciaries' 'decision-making process was flawed.'"  ECF No. 53 at 9-10.   As the Board demonstrated in its opening brief, the so-called "comparator" plans identified in the SAC are easily distinguishable from the IAP or do not reflect materially better investment performance or lower costs sufficient to raise a plausible inference of imprudence.

Plaintiff's only response to the Board's motion is that the 12 "comparable" plans referenced in the SAC—of which she identifies only four by name—are, essentially, "good enough" at the pleadings stage, where the Court may not evaluate whether her comparisons are appropriate. *See* Opp. 16-17.  Plaintiff is wrong.

### 1.     *Plaintiff's "Comparator" Plans Are Easily Distinguishable*

*First*, even a cursory review of the four plans actually identified in the SAC undermines Plaintiff's *ipse dixit* contention that the 12 plans are truly comparable to the IAP.   To begin, two of the four identified plans—Building Service Plan and Bricklayers Savings Plan—are transparently distinguishable.  The Building Service Plan is a traditional self-directed 401(k) "defined contribution plan designed to give [participants] an opportunity to save and invest for retirement." Ex. F at 6.  As such, the *participants choose* how to invest their contributions from a menu of investment options chosen by the plan's fiduciary. *Id.* at 7.  Although Plaintiff self-servingly compares the Building Service Plan's "single default investment"—the Vanguard Wellesley Income Fund—to the IAP because it allegedly has similar investment goals and two-thirds of the Building Service Plan's participants invest in it, the Vanguard fund is a fundamentally inapt comparison to the IAP because it is the Building Service Plan's qualified default investment alternative ("QDIA"). *Id.* at 7.

6

A QDIA is a standard feature of a self-directed 401(k) plan (*see* 29 C.F.R. § 2550.404c-5), which serves as the default option for participants who do not select other investments.  Plaintiff fails to explain how a QDIA for a 401(k) plan shares common characteristics with the diverse investment portfolio of a trustee-directed, pooled asset plan like the IAP.  To the contrary, the Vanguard fund—which is but one of the mutual funds in the Building Service Plan—is not remotely comparable to the IAP's diversified investment portfolio comprised of dozens of asset types.

The Bricklayers Savings Plan, which is a hybrid plan composed of an annuity retirement benefit with an additional participant-directed 401(k) benefit, is also not comparable to the IAP.  Ex. G at 14.  As the Board discussed in its prior motion (ECF No. 44 at 11-12) and its opening brief, there are myriad differences between the "character" and "aims" of trustee-directed, pooled-asset multiemployer plans like the IAP and participant-directed 401(k) plans.

The Board also showed in its opening brief that Plaintiffs' four "comparator" plans were materially smaller than the IAP, notwithstanding Plaintiff's own allegation that plan size is determinative of prudence (SAC ¶ 48, "the reasonableness of investment expenses should be determined by comparisons to other similarly sized plans").  Indeed, Plaintiffs' four plans were only a fraction of the IAP's size as of 2019:

- Building Service Plan: 95,563 participants but only $1.8 billion in assets (Ex. K at PDF pp. 3, 19);

- Bricklayers Savings Plan: 19,826 participants and only $109 million in assets (Ex. L at PDF pp. 3, 18);

- Boilermakers Trust: 22,552 participants and only $1.3 billion in assets (Ex. N at PDF pp. 3, 36); and

- Southern New England Plan: 14,258 participants and only $550 million in assets (Ex. P at PDF pp. 3, 29).

Stating only that these materially smaller plans are "not flyweights," Opp. 17, Plaintiff fails to explain how these plans with significantly less assets and fewer participants are meaningful comparators to the IAP. Her only retort is that there is "no reason to believe that the Plan would have fared materially better against a peer group" that has a similar number of participants or assets. Opp. 17. But this assertion amounts to nothing more than speculation, which is insufficient to state a plausible claim.

Even at the pleadings stage, a plaintiff must plausibly allege that her comparisons are apt. *See, e.g.*, *Davis v. Salesforce.com, Inc.*, 2020 WL 5893405, at *1, 3-4 (N.D. Cal. Oct. 5, 2020); *Forman v. TriHealth, Inc.*, 2021 WL 4346764, at *7 (S.D. Ohio Sept. 24, 2021). Rather than attempt to do so, Plaintiff incorrectly asserts that the Court may not even consider the validity of her comparators at the pleading stage. Opp. 16-17. But, as the Court correctly recognized in dismissing the FAC because it lacked relevant comparators, this is a threshold issue that the Court must evaluate in determining whether Plaintiff has put forth a strong enough inference of imprudence to move forward with her claim. ECF No. 53 at 9-12 (citing *Terraza v. Safeway Inc.*, 241 F. Supp. 3d 1057, 1076 (N.D. Cal. 2017); *Anderson v. Intel Corp.*, 2021 WL 229235, at *8 (N.D. Cal. Jan. 21, 2021)).[1]

### 2. Plaintiff's Allegations About the IAP's Fees Do Not Raise a Plausible Inference of Imprudence

Even if Plaintiff's "comparator" plans were similar to the IAP—they are not—the allegations in the SAC fall far short of plausibly alleging that the IAP's investment fees were materially worse than these plans.

---

[1] The cases Plaintiff cites for the proposition that determining proper benchmarks is inappropriate on a motion to dismiss present different circumstances. For instance, in *In re Prime Healthcare ERISA Litig.*, 2021 WL 3076649, at *6 (C.D. Cal. July 16, 2021), the court held that it would not determine if investment benchmarks were appropriate on a motion to dismiss because there were "numerous other grounds" for imprudence. *Id.* (citing *In re MedStar*, 2021 WL 391701, at *6 (D. Md. Feb. 4, 2021)).

As the Board explained in its prior motion (ECF No. 44 at 23-24 & n. 25-26) and its opening brief (Mot. 13), Plaintiff's allegations about the IAP's fees are hopelessly vague and speculative.  In the SAC, Plaintiff doubles down on her assertion and alleges that the IAP "charges fees averaging 1.18% per year."  SAC ¶ 10.  But this conclusory assertion is not a well-pleaded fact that must be accepted as true because (1) the SAC does not specify whether the 1.18% is both investment fees and administrative fees, and (2) Plaintiff has not pointed to any information (and the Board is aware of none) supporting this calculation of the IAP's fees.  ECF No. 44 at 23-24 & n. 25-26; ECF No. 63 at 13.  In her opposition brief, Plaintiff claims for the first time in this litigation that the 1.18% includes both investment and administrative fees and argues that the IAP's investment management fees account for 1.03% of that total.  Opp. 12-14.  Significantly, this 1.03% investment management fee is entirely absent from the SAC (as well as Plaintiff's prior two complaints), nor is it in the IAP's Performance Reports.  As such, it must be given no credence as support for Plaintiff's claims.  *See Cook v. City of Fremont*, 2020 WL 6318712, at *5 n.2 (N.D. Cal. Oct. 28, 2020) ("The Court may not consider facts asserted for the first time in [the plaintiff's] opposition brief [to a motion to dismiss].") (citation omitted).

Putting aside Plaintiff's unreliable and constantly shifting fee allegations, which undermine the credibility of all of her fee-related allegations, the publicly-available Form 5500 fee disclosures for Plaintiff's alleged "comparator" plans objectively show that the IAP's fees were materially similar to those plans.[2]  This reliable and verifiable data shows that the IAP's investment management fees totaling 0.30% are on par with both the Boilermakers Trust (0.35%) and Southern New England Plan (0.22%), which are two of Plaintiff's "comparator" plans identified in the SAC.  *See* Ex. Q (summary of data from judicially noticeable Form

---

[2] Plaintiff repeatedly relies on Form 5500 disclosures in the SAC (*e.g.*, SAC ¶¶ 54 n.13, 55 n. 14-15, 69 n. 29).

5500s).  Moreover, Plaintiff's complaint that the IAP pays performance fees to its investment managers as incentives for superior returns (Opp. 13) does not move the needle since these performance fees are only paid to those investment managers who materially outperform their expected results.  Plaintiff does not complain that performance fees are not warranted in such circumstances.

Plaintiff's fee comparisons are infirm for still other reasons.  For one, Plaintiff's opposition attempts to resurrect her inappropriate comparison of the IAP's fees to the fees of self-directed 401(k) plans.  For example, when Plaintiff argues that the IAP is "one of the most expensive plans in the country" (Opp. 12 (citing SAC ¶ 54)) her claim is based on a comparison of the IAP's fees against fees for 401(k) plans that were reported in *The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans, 2017* (2020).  As the Board explained in its opening brief (Mot. 11-12), these comparisons of the IAP to 401(k) plans do not support Plaintiff's claim of imprudence.[3]

In addition, Plaintiff's opposition points to several other investment options with allegedly lower investment fees that the IAP could (and, in her opinion, should) have picked.  Specifically, Plaintiff points to the T. Rowe Price Capital Appreciation Fund (0.55% in fees) and the Vanguard LifeStrategy Income Fund (0.11% in fees).  Opp. 14.  As a threshold matter, the Board has already shown that these mutual funds are inappropriate comparisons for evaluating the IAP's overall investment portfolio.  It is of no value to compare the fees of a passively-managed mutual fund against the fees of a highly diversified plan, such as the IAP, that utilizes both passively and actively managed investments.  *See Smith v. CommonSpirit Health*, 2021 WL 4097052, at *6-8 (E.D. Ky. Sept. 8, 2021) (rejecting a comparison of passively

---

[3] While Plaintiff now relies in her opposition on the fees stated in the 2020 report of 0.64%, she has previously amended her complaint to remove that specific fees allegation after the Board pointed out that it is comparable to the average fees that Plaintiff alleged in her original complaint. ECF No. 44 at 21.  Thus, Plaintiff cites yet *another* measure of fees that she has not actually pleaded as support for her allegations that the IAP's fees are excessive.  As noted above (at 9), this mere rhetorical argument carries no legal weight in evaluating the adequacy of her allegations.

managed and actively managed investments).  But even more fundamentally, courts have repeatedly recognized that ERISA's prudence standard does not require a race to the bottom that compels plan fiduciaries to use the cheapest investments.  *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 596 n.7 (9th Cir. 2009) ("[N]othing in ERISA requires every fiduciary to scour the market to find and offer the cheapest possible fund"); *Meiners v. Wells Fargo & Co.*, 898 F.3d 820, 823-24 (8th Cir. 2018) ("the existence of a cheaper fund does not mean that a particular fund is too expensive in the market generally or that it is otherwise an imprudent choice").  As another court in this District held recently, even fees that are materially higher than the IAP's alleged fees do not support an inference of imprudence.  *See Kong v. Trader Joe's Co.*, 2020 WL 7062395, at *4 (C.D. Cal. Nov. 30, 2020) (collecting cases where fee expense ratios of 1.24% and 2% were held to be reasonable).

### 3. Plaintiff's Allegations that the IAP Underperformed the 12 "Comparator" Plans Likewise Fail to Raise a Plausible Inference of Imprudence

Much of Plaintiff's response to the Board's explanation that her 12 comparator plans are nothing of the sort when it also comes to comparing performance is based on nothing more than a regurgitation of the allegations in her SAC.  For instance, in her opposition, Plaintiff argues that the SAC alleges that the IAP's ten-year performance from 2010 to 2019 was 0.82% lower and its five-year performance was 1.08% lower than her "peer" group of plans' cumulative performance.  Opp. 16 (citing SAC ¶ 70).  Not only does Plaintiff not provide any explanation sufficient to refute the Board's response, but the level of alleged underperformance she restates is "certainly insubstantial" and insufficient to state a claim of imprudence.  *See Patterson v. Morgan Stanley*, 2019 WL 4934834, at *10 (S.D.N.Y. Oct. 7, 2019) ("This difference of less than one percentage point is certainly insubstantial compared to the nine-point differential in *Jacobs*.  Even assuming the truth of these allegations, such a small disparity in performance relative

to its benchmark does not support the inference that Defendants were imprudent to retain the Mid Cap Fund in the set of Plan offerings.").  Indeed, "the mere fact that [an investment] did not do as well as other options does not give rise to the inference that [a fiduciary's] decision to retain that investment option was imprudent."  *Id.* at *11 (collecting cases).

Moreover, Plaintiff's ongoing focus on the IAP's short-term performance relies inappropriately on five-year and ten-year performance and volatility comparisons.  *See* SAC ¶ 70.  Such an artificially restricted analysis purposefully ignores the fact that the IAP's long-term/full-business cycle performance is better than—or at least even with—its benchmarks, particularly during bear markets, while experiencing lower volatility than its benchmarks and similar volatility to Plaintiff's comparators.  *Compare* Ex. D at 22-23 ("Risk Analysis (IAP)" and "Long-Term Return History (IAP)") *with* SAC ¶ 70.

*        *        *

In summary, Plaintiff once again fails to identify any adequate comparator plans to support her claim of imprudent monitoring.  She has not only floundered in her attempts to identify true peer plans that can carry the weight of her comparisons, but the plans she has identified do not substantiate her claims of excessive fees and material underperformance.

### C.     Plaintiff's "Comparator" Investments Likewise Fail to Plausibly State a Claim of Imprudent Investment Monitoring

As the Board demonstrated in its opening brief, Plaintiff's SAC fails to identify any actual "comparator" investments that outperformed the IAP's investment portfolio at a lower cost.  While Plaintiff identifies eight mutual funds she maintains are comparable (SAC ¶¶ 74-76), and argues the IAP "could have achieved its conservative investment objectives using just a single, lower-cost

mutual fund" (*Id.* ¶ 74), the Board showed in its opening brief the significant flaws in Plaintiff's argument.  Mot. 15-17.

Plaintiff's only response is that she has identified "plan[s] with more than $50 million in assets and with more than half of the plan's assets invested in a single mutual fund managed in a style similar to the Plan" and that the Building Service Plan uses a QDIA (the Vanguard Wellesley Income Fund) like most other 401(k) plans. *See* Opp. 21-22 (citing ¶¶ 67, 74).  As to the Building Service Plan's QDIA, as stated above, it is patently unreasonable to compare a single-investment option that plan participants' assets are directed into in the event they do not choose their own investments with the pooled-asset structure for all *$5 billion* in assets held by the IAP.  Plaintiff has not provided any plausible rationale for this comparison.

As to Plaintiff's allegation that she identified the eight mutual funds in the SAC by finding plans with more than $50 million in assets with at least half of their assets invested in a single fund, Plaintiff similarly fails to explain how these unidentified plans with "more than $50 million in assets" can logically compare to the IAP with over $5 billion in assets. *See* Opp. 22.  Plaintiff's silence on this issue speaks loudly, given her allegation elsewhere that "the reasonableness of investment expenses should be determined by comparisons to other similarly sized plans."  SAC ¶ 48.

Plaintiff also has no response to the case law that provides that a comparator fund is only a meaningful benchmark for purposes of pleading imprudence if it is materially similar to the challenged fund. *See Cho v. Prudential Ins. Co. of Am.*, 2021 WL 4438186, at *8 (D.N.J. Sept. 27, 2021) (citing *Meiners*, 898 F.3d at 824, finding the plaintiff failed to provide a meaningful benchmark by alleging that "cheaper alternative investments with *some* similarities exist in the marketplace") (emphasis in original); *see also id.* at 823 ("The fact that one fund with a different investment strategy ultimately performed better does not establish anything about

whether the [challenged funds] were an imprudent choice").  Plaintiff has not and cannot explain why it is appropriate to compare the performance of a highly-diversified plan such as the IAP against a single-investment option like the mutual funds she cites in her new allegations.

### D.   Plaintiff's Claims That the IAP Underperformed Its Own Benchmarks Do Not Save Her Imprudent Monitoring Claim

Finally, Plaintiff continues to misrepresent the IAP's long-term investment performance against its own benchmarks and judicially noticeable documents showing the Board's active oversight of the IAP's investments throughout the years. As discussed above and in the Board's opening brief, the IAP's "overall portfolio strategy is to protect capital while trying to earn attractive net returns," which is achieved "by diversifying the portfolio across various asset classes that respond differently to different economic environments."  Ex. D at 19.  In response to fluctuating market conditions, the IAP's portfolio is adjusted periodically to achieve its overall strategy and mission. Ex. D at 26-31; Ex. E at 28-33.  The IAP has been particularly successful at achieving these goals and has achieved returns that are on par with benchmarks used to evaluate its performance.  *Compare* Ex. D at 22-23 ("Risk Analysis (IAP)" and "Long-Term Return History (IAP)") *with* SAC ¶ 70.

Despite this clear record of obtaining results that are consistent with its own goals and the performance of its benchmarks, as the Court previously recognized (ECF No. 53 at 11), Plaintiff again asserts that the IAP has underperformed its benchmarks over the long term.  Opp. 23.  Plaintiff claims that she has fixed her previously deficient allegations that the IAP underperformed its own benchmarks because her SAC allegations now rely on data that also includes returns for 2020. Opp. 23 (citing SAC ¶ 61).  Plaintiff's argument misses the mark, as she fails to appreciate that the IAP has performed on par with its benchmarks while experiencing significantly less volatility.  *See* Ex. E at 23 (the IAP portfolio had a Return/Risk

(Sharpe) Ratio of 0.53 compared to its benchmarks of 0.29 and 0.47, which indicates higher return per unit of risk. This outcome is precisely in line with the IAP's stated investment goals and represents an imminently reasonable strategy for achieving those goals.

Moreover, Plaintiff's conclusory allegations that the Board "doubl[ed] down on their misguided [investment] decisions" (Opp. 24 (citing SAC ¶ 57)) is patently refuted by the judicially noticeable facts, as demonstrated in the Board's opening brief. Mot. 17-20. Plaintiff notably ignores the Board's explanation. *See* Opp. 24-25. Not only do Plaintiff's allegations misrepresent the IAP's investments in actively managed options (Mot. 18-19), but she also ignores the substantial evidence in judicially noticed documents that the Board is actively engaged in continuous monitoring of the IAP's investment lineup, making changes as needed. *Id.* at 19-20. These efforts included hiring new investment managers, adding new alternative investment funds, and reducing the IAP's investments in certain hedge funds (particularly the Renaissance Institutional Diversified Alpha fund of which Plaintiff complains in paragraph 59 of the SAC), among others. *Id.* at 18-20. Plaintiff's preference for a different approach than the investment strategy followed by the Board does not present a plausible claim of imprudence. *See Sweda v. Univ. of Penn.*, 923 F.3d 320, 333 (3d Cir. 2019) (ERISA fiduciaries are "afforded discretion" because "[t]here are no universally accepted and enduring theories of financial markets or prescriptions for investment that can provide clear and specific guidance.") (quoting Restatement (Third) of Trusts § 90 (2007), cmt. f).

## CONCLUSION

Stripped down to its fundamentals, Plaintiff's SAC alleges that the Board failed to exercise prudence in monitoring the IAP because the plan "could have chosen different vehicles for investment that performed better during the relevant period, or sought lower fees for . . . the fund." *White v. Chevron Corp.*, 752 F. App'x

453, 455 (9th Cir. 2018).  Here, as in *White*, "none of the[se] allegations ma[ke] it more plausible than not that any breach of a fiduciary duty had occurred," *id.*, and thus Plaintiff has not stated a claim of imprudent monitoring.  Recognizing the pleading required to state a plausible claim, just last month another court within the Ninth Circuit dismissed a claim of imprudence regarding investments offered in a retirement plan, finding that the complaint offered "no factual allegations surrounding defendant's *process* for selecting and monitoring investments" but instead "merely recites concerns on how certain investments either *resulted* in unreasonably high administrative expenses or produced suboptimal results within compared to non-Plan investments."  *Enos v. Adidas America, Inc.*, 2021 WL 5622121, at *5-6 (D. Or. Aug. 26, 2021), *report and recommendation adopted*, 2021 WL 5611481 (D. Or. Nov. 30, 2021) (emphasis in original).

The SAC is Plaintiff's third attempt to state a claim for breach of fiduciary duty against the Board in her attempt to reimagine the IAP to her liking.  For all of the reasons stated above and in the Board's opening brief, Plaintiff's newest efforts have failed and a further attempt to amend the complaint would be futile.  As such, the SAC should be dismissed with prejudice.  *See White v. Chevron Corp.*, 2017 WL 2352137, at *23 (N.D. Cal. May 31, 2017), *aff'd*, 752 F. App'x 453 (9th Cir. 2018) (dismissing breach of fiduciary duty claim with prejudice because a third attempt to amend the complaint would be futile).

Dated: December 7, 2021

Respectfully submitted,

By: */s/ Nancy G. Ross*
Nancy G. Ross
Richard E. Nowak
Abigail M. Bartine
Naama Shemesh
MAYER BROWN LLP

*Attorneys for Defendant Board of Directors for the Motion Picture Industry Pension Plans*