# Exhibit B

IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| COLE MATNEY and PAUL WATTS, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>BARRICK GOLD OF NORTH AMERICA, INC.; BOARD OF DIRECTORS OF BARRICK GOLD OF NORTH AMERICA, INC.; BARRICK U.S. SUBSIDIARIES BENEFITS COMMITTEE; and JOHN DOES 1-30,<br>Defendants. | ORDER<br><br>Case No. 2:20-cv-275-TC-CMR |

On April 21, 2022, the court issued its Order and Memorandum Decision granting the Defendants' Motion to Dismiss Plaintiffs' Amended Complaint for failure to state a claim upon which relief can be granted. (See ECF No. 61.) Plaintiffs subsequently filed a Rule 59(e) Motion for Reconsideration ("Motion") of that decision. (See ECF No. 63.) Defendants filed their Response in Opposition on June 2, 2022. (See ECF No. 68.) Under the local rules, Plaintiffs had fourteen days to file a reply in further support of their Motion. (See Local Rule DUCivR 7-1(a)(4)(D)(iii).) Plaintiffs have not filed a reply, and the time for doing so has passed.

The court has reviewed Plaintiffs' request. For the reasons set forth in Defendants'

Response in Opposition to Plaintiffs' Motion for Reconsideration (ECF No. 68), the court denies

the Motion.

SO ORDERED this 21st day of June, 2022.

BY THE COURT:

*Tena Campbell*

TENA CAMPBELL
U.S. District Court Judge

IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| COLE MATNEY and PAUL WATTS, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>BARRICK GOLD OF NORTH AMERICA, INC.; BOARD OF DIRECTORS OF BARRICK GOLD OF NORTH AMERICA, INC.; BARRICK U.S. SUBSIDIARIES BENEFITS COMMITTEE; and JOHN DOES 1-30,<br><br>Defendants. | ORDER<br>AND<br>MEMORANDUM DECISION<br><br>Case No. 2:20-cv-275-TC-CMR |

Plaintiffs Cole Matney and Paul Watts are participants in the retirement plan (the Plan) that Defendant Barrick Gold of North America, Inc. (Barrick) offers its employees. They bring this putative class action under sections 409 and 502 of ERISA[1] (29 U.S.C. §§ 1109 and 1132), against the Plan's fiduciaries, which include Barrick, Barrick's Board of Directors and its members (the Board), and Barrick U.S. Subsidiaries Benefits Committee and its members (the Committee) (collectively, the Defendants).

In the Amended Complaint, Mr. Matney and Mr. Watts allege that Defendants breached

---

[1] Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 et seq.

1

the duties that ERISA imposes on fiduciaries of employee retirement plans.[2]  Defendants move

to dismiss the suit under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim

upon which relief can be granted.  For the reasons set forth below, the court GRANTS the

motion.

**<u>Plaintiffs' Claims</u>**

Plaintiffs bring two causes of action.  First they assert breach of the dual fiduciary duties

of loyalty and prudence against the Committee.  In their second cause of action, Plaintiffs

contend that Barrick and the Board failed to monitor and correct the Committee's violation of its

fiduciary duties.  (By definition, this claim is derivative of the fiduciary duty claim.)

In the breach of fiduciary duty claim, Plaintiffs focus primarily on the costs of their

investment options and administrative recordkeeping fees.  They initially complain about the

amount of management fees charged by the investment funds the Committee chose for the Plan.

According to Plaintiffs, the Committee breached its duties by

> (1) failing to objectively and adequately review the Plan's investment portfolio
> with due care to ensure that each investment option was prudent, in terms of cost;
> and (2) maintaining certain funds in the Plan despite the availability of identical
> or similar investment options with lower costs and/or better performance
> histories.

(Am. Compl. ¶ 12, ECF No. 21.)

Plaintiffs also challenge recordkeeping expenses that Plan participants paid out of their

retirement accounts to Fidelity Management Trust Company (Fidelity), the investment trustee

providing recordkeeping services to the Plan.  Plaintiffs say the Committee failed to create "a

---

[2] After Plaintiffs filed their original complaint, Defendants moved to dismiss.  Plaintiffs then
amended their complaint to correct deficiencies Defendants identified in the first motion to
dismiss.

prudent payment arrangement" with Fidelity, which led to payment of fees higher than necessary given the Plan's sizable assets.  (Id. ¶ 69.)

Defendants challenge Plaintiffs' fiduciary duty claim, arguing that inaccurate and misleading allegations and unsupported inferences fail to state a plausible claim for relief. Defendants further maintain that because Plaintiffs have not alleged a breach of the duties of prudence and loyalty, their derivative monitoring claim necessarily fails.

In response, Plaintiffs say the Amended Complaint contains sufficient circumstantial factual allegations from which the court may reasonably infer that Defendants' decisionmaking processes wasted the Plan's and participants' assets because of unnecessary costs.  They also point out that much of the relevant information is solely in Defendants' possession[3] and that analysis of a fiduciary's decisionmaking process is a fact intensive endeavor better suited for summary judgment.

As explained below, the court finds that Plaintiffs' allegations, supplemented by materials appropriately cited by Defendants, do not state a plausible claim for breach of the duty of prudence or the duty of loyalty.  Consequently, Plaintiffs' monitoring claim fails as a matter of law because that claim's success relies on the viability of Plaintiffs' insufficiently pled fiduciary duty claim.

**Standing**

To begin, the court must address the threshold standing issue raised by Defendants, who

---

[3] Before Plaintiffs filed their suit, the Plan administrator denied a portion of Plaintiffs' ERISA § 104(b)(4) request for information, including the investment committee's meeting minutes. According to Plaintiffs, those documents "potentially contain the specifics of Defendants' *actual* practice in making decisions with respect to the Plan, including Defendants' processes (and execution of such) for selecting, monitoring, and removing Plan investments."  (Am. Compl. ¶ 23 (emphases in original).)

3

assert that Plaintiffs lack standing to challenge decisions related to fifteen of the twenty funds

Plaintiffs allege were imprudently retained in the Plan.  To establish Article III standing, a

plaintiff must show an injury in fact that is fairly traceable to the defendant's action and that

likely would be redressed by a favorable decision.  Lujan v. Defenders of Wildlife, 504 U.S. 555,

560–61 (1992).

According to Defendants, the fact that Plaintiffs personally invested in only five of the

twenty funds discussed in the Amended Complaint means Plaintiffs "have not suffered any

individualized harm as to [the remaining fifteen] funds."  (Mot. to Dismiss Pls.' Am. Compl. at

11 n.5, ECF No. 24.)  But Plaintiffs do not challenge decisions specific to the options in which

they invested.  They focus on an allegedly flawed process that resulted in investment offerings

Plaintiffs say were imprudent and unnecessarily cost them money.

That Plaintiffs did not invest in every option provided by the Plan is not relevant to the

issue of standing.  "[A] plaintiff's standing to sue a plan's fiduciaries, and that same plaintiff's

ability to seek relief that goes beyond his own injuries, are separate issues."  Krueger v.

Ameriprise Fin., Inc., 304 F.R.D. 559, 567 (D. Minn. 2014).  Plaintiffs allege infirmities in the

overall decisionmaking process, and that confers standing to challenge decisions that happened

to affect not only their accounts but other accounts in the Plan the fiduciaries managed.

Many courts have held that ERISA plaintiffs in putative class actions who allege breach

of a fiduciary duty through a claim of mismanagement of an ERISA plan's overall investments,

have standing even though the named plaintiffs did not invest in some of the plan's funds.  See

Kurtz v. Vail Corp., 511 F. Supp. 3d 1185, 1192–94 (D. Colo. 2021) (putative class action

collecting cases arising out of the First, Second, Third, Fourth, Eighth, and Ninth Circuits);

Larson v. Allina Health Sys., 350 F. Supp. 3d 780, 791–93 (D. Minn. 2018) (holding that ERISA

plaintiffs had standing in putative class action to bring breach of fiduciary duty claims

challenging, among other things, plan's investment fees and recordkeeping costs); Krueger, 304

F.R.D. at 567 (same). The court agrees with those decisions and will not bar or otherwise limit

Plaintiffs' claims based on standing.

## Rule 12(b)(6) Motion to Dismiss Standard

Federal Rule of Civil Procedure 12(b)(6) requires dismissal if the complaint fails to state

a claim upon which relief can be granted. "[T]o withstand a motion to dismiss, a complaint must

have enough allegations of fact, taken as true, 'to state a claim to relief that is plausible on its

face.'" Kansas Penn Gaming, LLC v. Collins, 656 F.3d 1210, 1214 (10th Cir. 2011) (quoting

Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).

The court must accept all well-pled factual allegations as true and construe them in the

light most favorable to the nonmoving party. Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009);

Strauss v. Angie's List, Inc., 951 F.3d 1263, 1267 (10th Cir. 2020). But that rule does not apply

to legal conclusions. Id. at 678–79. "Mere 'labels and conclusions,' and 'a formulaic recitation

of the elements of a cause of action' will not suffice; a plaintiff must offer specific factual

allegations to support each claim." Kansas Penn, 656 F.3d at 1214 (quoting Twombly, 550 U.S.

at 555).

Moreover, "a plaintiff must offer sufficient factual allegations to 'raise a right to relief

above the speculative level.'" Id. at 1214 (citing Twombly, 550 U.S. at 555).

> A claim has facial plausibility when the plaintiff pleads factual content that allows
> the court to draw the reasonable inference that the defendant is liable for the
> misconduct alleged. The plausibility standard is not akin to a "probability
> requirement," but it asks for more than a sheer possibility that a defendant has
> acted unlawfully. Where a complaint pleads facts that are merely consistent with a
> defendant's liability, it stops short of the line between possibility and plausibility
> of entitlement to relief.

5

Iqbal, 556 U.S. at 678 (internal citations and quotation marks omitted). The Tenth Circuit, applying this standard, has stated that "plausibility" refers to "the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs 'have not nudged their claims across the line from conceivable to plausible.'" Robbins v. Okla. ex rel. Dep't of Human Servs., 519 F.3d 1242, 1247 (10th Cir.2008) (quoting Twombly, 550 U.S. at 570). "Determining whether a complaint states a plausible claim for relief [is] … a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Iqbal, 556 U.S. at 679.

In support of their motion, Defendants point to documents Plaintiffs cite in the Amended Complaint or that the court may judicially notice. In large part, a court may not consider information outside the four corners of the complaint to assess whether the claims survive a Rule 12(b)(6) motion to dismiss. Four exceptions exist: (1) documents attached to the complaint as exhibits, (2) documents the complaint incorporates by reference, (3) documents and information subject to judicial notice, and (4) documents referred to in the complaint if they are central to the plaintiff's claim and the parties do not dispute the documents' authenticity. Gee v. Pacheco, 627 F.3d 1178, 1186 (10th Cir. 2010); Prager v. LaFaver, 180 F.3d 1185, 1188–89 (10th Cir. 1999). Defendants contend their exhibits fall within the boundaries of those exceptions. The court agrees in part.

The following sources satisfy the criteria described by Gee and Prager: the Master Trust Agreement between Barrick and Fidelity, the Plan's publicly available 5500 Forms submitted to the IRS for the years 2014 to 2018, Barrick's Investment Policy, 2019 Summary Prospectuses for JPMorgan Funds, the "ICI Study," a Fidelity FIAM Blend Target Date Fund fact sheet, the American Funds Target Date Retirement Fund prospectus, and the *401k Averages Book* (20th ed.

2020). Plaintiffs refer to these materials in their Amended Complaint,[4] do not dispute the documents' authenticity, and rely on information in the documents to create an inference that Defendants breached their fiduciary duties.[5] The court also judicially notices the publicly available documents, including the 5500 Forms, fund prospectuses, and information compiled in the Barrick Fund Descriptions. See, e.g., Slater v. A.G. Edwards & Sons, Inc., 719 F.3d 1190, 1196 (10th Cir. 2013) (taking judicial notice of public filings with the SEC).

## Breach of the Fiduciary Duty of Prudence[6]

The duty of prudence imposed by ERISA requires plan fiduciaries to act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man" would have used in the same situation. 29 U.S.C. § 1104(a)(1)(B). A plaintiff seeking to show a violation of the prudent man standard "must allege that a fiduciary's 'investment decisions—in the conditions prevailing at the time, and without the benefit of hindsight—are such that a reasonably prudent fiduciary would not have made that decision as part of a prudent, whole-portfolio, investment strategy that properly balances risk and reward, as well as short-term and long-term performance.'" Kurtz, 511 F. Supp. 3d at 1196 (quoting Birse v. Century Link, Inc., No. 17-CV-02872-CMA-NYW, 2019 WL 1292861, at *3 (D. Colo. Mar. 20, 2019)).

Under 29 U.S.C. § 1104, "a trustee has a continuing duty to monitor trust investments and remove imprudent ones," which includes a regular and systematic review of the trust's

---

[4] See Am. Compl. ¶¶ 26, 28, 31, 34–35, 49–50, 76–77, 83, 96, 104, 109, 111, 117, 119, 122–24.
[5] The court will not, however, consider Plaintiffs' retirement account statements offered by Defendants.
[6] ERISA imposes both a duty of prudence and a duty of loyalty on plan fiduciaries. See 29 U.S.C. § 1104(a)(1)(A) (duty of loyalty), § 1104(a)(1)(B) (duty of prudence). Plaintiffs assert in their first cause of action that the Committee breached both. Because the statutorily imposed duties have different elements, the party seeking protection must plead each one separately. Accordingly, the court addresses each one in turn.

investments to ensure they are appropriate. Tibble v. Edison Int'l, 575 U.S. 523, 528–29 (2015); Hughes v. Northwestern Univ., 142 S. Ct. 737, 741 (2022). "Because the content of the duty of prudence turns on 'the circumstances … prevailing' at the time the fiduciary acts, the appropriate inquiry will be necessarily be context specific." Fifth Third Bancorp v. Dudenhoeffer, 573 U.S. 409, 425 (2014) (internal citation omitted), quoted in Hughes, 142 S. Ct. at 742.

Plaintiffs contend the Committee violated the duty of prudence when it failed to monitor, investigate and ensure Plan participants paid reasonable investment management fees and recordkeeping fees during the Class Period.[7] But their lengthy Amended Complaint is filled with generalities, legal standards, generic descriptions of investment options available to consumers, industry-wide statistics and averages. Specific factual allegations concerning the Plan make up a small portion of the Amended Complaint.

The court recognizes that plaintiffs have limited access to information demonstrating the process fiduciaries use to make their decisions. But a plaintiff can survive a motion to dismiss if the court can infer from the circumstantial allegations that the fiduciary's decisionmaking process was flawed. Pension Benefit Guar. Corp. ex. rel. St. Vincent Catholic Med. Ctr.'s Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc., 712 F.3d 705, 719–20 (2d Cir. 2013); Braden v. Wal-Mart Stores, Inc., 588 F.3d 585, 596 (8th Cir. 2009). Nevertheless, circumstantial factual allegations "must give rise to a '*reasonable* inference' that the defendant committed the alleged misconduct, thus 'permit[ting] the court to infer more than the *mere possibility* of misconduct." St. Vincent, 712 F.3d at 718–19 (emphasis in original) (quoting Iqbal, 5556 U.S. at 678–79). "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." Iqbal, 556 U.S. at

_____

[7] Plaintiffs define the "Class Period" as April 24, 2014, through the date of judgment.

678.

Ultimately, Plaintiffs' allegations do not create a plausible inference that the Committee breached its fiduciary duty. As discussed in more detail below, Plaintiffs focus on a handful of funds and a small window of time in the Class Period. They rely on comparisons of dissimilar investment options. And a number of their allegations contain incorrect information that, when corrected, show that many of the Plan's investment management fees are lower than the ones Plaintiffs cite as examples of prudent investment choices. At most, Plaintiffs have plead circumstantial facts that are "merely consistent" with liability.

### 1. The Plan

The Plan, which is a defined contribution plan governed by ERISA, offers Barrick employees a collection of retirement investment options. Barrick is the Plan sponsor. The Committee, which the Board appointed as the Plan's fiduciary, selects the investment options.

During the Class Period, the investment options included money market accounts, collective trusts (CITs), actively-managed mutual funds, and passively-managed mutual funds. At the time, the Plan had approximately half a billion dollars in assets. This gave the Plan substantial bargaining power regarding fees and expenses charged against Plan participants' investments.

### 2. The Committee

The Committee performs a number of fiduciary duties, including selecting investment options; selecting investment trustees, recordkeepers, and managers; monitoring those entities; evaluating the Plan's investment performance; and recommending investment changes. In turn, Barrick and the Board, as fiduciaries of the Plan, monitor the Committee's activities.

The Committee has a very detailed Investment Policy that creates a process for reviewing
and selecting Plan investments, including (i) conducting a semi-annual review of the investment
results of Plan funds; (ii) regularly reviewing each of the Plan's investments; (iii) placing funds
on a "watch" or "probation" list for a specified period to determine if replacement of the
investment option is necessary; and (iv) selecting new or alternative funds to include in the Plan.
(Investment Policy at 4–6, ECF No. 24-10.)

**3.   Fees**

A portion of each Plan participant's retirement assets covers expenses incurred by the
Plan, including individual investment fund management fees and Fidelity's recordkeeping fees.
Plaintiffs allege those fees were excessive and cost the proposed class millions of dollars in
direct losses and lost investment opportunities.

a.   <u>Investment Fund Management Fees</u>

According to Plaintiffs, the Committee violated its fiduciary duty to ensure that Plan
participants paid reasonable fees for management of funds in the Plan's investment portfolio.  To
support their allegation of imprudent decisionmaking, Plaintiffs provide examples of fees,
measured as "expense ratios,"[8] charged by a select group of funds in the Plan for a slice of time
during the Class Period.  They compare those fees to fees charged by other funds in the
marketplace.  The comparisons are for illustrative purposes only, for the number, mix, and type
of funds available to Plan participants changed throughout the Class Period.  But Plaintiffs assert
the examples give rise to an inference that the Committee breached its fiduciary duties

---

[8] An expense ratio is a "measure of what it costs to operate a fund expressed as a percentage of
its assets."  (BrightScope & Investment Co. Inst., *The BrightScope/ICI Defined Contribution
Plan Profile: A Close Look at 401(k) Plans* 71 (2016), ECF No. 24-13 (the "ICI Study").)

throughout the Class Period by failing to investigate and select lower cost funds.

To create the inference, Plaintiffs discuss expense ratios, costs of share classes, costs of collective trusts versus mutual funds, and costs of actively-managed versus passively-managed funds.

        *i.   Actual Expense Ratios versus Median Expense Ratios in the ICI Study*

As evidence of the Committee's alleged failure to prudently monitor and manage the Plan's costs, Plaintiffs point to "several [Plan] funds during the Class Period [that] were more expensive than comparable funds found in similarly sized plans (plans having between $500m and $1b in assets)." (Am. Compl. ¶ 75.) To illustrate, Plaintiffs evaluate eleven miscellaneous Plan funds with expense ratios higher than the median expense ratios of funds in the same investment categories (e.g., domestic equity and money market).

In their comparison, Plaintiffs rely on information in the investment funds' 2019 summary prospectuses and a 2016 publication they call the ICI Study.[9] (Id. n.7.) They present a chart listing the eleven Plan funds' 2019 actual expense ratios on the one hand, and the median expense ratios of the funds' generic investment categories on the other hand. (Id. ¶ 76.)

According to the chart, each of the eleven selected Plan funds' expense ratios exceeded the median of funds in the same investment categories. For instance, a domestic equity fund in the Plan in 2018 (the "Fidelity Growth Company K" fund) had an expense ratio of 76 basis points (0.76%) while the median expense ratio of domestic equity funds in the marketplace was 52 basis points (0.52%). In the chart, the expense ratios of the select Plan funds ranged from 0.42% to 1.12% while the median expense ratios ranged from 0.14% to 0.54%.

---

[9] See id.

11

Plaintiffs' selective examples are problematic.  To begin, expense ratios from the ICI

Study do not allow a meaningful analysis.  Plaintiff place a very specific Plan fund into a

particular investment category, such as "Domestic Equity," and compare it to the "ICI Median"

for investments falling into that category.  (See id.)  But the ICI Study itself clarifies that the

broad one-size-fits-all investment categories have limited utility, noting that "the expense ratios

applicable to funds vary within a given investment category."  (ICI Study at 53.)  As an example,

the study notes that "equity mutual funds have different expense ratios depending on the extent

to which they invest in small-cap, mid-cap, or emerging market stocks (which tend to be more

expensive to manage) instead of large-cap or developed market stocks (which tend to be less

expensive to manage)."  (Id.)

Also, Plaintiffs do not discuss Plan options that have lower expense ratios.  As

Defendants point out, the Plan's recent offerings include a wide variety of investment options

with expense ratios ranging from 0.06% to 1.07%.  (Mot. to Dismiss at 13–14 (citing Barrick

Fund Descriptions, ECF No. 24-12).)  Courts have found comparable ranges of expense ratios

reasonable.  See, e.g., Martin v. CareerBuilder, LLC, No. 19-cv-6463, 2020 WL 3578022, at *6

(N.D. Ill. July 1, 2020) (dismissing prudence claims concerning funds with expense ratios

between 0.04% and 1.06%); Tibble v. Edison Int'l, 729 F.3d 1110, 1135 (9th Cir. 2013) (expense

ratio range of ".03 to 2%" did not make selection of those funds imprudent), rev'd & remanded

on unrelated grounds, 575 U.S. 523 (2015); Loomis v. Exelon Corp., 658 F.3d 667, 669–72 (7th

Cir. 2011) (affirming dismissal where "expense ratios rang[ed] from 0.03% to 0.96%"); Renfro

v. Unisys Corp., 671 F.3d 314, 319 (3d Cir. 2011) (affirming dismissal where fees "ranged from

0.1% to 1.21%"); Hecker v. Deere & Co., 556 F.3d 575, 586 (7th Cir. 2009) (affirming dismissal

where "[a]t the low end, the expense ratio was .07%; at the high end, it was just over 1%");

White v. Chevron Corp., No. 16-cv-0793-PJH, 2016 WL 4502808, at *11 (N.D. Cal. Aug. 29, 2016) (White I) (rejecting a claim of excessive investment fees where complaint alleged fees ranging from .05% to 1.24%).

        *ii.*    *Share Classes*

As another example of imprudence, Plaintiffs allege the Committee chose unnecessarily expensive mutual funds that contained higher fee "share classes." Mutual funds offer share classes based on the types of investors and their bargaining power.

Plaintiffs focus on the Plan's retail-class ("Class R") mutual funds. According to Plaintiffs, "[t]here is no difference between share classes other than cost—the funds hold identical investments and have the same manager." (Am. Compl. ¶ 79.) Plaintiffs assert the court must infer a breach of fiduciary duty because the Plan failed to use "lower fee" share classes even though it had the "asset size and negotiating power to invest in the cheapest share class available." (Id. ¶ 80.)

Plaintiffs use the Plan's JPMorgan "R" share classes as an example. Focusing on nine JPMorgan target date funds the Plan offered in 2015 that contained R5 share classes, Plaintiffs compare the R5 expense ratios with the R6 expense ratios of JPMorgan target date funds that Plaintiffs say were otherwise "identical counterparts." (Id. ¶ 83.) To illustrate, they list the expense ratios side by side in a chart purporting to show that the expense ratios for the Plan's R5 share class funds were about 20% more than the otherwise identical R6 share class funds.[10]

These comparisons are problematic. To begin, courts have often held that "[a]lleging only the inclusion of more expensive share classes is not enough" to suggest imprudence. Kurtz,

---

[10] See Am. Compl. ¶ 83. For example, the Plan's JPMorgan SmartRetirement2025 R5 had an expense ratio of 0.55 %, while the corresponding JPMorgan R6 fund had an expense ratio of 0.45%. According to the chart, the Plan paid 22% more than it needed to pay.

511 F. Supp. 3d at 1199. But the bigger problem lies with Plaintiffs' numbers. Defendants, using the same sources upon which Plaintiffs rely throughout the complaint, show that Plaintiffs' comparison of share classes relies on incorrect information about actual fees paid by the Plan's participants. Taking into account the 15-basis-point revenue credit that Defendants negotiated for the JPMorgan funds' R5 share class,[11] the Plan's expense ratio for each JPMorgan R5 fund was actually less than the R6 funds' expense ratios upon which Plaintiffs rely.[12]

### iii. Collective Trusts

Plaintiffs allege that the Committee breached its fiduciary duty because it failed to identify and select lower cost collective trusts (also referred to as CITs) in lieu of mutual funds. They say a "prudent fiduciary conducting an impartial review of the Plan's investments would have identified all funds that could be converted to collective trusts at the earliest opportunity." (Am. Compl. ¶ 95.)

As Plaintiffs did for the JPMorgan share classes, they offer a chart[13] comparing the 2016 expense ratio of the JPMorgan mutual funds to the expense ratio of JPMorgan CITs. For example, the chart shows that the JPMorgan SmartRetirement 2025 R5 fund had an expense ratio of 0.55%, while the collective trust version's was only 0.44%. But, again, Defendants provide a corrected chart showing the expense ratio is actually lower because the Plan received the 15-basis-point revenue credit. Once that is taken into account, the expense ratios are actually lower

---

[11] See Trust Agreement, ECF No. 24-4; 2018 Form 5500, ECF No. 24-9.
[12] For instance, the JPMorgan R5 0.55% expense ratio listed in the chart inaccurately reflects the actual 0.40% expense ratio Defendants negotiated with Fidelity. (See Mot. to Dismiss at 15 (correcting chart in Am. Compl. ¶ 83).)
[13] See Am. Compl. ¶ 95.

than the CIT funds that Plaintiffs use for comparison.[14]

Plaintiffs also compare the 2019 JPMorgan funds' expense ratios to lower expense ratios of the Fidelity Freedom CITs, because, according to Plaintiffs, those CITs "had the same investment goals as the JPMorgan trust funds utilized by the Plan." (Id. ¶ 96.) For example, the chart shows JPMorgan SmartRetirement 2025 R5 fund's expense ratio was 0.55% while the Freedom CIT's expense ratio was notably less, at 0.32%. (Id.) Plaintiffs list a "% Fee Excess" for the expense ratios, ranging from 69% to 78%. But Plaintiffs' comparison to the Fidelity CITs has significant problems as well.

Again, Plaintiffs did not apply the 15-basis-point revenue credit. Once one corrects the expense ratios, the R5 funds' improperly inflated "% Fee Excess" goes down.

Second, the 0.32% expense ratio Plaintiffs drew from the Fidelity CIT 2019 fact sheet[15] for comparison is not the CIT's actual expense ratio; it is an estimate.[16] Plaintiffs do not allege facts suggesting the Plan would receive the 0.32% estimated expense ratio or otherwise explain why an average is a fair benchmark for comparison given all the factors at play.

Third, CITs are not comparable investments. Plaintiffs acknowledge there are substantive differences between mutual funds and CITs, and the sources upon which they rely support that point. (See id. ¶¶ 92–94, n.9.) For example, the regulatory agencies overseeing each investment type are different, CITs are not required to file prospectuses or comply with

---

[14] For instance, the 0.55% ratio for the JPMorgan SmartRetirement 2025 R5 fund was 0.40%, lower than the CIT's 0.44% expense ratio. (Compare Am. Compl. ¶ 96 to Mot. to Dismiss at 15 (showing actual expense ratios when the 15-basis-point revenue credit is applied).)
[15] See Am. Compl. n.12.
[16] According to the Fidelity fact sheet, the maximum expense ratio for the Fidelity blend target-date funds is 0.42%, an amount "subject to certain decreases" that "depends on a variety of factors." (Fidelity FIAM Blend Target Date Q Fund Fact Sheet at 4, ECF No. 24-18.)

reporting requirements, and CITs cannot be rolled over if the employee changes employment.[17]
"Separate accounts, collective trusts, and stable value funds are all common investment
instruments with the potential to outperform mutual funds.  These non-mutual fund vehicles
differ so much from mutual funds, however, in terms of their regulatory and transparency
features that other courts have found it impossible to make an 'apples-to-oranges' comparison of
the two."  Moitoso v. FMR LLC, 451 F. Supp. 3d 189, 212 (D. Mass. 2020) (internal citations
omitted).  See also Renfro, 671 F.3d at 318 ("Mutual funds … are subject to a variety of
reporting, governance, and transparency requirements that do not apply to other investment
vehicles such as commingled pools."); Tobias v. NVIDIA Corp.,  No. 20-CV-06081-LHK, 2021
WL 4148706, at *12 (N.D. Cal. Sept. 13, 2021) ("[C]ourts have repeatedly recognized that
collective trusts 'differ so much from mutual funds … in terms of their regulatory and
transparency features that other courts have found it impossible to make an 'apples-to-oranges'
comparison of the two.") (quoting Moitoso, 451 F. Supp. 3d at 212); White I, 2016 WL 4502808,
at *12 ("It is inappropriate to compare distinct investment vehicles solely by cost, since their
essential features differ so significantly.").

Given these underlying problems with Plaintiffs' use of CITs, their suggestion that the
Committee made imprudent investment choices is not plausible.

    iv.    *Actively-Managed and Passively-Managed Funds*

In another comparison, Plaintiffs contend the Committee's failure to select more
passively-managed funds and cheaper actively-managed funds[18] supports a finding that it

---

[17] At any rate, the Plan offered CITs for multiple years during the Class Period.  (See, e.g., 2014
Form 5500 at 17, ECF No. 24-5; 2015 Form 5500 at 20, ECF No. 24-6; 2016 Form 5500 at 19,
ECF No. 24-7; 2017 Form 5500 at 19, ECF No. 24-8; 2018 Form 5500 at 19, ECF No. 24-9.)
[18] The Seventh Circuit provides a helpful definition of actively-managed and passively-managed
funds: "The low-expense funds tend to be passively managed (index funds, for example, which

breached its fiduciary duty:

> One indication of Defendants' failure to prudently monitor the Plan's funds is that
> the Plan has retained several actively-managed funds as Plan investment options
> despite the fact that these funds charged grossly excessive fees compared with
> comparable or superior alternatives, and despite ample evidence available to a
> reasonable fiduciary that these funds had become imprudent due to their high
> costs.  Between 2014 and 2018 the Plan included only four passively managed
> funds.

(Am. Compl. ¶ 74.)

Plaintiffs first compare the past performance of actively-managed mutual funds to that of
passively-managed funds.  But Plaintiffs talk in generalities, comparing fund categories (for
example, large-cap, mid-cap, small-cap, domestic equity) to corresponding market indexes (for
example, S&P 500, S&P MidCap 400, S&P SmallCap 600, S&P Composite 1500).  They list
"percentage of funds that underperformed their benchmark" over five years.  Those percentages,
according to a report they cite, ranged from 63 percent to 92 percent.  This, they say, suggests
that selecting an actively-managed fund is imprudent because historically such funds cost more
and have not performed as well.

Then, in support of their allegation that the Committee breached its fiduciary duties by
failing to shift the weight of investment options to passively-managed funds, Plaintiffs offer a
chart that "demonstrates that the expense ratios of the Plan's investment options were more
expensive by multiples of comparable passively-managed and actively-managed alternative
funds in the same investment style."  (Id. ¶ 103.)  The chart uses 2019 expense ratios "as a

---

do not make any independent investment choices but simply track a designated portfolio such as
the Standard & Poor's 500 Index) and have features that discourage turnover (an index fund
typically disallows new investments for a month or more following any withdrawal). The high-
expense funds tend to be actively managed (that is, the fund's investment advisers try to find and
buy underpriced securities while selling ones that the advisers think are overvalued) and to allow
rapid turnover both in the funds' holdings and the participants' investments. Higher turnover
means higher brokerage fees and higher administrative expenses." Loomis, 658 F.3d at 669–70.

methodology to demonstrate how much more expensive the Plan's funds were than their
alternative fund counterparts."  (Id. ¶ 104.)

In the chart, Plaintiffs list the 2019 expense ratios of actively-managed JPMorgan funds
in the Plan alongside the 2019 expense ratios of two alternative funds, one passively-managed
and the other actively-managed.  The chart indicates that the alternative funds' fees were
significantly less expensive than the Plan's JPMorgan funds.  Plaintiffs say they offer the chart
for illustrative purposes only and allege that "the significant fee disparities … existed for all
years of the Class Period."  (Id. ¶ 105.)

But, as in previous comparisons, Plaintiffs use incorrect numbers.  Applying the 15-basis-
point revenue credit, the expense ratios are less than Plaintiffs represent, albeit higher than the
funds Plaintiffs select for comparison.  The fact that the numbers are higher does not suggest
imprudent decisionmaking.  See Meiners v. Wells Fargo & Co., 898 F.3d 820, 823 (8th Cir.
2018) (selecting actively-managed funds as opposed to passively-managed funds is not per se
imprudent); Kurtz, 511 F. Supp. 3d at 1200 ([P]laintiff's complaint reads as suggesting that
choosing actively-managed funds can never be a prudent choice, which cannot be true.")
(emphasis in original).

As for the types of investments Plaintiffs choose for comparison, some of the funds have
different investment strategies.  For example, the actively-managed American Funds Target Date
Retirement funds that Plaintiffs select for comparison have materially different investment
strategies than the JPMorgan target date funds.  (See Mot. to Dismiss at 20 n.8 (citing fund
prospectuses upon which Plaintiffs rely for their data).)  This belies Plaintiffs' characterization of
the funds as sufficiently similar.

v.    *Conclusion*

Plaintiffs' assertion that the alleged circumstantial facts give rise to an inference of imprudence is flawed.

Importantly, Plaintiffs misstate expense ratios of Plan funds.  But they also make "apples to oranges" comparisons that do not plausibly infer a flawed monitoring and decisionmaking process.  "To show that 'a prudent fiduciary in like circumstances' would have selected a different fund based on the cost or performance of the selected fund, a plaintiff must provide a sound basis for comparison—a meaningful benchmark."  Meiners, 898 F.3d at 822 (affirming dismissal of ERISA fiduciary claim alleging that defendants breached their duty by keeping higher-fee mutual funds in the plan's investment portfolio).  The fact that "cheaper alternative investments with *some* similarities exist in the marketplace" does not provide a "meaningful benchmark" upon which to determine whether the Committee breached its duty.  Id. at 823 (emphasis in original).

ERISA does not require plan fiduciaries to offer a particular mix of investment options, whether that be, for example, favoring institutional over retail share classes, preferring CITs to mutual funds, or choosing passively-managed over actively-managed investments.  "[N]othing in ERISA requires every fiduciary to scour the market to find and offer the cheapest possible fund (which might, of course, be plagued by other problems)."  Hecker, 556 F.3d at 586 ("We see nothing in [ERISA] that requires plan fiduciaries to include any particular mix of investment vehicles in their plan.").  See also Loomis, 658 F.3d at 670 (same); Braden, 588 F.3d at 596 n.7 ("[W]e do not suggest that a claim is stated by a bare allegation that cheaper alternative investments exist in the marketplace."); Kurtz, 511 F. Supp. 3d at 1198 (the ERISA prudent man "mandate … naturally involve[s] selecting funds with a range of return and expense profiles");

White v. Chevron Corp., No. 16-cv-0793-PJH, 2017 WL 2352137, at *11 (N.D. Cal. May 31,
2017) ("White II") ("[F]iduciaries have latitude to value investment features other than price
(and indeed are required to do so).").  Showing that purportedly "better" investment
opportunities existed at the relevant times does not give rise to an inference that the Committee
breached its fiduciary duties.  St. Vincent, 712 F.3d at 718; Kurtz, 511 F. Supp. 3d  at 1201
(collecting cases that "routinely rejected arguments … based on allegations of excessive fees");
Martin, 2020 WL 3578022 at * 6 ("[A]t the end of the day one cannot plausibly infer imprudence
from the mere fact that fiduciaries failed to go with the cheapest possible option.") (citing Davis
v. Washington Univ. in St. Louis, 960 F.3d 478, 485–86 (8th Cir. 2020) (dismissing ERISA
complaint)).

     b.  Recordkeeping Fees

Plaintiffs separately challenge the Committee's recordkeeping fee arrangement with
Fidelity as yet another result of imprudent monitoring and decisionmaking.  Fidelity has been the
recordkeeper for the Plan since Barrick and Fidelity entered into a Master Trust Agreement on
April 1, 2002.  Barrick and Fidelity have amended the Trust Agreement seventeen times, most
recently on April 1, 2020.

Plaintiffs take issue with the long partnership between Barrick and Fidelity.  They assert
the Committee breached its fiduciary duty to failing to conduct a Request for Proposal ("RFP")
process to shop around for less expensive recordkeeping arrangements.  According to Plaintiffs,
a fiduciary should obtain competitive bids "at least every three to five years as a matter of
course, and more frequently if the plans experience an increase in recordkeeping costs or fee
benchmarking reveals the recordkeeper's compensation to exceed levels found in other, similar
plans."  (Am. Compl. ¶ 116.)

As another basis for their position that annual fees were unreasonable, Plaintiffs complain that Plan participants paid an unreasonable amount of fees.  They extrapolate from studies published in the *401k Averages Book*.  Those studies focus on fees charged to plans with less than $200 million in assets.  Acknowledging that Barrick's Plan is much larger (more than $500 million in assets), Plaintiffs still contend the *401k Averages Book* is "a useful resource" because "recordkeeping and administrative fees should decrease as a Plan increases in size."  (Id. ¶ 122.)

According to Plaintiffs, "a plan with 200 participants and $20 million in assets has an average recordkeeping and administration cost (through direct compensation) of $12 per participant."  (Id. (citing *401k Averages Book* at 95).)  For a larger plan, the average fee goes down: a larger plan, one "with 2,000 participants and $200 million in assets," pays an average fee of $5 per participant.  (Id. (citing *401k Averages Book* at 108).)  Using that as a comparison point, Plaintiffs surmise that "the Plan, with half a billion dollars in assets and over 4,500–5,000 participants throughout the Class Period, should have had direct recordkeeping costs below the $5 average[.]"  (Id. ¶ 122.)  The Plan's "total amount of recordkeeping fees (both through direct and indirect payments)," which were "conservatively above $60 per participant per year," "exceeded that benchmark.  (Id. ¶ 124.)  Plaintiffs conclude that "[t]hese amounts are clearly unreasonable as they are well above recognized reasonable rates for large plans."  (Id. ¶ 125.)  They further conclude, "Given the size of the Plan's assets during the Class Period and total number of participants, in addition to the general trend towards lower recordkeeping expenses in the marketplace as a whole, the Plan could have obtained recordkeeping services that were comparable to or superior to the typical services provided by the Plan's recordkeeper at a lower cost."  (Id. ¶ 126.)

Plaintiffs also take issue with the Plan's use of revenue sharing to cover recordkeeping costs.  From April 24, 2014 (the start of the Class Period) to December 31, 2016, the Plan paid fees to Fidelity through revenue sharing.  But the Trust Agreement required Fidelity to deposit a portion of its annual revenue sharing into a "Revenue Credit Account" to defray the costs for recordkeeping and administration costs.  After applying that credit, the cost per participant was $101 in 2014.  The cost went down to $85 in 2015.

On January 1, 2017, as shown in the Fourteenth Amendment to the Trust Agreement, the Plan transitioned to paying a contractual per-participant recordkeeper fee of $68.  Then, in April 2020, the Plan's modified agreement with Fidelity reduced that fee to $53 per participant.  And although Fidelity continued with its revenue sharing arrangement, the Trust Agreement's revenue credit program required Fidelity to credit the Plan the difference between what it collected and the amount of the per-participant recordkeeping fees.  (See Fourteenth Amendment to Trust Agreement at 112, ECF No. 24-4.)

Despite that agreement, Plaintiffs allege that in 2018, Fidelity pocketed the difference in violation of its contractual obligation under the Trust Agreement's Fourteenth Amendment. Plaintiffs cite to the Plan's 2018 Form 5500 (which Defendants submitted to the IRS as part of their regulatory reporting obligations), and note that "for the years ended December 31, 2018 and 2017, $45,719 and $53,178 of the Revenue Credit Account were used to pay plan administrative expenses, respectively."  (Am. Compl. ¶ 119 (quoting Note 1 to Barrick Retirement Plan's Audited Financial Statements, attached to 2018 Form 5500, ECF No. 24-9 p. 34).)  They then allege that "[r]evenue sharing for 2018 was $664,000."  (Id.)  From that they conclude that "over $600,000 in collected revenue sharing never made [it] back to the pockets of the Plan participants in 2018."  (Id.)

22

The contractual arrangement in the Fourteenth Amendment (to which the 2018 Form 5500 alluded) requires Fidelity to allocate amounts collected from revenue sharing, including that $600,000, "to Eligible Participant Accounts as soon as administratively feasible (generally within 15 business days)." (Fourteenth Amendment to Trust Agreement at 111–12.) Plaintiffs do not allege that Defendants knew, or should have known, about the alleged "pocketing" by Fidelity or that they failed to remedy any problem. Moreover, Plaintiffs' suggestion that Fidelity violated its contractual obligation, and that Defendants let it happen, is not plausible in light of the 2017 Fourteenth Amendment to the Trust Agreement.

Plaintiffs have not created a reasonable inference that the Committee violated the duty of prudence through its fee arrangement with Fidelity. To begin, revenue sharing is not per se imprudent. "Revenue sharing arrangements are not per se prohibited under ERISA." Terraza v. Safeway Inc., 241 F. Supp. 3d 1057, 1081 (N.D. Cal. 2017). "In fact, courts have noted that revenue sharing is a 'common and acceptable investment industry practice[ ] that frequently inure[s] to the benefit of ERISA plans.'" Id. at 1081 n.8 (quoting Tussey v. ABB, Inc., 746 F.3d 327, 336 (8th Cir. 2014)). See also Hecker, 556 F.3d at 585 (holding that maintaining a revenue sharing arrangement did not breach a fiduciary duty under ERISA); White I, 2016 WL 4502808 at *14 (same).

Second, the *401k Averages Book* does not provide a meaningful benchmark. Plaintiffs rely on averages. They then make a leap that is too far removed to create anything more than the "mere possibility" of misconduct, which does not nudge the claim "across the line from conceivable to the plausible." Twombly, 550 U.S. at 570.

Third, Defendants did manage, and reduce, Fidelity's fees over the years. Between 2002 and 2020, they re-negotiated the Trust Agreement seventeen times, which included amendments

modifying the revenue sharing arrangement and reducing fees participants paid for Fidelity's services.

Fourth, nothing in ERISA requires a fiduciary to obtain competitive bids at any regular interval.  See, e.g., Marks v. Trader Joe's Co., No. 19-10942 PA (JEMx), 2020 WL 2504333, at *6 (C.D. Cal. Apr. 24, 2020) (allegations that plan failed to engage in RFP process did not suggest imprudence); Del Castillo v. Cmty. Child Care Council of Santa Clara Cty., Inc., No. 17-cv-07243-BLF, 2019 WL 6841222, at *5 (N.D. Cal. Dec. 16, 2019) ("T[he] absence of competitive bidding or RFP process, without more, does not support Plaintiffs' allegations that the [plan fiduciaries] acted imprudently"); White I, 2016 WL 4502808, at *14 (allegation that ERISA required fiduciary "to solicit competitive bids on a regular basis has no legal foundation.").  Moreover, there is no question that Defendants regularly re-negotiated their fee arrangement with Fidelity, resulting in lower costs for participants.  Plaintiffs essentially speculate that an RFP process would result in even lower fees.

While compelling in the abstract, Plaintiffs' characterization of the reasonableness of the Plan's handling of its arrangement with Fidelity and payment of administrative costs through revenue sharing is based on generalizations, assumptions, and unsuitable comparisons.  Their allegations about recordkeeping fees do not give rise to a reasonable inference that the Committee violated its fiduciary duty.

### 4.  Conclusion

For the foregoing reasons, the court cannot infer that the process was flawed or that a prudent fiduciary in the same circumstances would have acted differently.  Accordingly, the

court dismisses Plaintiffs' claim of breach of the duty of prudence.

**Breach of the Duty of Loyalty**

The duty of loyalty requires a fiduciary to act "solely in the interest of the participants

and beneficiaries … (A) for the exclusive purpose of (i) providing benefits to participants and

their beneficiaries; and (ii) defraying reasonable expenses of administering the plan."  29 U.S.C.

§ 1104(a)(1)(A).  A fiduciary may not engage in "transactions that involve self-dealing or that

otherwise involve or create a conflict between the trustee's fiduciary duties and personal

interests."  Restatement (Third) of Trusts § 78(2) (Am. Law Inst. 2007).[19]

Here, Plaintiffs essentially conflate their duty of prudence claim with their duty of loyalty

claim.  They rely on the same set of allegations to support each theory of liability, yet the

allegations almost exclusively concern issues of prudence.

The duties of prudence and loyalty are distinct.  See, e.g., Turner v. Schneider Elec.

Holdings, Inc., 530 F. Supp. 3d 127, 1344 (D. Mass. 2021) (pleading a breach of loyalty claim

requires allegations that "'the fiduciary's subjective motivation' was improper") (quoting

Moitoso, 451 F. Supp. 3d at 204); Cassell v. Vanderbilt Univ., 285 F. Supp. 3d 1056, 1062

(M.D. Tenn. 2018) (to allege breach of duty of loyalty under ERISA, a plaintiff "must

sufficiently allege that Defendants acted for the purpose of benefitting … third parties or

---

[19] Courts look to the common law of trusts to analyze ERISA-imposed fiduciary duties.  See
Varity Corp. v. Howe, 516 U.S. 489, 497 (1996) ("[W]e believe that the law of trusts often will
inform, but will not necessarily determine the outcome of, an effort to interpret ERISA's
fiduciary duties. In some instances, trust law will offer only a starting point, after which courts
must go on to ask whether, or to what extent, the language of the statute, its structure, or its
purposes require departing from common-law trust requirements."). See, also, e.g., Tibble v.
Edison Int'l, 575 U.S. 523, 528 (2015) ("[A]n ERISA fiduciary's duty is 'derived from the
common law of trusts.'") (quoting Cent. States, Se. & Sw. Areas Pension Fund v. Cent. Transp.,
Inc., 472 U.S. 559, 570 (1985)); Petersen v. Comm'r of Internal Revenue, 924 F.3d 1111, 1117
(10th Cir. 2019) ("Although ERISA trusts are not governed by the common law of trusts …, the
federal statutory requirements mirror the law regarding a common-law trust.").

themselves. When claims do not support an inference that the defendants' actions were for the purpose of providing benefits to themselves or someone else and simply had that incidental effect, loyalty claims should be dismissed.").

Accordingly, even if Plaintiffs had sufficiently alleged a breach of the duty of prudence, breach of that duty does not equate to an act of disloyalty under ERISA.  See, e.g., Tobias, 2021 WL 4148706, at *16 ("[T]he duty of prudence and the duty of loyalty are two different requirements under ERISA § 404(a), and courts in this district dismiss claims for breach of the duty of loyalty when those claims hinge entirely on breach of the duty of prudence allegations."); Martin, 2020 WL 3578022, at *6 (dismissing duty of loyalty claim that repackaged duty of prudence claim and failed to provide additional allegations suggesting, for example, self-dealing); In re: SunEdison, Inc. ERISA Litig., 331 F. Supp. 3d 101, 115 (S.D.N.Y. 2018) (dismissing claim for breach of the duty of loyalty because the plaintiffs' allegations "merely repackage[d]" plaintiffs' inadequately pled claim for breach of the duty of prudence); In re: Pfizer Inc. ERISA Litig., No. 04 Civ. 10071(LTS)(HBP), 2013 WL 1285175, at *10 (S.D.N.Y. Mar. 29, 2013) (dismissing claim that defendants breached ERISA duty of loyalty because such claim was derivative of unsuccessful claim for breach of the ERISA duty of prudence).

The court, having reviewed the Amended Complaint's allegations independently in the context of ERISA's duty of loyalty, concludes that Plaintiffs do not allege any facts creating a reasonable inference that Defendants were disloyal to Plan participants.  Their only "allegations" of disloyalty are either conclusions of law or altogether conclusory and unsupported statements, all of which are insufficient to survive Defendants' Rule 12(b)(6) motion to dismiss.  Because Plaintiffs have not pled facts plausibly alleging breach of the duty of loyalty under 29 U.S.C. § 1104(a)(1)(A), the court dismisses that claim.

**Failure to Adequately Monitor Other Fiduciaries**

Plaintiffs' monitoring claim is fully dependent on the validity of their breach of fiduciary duty claims. Because Plaintiffs have not adequately alleged a claim for breach of the duty of prudence or the duty of loyalty, the court dismisses their derivative monitoring claim.

## ORDER

For the foregoing reasons, Defendants' Motion to Dismiss Plaintiffs' Amended Complaint (ECF No. 24) is GRANTED. Moreover, because Plaintiffs have already had one opportunity to amend their original complaint (following Defendants' first motion to dismiss), and because further amendment would not correct the problems the court has identified, the dismissal is with prejudice.

DATED this 21st day of April, 2022.

BY THE COURT:

TENA CAMPBELL
U.S. District Court Judge