Jason Marsili, CA Bar No. 233980
jmarsili@rmrllp.com
ROSEN MARSILI RAPP LLP
11150 W. Olympic Blvd., Suite 990
Los Angeles, CA 90064
Telephone: 213-389-6050

Paul J. Lukas, MN Bar No. 22084X*
lukas@nka.com
Brock J. Specht, MN Bar No. 0388343*
bspecht@nka.com
Patricia C. Dana, MN Bar No. 400803*
pdana@nka.com
NICHOLS KASTER, PLLP
4700 IDS Center
80 S 8th Street
Minneapolis, MN 55402
Telephone: 612-256-3200
Facsimile: 612-338-4878
*admitted *pro hac vice*

ATTORNEYS FOR PLAINTIFF AND THE
PROPOSED CLASS

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

**THIRD AMENDED COMPLAINT**

| | | |
|---|---|---|
| 1 | Patricia Klawonn, on behalf of the Motion Picture Industry Individual Account Plan, | **Case No. 2:20-cv-09194-DMG-JEM** |
| 2 | | |
| 3 | Plaintiff, | **THIRD AMENDED COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, AND OTHER EQUITABLE RELIEF –** |
| 4 | v. | **CLASS ACTION** |
| 5 | Board of Directors for the Motion Picture Industry Pension Plans, Patric Abaravich, Aric Ackerman, Alex Aguilar, Helayne Antler, Mark Badagliacca, Jay Barnett, Scott Bernard, Krysten Brennan, Bill Brinkmeyer, Ed Brown, Ann Calfas, Michael Campolo, Stephanie Caprielian, Bonnie Chavez, Tommy Cole, Chuck Cortez, Catherine Cusimano, Thom Davis, Steve Dayan, Bruce Doering, Eryn Doherty, Colleen Donahue, Kenny Farnell, Marc Flynn, John Ford, Nicole Gustafson, Tom Inman, Steve Kaplan, Sheldon Kasdan, Ronald Kutak, Hank Lachmund, Laura Legge, Matt Loeb, Carol Lombardini, Michael Messina, Michael Miller, Diane Mirowski, Catrice Monson, Charles Parker, Wes Ponsford, Cathy Repola, Rebecca Rhine, Michael Rosenfeld, Scott Roth, Ted Rubin, Joseph Scudiero, Joshua Staheli, Rachael Stanley, Carole Stepp, and Jennifer Talluto, | **(1) Breach of Fiduciary Duties under ERISA (29 U.S.C. § 1104)** |
| 6 | | |
| 7 | | |
| 8 | | |
| 9 | | |
| 10 | | |
| 11 | | |
| 12 | | |
| 13 | | |
| 14 | | |
| 15 | | |
| 16 | | |
| 17 | | |
| 18 | | |
| 19 | Defendants. | |

## SUMMARY

1.      Plaintiff Patricia Klawonn, on behalf of the Motion Picture Industry ("MPI") Individual Account Plan (the "Plan"), brings this action under the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001, *et seq.* ("ERISA"), against the Board of Directors for the Motion Picture Industry Pension Plans ("Board") and individual members of the Board between October 7, 2014 and October 7, 2020 ("Board Members," previously identified as "John and Jane Does 1-10") (collectively, "Defendants"). As described herein, Defendants have breached their fiduciary duties with respect to the Plan in violation of ERISA,

**THIRD AMENDED COMPLAINT**

1    to the detriment of the Plan and its participants and beneficiaries. Plaintiff brings
2    this action to remedy this unlawful conduct and to obtain appropriate monetary and
3    equitable relief on behalf of the Plan as provided by ERISA.

## **INTRODUCTION**

4
5        2.       As of the fourth quarter of 2019, Americans had approximately
6    $8.9 trillion in assets invested in defined contribution plans, such as 401(k) and
7    403(b) plans. *See* Investment Company Institute, *Ten Important Facts About 401(k)*
8    *Plans*, at 2 (Mar. 2020), available at https://www.ici.org/system/files/
9    attachments/pdf/ten_facts_401k.pdf .

10       3.       The potential for disloyalty and imprudence is much greater in defined
11   contribution plans than in defined benefit plans. In a defined benefit plan, the
12   participant is entitled to a fixed monthly pension payment, while the sponsor is
13   responsible for funding the plan and is liable for any shortfalls if the plan cannot
14   make those payments. As a result, the sponsor bears all risks related to excessive
15   fees and investment underperformance. *See Hughes Aircraft Co. v. Jacobson*,
16   525 U.S. 432, 439 (1999).

17       4.       In a defined contribution plan, however, participants' benefits "are
18   limited to the value of their own investment accounts, which is determined by the
19   market performance of employee and employer contributions, less expenses." *Tibble*
20   *v. Edison Int'l ("Tibble II")*, 575 U.S. 523, 525 (2015). Thus, the sponsor has no
21   financial incentive to keep costs low or to closely monitor the plan to ensure that
22   every investment remains prudent, because all risks related to high fees and poorly
23   performing investments are borne by the participants.

24       5.       To protect Americans' retirement savings, ERISA imposes strict
25   fiduciary duties upon retirement plan fiduciaries. *See* 29 U.S.C. § 1104(a)(1). These
26   fiduciary duties include a duty to exercise appropriate "care, skill, prudence, and
27   diligence" in managing the plan's investment options, *see* 29 U.S.C. § 1104(a)(1),
28   and are considered "the highest known to the law." *Howard v. Shay*, 100 F.3d 1484,

**THIRD AMENDED COMPLAINT**

1488 (9th Cir. 1996) (quoting *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982)). In addition, fiduciaries must consider "the circumstances and requirements of the trust and its beneficiaries." Restatement (Third) of Trusts § 90 cmt. d (2007).[1]

6.     Because participants in a large plan will have varying retirement ages and financial needs, fiduciaries will typically offer a "menu" of investment options designed to meet a wide range of needs, allowing participants to determine which investments on the menu are best suited for them and how much money to invest in each option. However, instead of following this common approach, Defendants funneled all of the Plan's assets into a single investment pool (which invests in a mix of pre-determined underlying investments with the same allocation of assets among these investments for all participants) and locked Plan participants into that investment, without regard to their age, anticipated retirement date, or individual preferences or needs.

7.     While it not *per se* imprudent to lock all participants into the same investment pool, it is critical that decisions relating to the management of the investment portfolio be made prudently and with the utmost care. *See Toomey v. DeMoulas Super Markets, Inc.*, 2020 WL 3412747, at *3–4 (D. Mass. April 16, 2020) (explaining that while it is not *per se* imprudent to offer only a single investment option "that might be a relevant factor in analyzing the prudence of Defendants' decisions when they were made"). Unfortunately for participants, Defendants failed to meet their fiduciary obligations in this regard. To the contrary, Defendants' process for managing the Plan's investment portfolio was wildly unsuccessful. From 2011 to 2018, the Plan's returns lagged significantly behind its peers, landing in the bottom 5% of the 1,651 plans with more than $100 million in assets on a 3-year basis, and in the **bottom 3%** of these plans on a 10-year basis.

---

[1] Since ERISA is derived from the law of trusts, courts regularly look to trust law for guidance on ERISA's fiduciary duties. *See Tibble II*, 575 U.S. at 528–29; *Varity Corp. v. Howe*, 516 U.S. 489, 496–97 (1996).

Among plans with over $1 billion in assets, the Plan ranked **173rd out of 175** on a 10-year basis.

8.   These abysmal returns were not the result of coincidence or bad luck. Nor can the Plan's underperformance be attributed to the Plan's pooled structure or its targeted risk level. Among comparable defined contribution plans that held substantially all of their assets in a single investment portfolio and took on similar levels of risk, the Plan performed poorly. Likewise, on a risk-adjusted basis, the Plan underperformed comparable mutual funds.

9.   The Plan's poor performance was the product of poor investment decisions that heavily utilized high-priced, actively managed investments with excessive fees. The subpar performance of these investments clearly did not justify their expense. Moreover, Defendants were aware that the Plan was trailing even Defendants' self-selected benchmarks significantly during the statutory period. Yet, Defendants failed to adjust their investment approach, and continued to make the same investment decisions, despite overwhelming evidence available at the beginning of the subject period that Defendants' investment approach was failing and would continue to fail going forward.

10.   The Plan's fees were also astronomical when compared to plans of similar size. The average plan with over $1 billion in assets has a total plan cost of approximately 0.28% per year, with over 90 percent of plans of that size having expenses of 0.46% per year or less. *See* BrightScope/Investment Company Institute, *The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans, 2017*, at 57–58 (2020), available at https://www.ici.org /pdf/20_ppr_dcplan_profile_401k.pdf (hereinafter "2020 BrightScope/ICI Study"). In stark contrast, the Plan, with over $5 billion in assets as of 2019, charges fees averaging 1.18% per year, four to five times higher than the average plan of similar size, which translates to the Plan's participants paying $46 million more per year in fees than participants in the average plan of this size. This makes the Plan **one of the**

**five most expensive plans in the country** among the 950 defined contribution plans governed by ERISA that had over $1 billion in assets as of the end of 2019.

11.     These increased expenses did not benefit participants by yielding increased returns. Further, because Defendants locked all participants into the same asset allocation in the same underlying investments, participants had no ability to pursue a different investment approach or choose investments with a better performance track record and lower costs.

12.     Based on this conduct and the other facts alleged herein, it is reasonable to infer that Defendants' process for managing the Plan's investments was flawed and inconsistent with the applicable standard of care under ERISA. Accordingly, Plaintiff asserts a claim against Defendants on behalf of the Plan for breach of their fiduciary duty of prudence under ERISA.

## JURISDICTION AND VENUE

13.     Plaintiff brings this action pursuant to 29 U.S.C. § 1132(a)(2) and (3), which provide that participants in an employee retirement plan may pursue a civil action on behalf of the plan to remedy breaches of fiduciary duties and other unlawful conduct in violation of ERISA, and to obtain monetary and appropriate equitable relief as set forth in 29 U.S.C. § 1109.

14.     This case presents a federal question, and this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1)(F).

15.     Venue is proper pursuant to 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b) because this is the District where the Plan is administered, where the breaches of fiduciary duties giving rise to this action occurred, and where Defendants may be found. In addition, Plaintiff also resides in this District.

## THE PARTIES

### PLAINTIFF

16.     Plaintiff Patricia Klawonn resides in Los Angeles, California, and has been a participant in the Plan since at least 1992. She has had a vested interest in her

accrued retirement benefits since 1994. Plaintiff has never been given any choice of investments and was subject to Defendants' investment decisions. Plaintiff has suffered financial harm and has been injured by Defendants' unlawful conduct as described herein. Had Defendants prudently managed the Plan, her account would be worth more today than it currently is.

## THE PLAN

17.   The MPI Individual Account Plan was established, as restated, on January 1, 1993.[2] The Plan is one of two retirement plans the Board manages on behalf of MPI members; the Board also manages a defined benefit plan, known as the MPI Pension Plan.

18.   The Plan at issue is an "employee pension benefit plan" within the meaning of 29 U.S.C. § 1002(2)(A) and a "defined contribution plan" within the meaning of 29 U.S.C. § 1002(34).

19.   The Plan covers eligible employees of motion picture industry employers in the Los Angeles area that have executed a collective bargaining agreement containing a participation provision approved by the Board. It also covers certain employees who are not covered by a collective bargaining agreement but whose employers have contracted with the Board to participate in the Plan.

20.   From the end of 2014 until the end of 2019,[3] the Plan had between 79,000 and 92,000 participants, and between $3.7 billion and $5.1 billion in assets.

21.   Participants' accounts are funded by employer contributions, which are allocated to participants on an annual basis.[4] Employees are not permitted to contribute their own money to the Plan.

---

[2] The Summary Plan Description lists the Plan's inception date as August 1, 1979. *See Summary Plan Description*, Exhibit A, at 32.

[3] 2019 is the most recent plan year for which reported Form 5500 information is available for the Plan.

[4] Employer contributions to a retirement plan are part of a standard benefits package offered by employers to attract and retain talented employees. *See* 401K SPECIALIST,

22.     The Plan includes one overarching investment in which participants are automatically enrolled. Within that investment, Defendants invest in numerous underlying investment accounts, and the combined returns net of fees for these underlying investment accounts equal the Plan's investment performance. Participants have no choice over how their money is invested, including the allocation of assets among the underlying investments. Defendants' choices are therefore critical to participants' investment results and, ultimately, their ability to retire with adequate assets.

## DEFENDANTS

### Board of Directors for the Motion Picture Industry Pension Plans

23.     Defendant Board of Directors for the Motion Picture Industry Pension Plans is based in Studio City, California. The Board is the "plan sponsor" within the meaning of 29 U.S.C. § 1002(16)(B), and is a "named fiduciary" pursuant to 29 U.S.C. § 1102(a) with respect to the Plan because it is identified in the Plan Documents as a fiduciary under ERISA.[5]

24.     The Board is also a functional fiduciary because it has discretionary authority with respect to the Plan and the Plan's investments. The Board's fiduciary responsibilities include, among other things, "discretion over the ... investment of

_____

*Top 4 Priorities of 401(k) Plan Sponsors* (Jan. 3, 2016) (highlighting survey findings that, among large defined contribution plan sponsors, attracting and retaining talented employees is a top priority), *available at* http://401kspecialistmag.com/top-4-priorities-of-401k-plan-sponsors; Joan Vogel, *Until Death Do Us Part: Vesting of Retiree Insurance*, 9 Indus. Rel. L.J. 183, 216 (1987) (noting that employers offer retirement benefits to attract and retain "reliable, productive employees"). They do not excuse imprudent management of a plan's assets or investments. *See Brotherston v. Putnam Invs. LLC*, 907 F.3d 17, 28-29 (1st Cir. 2018).

[5] *See Summary Plan Description*, Exhibit A, at 42 (defining a fiduciary as "[a]n individual and entity that has discretion over the administration of the Plans and investment of the assets of the Plans," and listing "[t]he Board of Directors of the Plans" as a fiduciary).

**THIRD AMENDED COMPLAINT**

the assets of the Plan[]."[6] According to the Plan's Form 5500s, the Board is also the Plan Administrator, controlling and managing the operation and administration of the Plan. Thus, the Board exercises discretionary authority or discretionary control with respect to management of the Plan, as well as discretionary authority and responsibility with respect to the administration of the Plan, and is a functional fiduciary under 29 U.S.C. § 1002(21)(A).

**Board Members**

25.     The members of the Board are employees of participating employers and representatives of participating unions, and at all times were acting within the scope of their agency with the Board. The Board Members are therefore functional fiduciaries pursuant to 29 U.S.C. § 1002(21)(A). Because the individuals who served on the Board during the statutory period were previously not known to Plaintiff, they were collectively named as John and Jane Does 1–10. The Board Members who served on the Board between October 7, 2014, and October 7, 2020 were identified by the Board Defendant in response to Plaintiff's discovery requests. These individuals are now named in the caption of this Complaint and identified in Exhibit B.

26.     The Board delegates a portion of its fiduciary responsibilities for investing Plan assets to the Finance Committee. Among other things, the Finance Committee is responsible for "the oversight of the Plan's assets," which includes "a responsibility for setting the Plan's Investment Policy, selecting the Investment Managers and Investment Consultant, and overseeing and evaluating the investment results." *Investment Policy Statement for Motion Picture Industry Individual Account Plan (Oct. 2016), Dkt. 44-10 at 4, 13–14.* The Finance Committee may authorize "[d]eviations from the investment policies and constraints outlined in [the Plan's Investment Policy Statement] when it determines that such deviations are in

---

[6] *Id.*

**THIRD AMENDED COMPLAINT**

the best interests of the Plan." *Id. at 14.* The Finance Committee and its members are therefore also functional fiduciaries pursuant to 29 U.S.C. § 1002(21)(A).

27.     All Finance Committee members concurrently serve as Board Members. The tenure of each Board Member on the Board (and on the Finance Committee, if applicable) is identified in Exhibit B.

28.     Each Defendant identified above as a Plan fiduciary is also subject to co-fiduciary liability under 29 U.S.C. § 1105(a)(1)–(3) because it enabled other fiduciaries to commit breaches of fiduciary duties, failed to comply with 29 U.S.C. § 1104(a)(1) in the administration of its duties, and/or failed to remedy other fiduciaries' breaches of their duties, despite having knowledge of the breaches.

## FIDUCIARY RESPONSIBILITIES

### DUTY OF PRUDENCE

29.     ERISA imposes strict fiduciary duties upon fiduciaries of retirement plans. Among other things, the statute provides:

[A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—

(B)     with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims . . . .

29 U.S.C. § 1104(a)(1)(B). This is commonly referred to as the "duty of prudence."

30.     The duty of prudence includes "a continuing duty to monitor [plan] investments and remove imprudent ones" that exists "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble II*, 575 U.S. at 529. If an investment is imprudent, the plan fiduciary "must dispose of it within a reasonable time." *Id.* at 530 (quotation omitted). Fiduciaries therefore may be held liable for failing to monitor a plan's investments to ensure that each remains

-10-

**THIRD AMENDED COMPLAINT**

prudent, in addition to imprudent selection of the investments. *Patterson v. Cap. Grp. Cos.*, 2018 WL 748104, at *4 (C.D. Cal. Jan. 23, 2018).

31.　　As explained above, in assessing the prudence of an investment option, fiduciaries must also consider the circumstances that are "relevant to the particular investment or investment course of action involved," 29 C.F.R. § 2550.404a-1(b)(1), including "the circumstances and requirements of the trust *and its beneficiaries*." Restatement (Third) of Trusts § 90 cmt. d (2007) (emphasis added).

32.　　The duty of prudence also includes a duty to minimize investment expenses. Indeed, "[c]ost-conscious management is fundamental to prudence in the investment function." *Tibble v. Edison Int'l ("Tibble III")*, 843 F.3d 1187, 1197 (9th Cir. 2016) (en banc) (quoting Restatement (Third) of Trusts § 90 cmt. b (2007)). Thus, selecting and retaining higher-cost investments constitutes a breach of fiduciary duties when similar or identical lower-cost investments are available. *See Braden v. Wal-Mart Stores, Inc.,* 588 F.3d 585, 596 (8th Cir. 2009).

33.　　The Introductory Note to the Restatement's chapter on the investment of trust assets further clarifies:

> [T]he duty to avoid unwarranted costs is given increased emphasis in the prudent investor rule. This is done to reflect the importance of market efficiency concepts and differences in the degrees of efficiency and inefficiency in various markets. In addition, this emphasis reflects the availability and continuing emergence of modern investment products, not only with significantly varied characteristics but also with similar products being offered with significantly differing costs. The duty to be cost conscious requires attention to such matters as the cumulation of fiduciary commissions with agent fees or the purchase and management charges associated with mutual funds and other pooled investment vehicles. In addition, active management strategies involve investigation expenses and other transaction

-11-
**THIRD AMENDED COMPLAINT**

costs ... that must be considered, realistically, in relation to the likelihood of increased return from such strategies.

Restatement (Third) of Trusts ch. 17, intro. note (2007).

34.     Where markets are efficient, fiduciaries are encouraged to use low-cost index funds. *Id.* § 90 cmt. h(1). While a fiduciary may consider higher-cost, actively managed mutual funds as an alternative to index funds, "[a]ctive strategies . . . entail investigation and analysis expenses and tend to increase general transaction costs . . . . [T]hese added costs . . . must be justified by realistically evaluated return expectations." *Id.* § 90 cmt. h(2) (emphasis added).[7]

### PRUDENT SELECTION AND MONITORING OF INVESTMENT OPTIONS IN DEFINED CONTRIBUTION PLANS

35.     To ensure a sufficient mix of investments that meets a wide variety of participant needs, prudent fiduciaries of defined contribution plans typically create a "menu" of investment options from which participants can choose to invest. Each investment option is generally a pooled investment product (*e.g.*, a mutual fund,

---

[7] The emphasis in trust law and under ERISA in minimizing expenses is consistent with academic and financial industry literature, which has consistently shown that the most important consideration in selecting prudent investments is low fees. Numerous scholars have demonstrated that high expenses are not correlated with superior investment management. Indeed, funds with high fees on average perform worse than less expensive funds, *even on a pre-fee basis*. Javier Gil-Bazo & Pablo Ruiz-Verdu, *When Cheaper is Better: Fee Determination in the Market for Equity Mutual Funds*, 67 J. Econ. Behav. & Org. 871, 873 (2009); *see also* Jill E. Fisch, *Rethinking the Regulation of Securities Intermediaries*, 158 U. Pa. L. Rev. 1961, 1993 (2010) (summarizing numerous studies showing that "the most consistent predictor of a fund's return to investors is the fund's expense ratio"). According to this published academic literature:

> [T]he empirical evidence implies that superior management is not priced through higher expense ratios. On the contrary, it appears that the effect of expenses on after-expense performance (even after controlling for funds' observable characteristics) is more than one-to-one, which would imply that low-quality funds charge higher fees. Price and quality thus seem to be inversely related in the market for actively managed funds.

Gil-Bazo & Ruiz-Verdu, *When Cheaper is Better*, at 883.

**THIRD AMENDED COMPLAINT**

collective investment trust, or separate account) offering exposure to a particular asset class or sub-asset class. *See* BrightScope/Investment Company Institute, *The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans, 2016*, at 2 (2019) available at https://www.ici.org/pdf/19_ppr_dcplan _profile_401k.pdf (hereinafter "2019 BrightScope/ICI Study"); Ian Ayres & Quinn Curtis, *Beyond Diversification: The Pervasive Problem of Excessive Fees and "Dominated Funds" in 401(k) Plans*, 124 Yale L.J. 1476, 1485 (2015).

36.  Asset classes within pooled investments generally include fixed investments, bonds, stocks, and occasionally real estate. Money market funds, guaranteed investment contracts, and stable value funds are examples of fixed investments. Bonds are debt securities, which are generally categorized by the issuer/borrower (U.S. Government, foreign governments, municipalities, corporations), the duration of the debt (repayable anywhere between 1 month and 30 years), and the credit risk associated with the particular borrower. Equity, or stock, investments, are generally defined by three characteristics: (1) where they invest geographically (*i.e.*, whether they invest in domestic or international companies, or both); (2) the size of company they invest in (generally categorized as small cap, mid cap, or large cap); and (3) their investment style, *i.e.* growth, value, or blend (growth funds invest in fast-growing companies, value funds look for more conservative or established stocks, and blend funds invest in a mix of both types of stocks). Balanced funds are a type of fund that invests in a mix of stocks, bonds, and occasionally other assets. Target-risk funds are balanced funds that assemble a portfolio of investments to match the risk preference of the investor. Each target-risk portfolio is typically made up of other pooled investment funds.

37.  Target date funds ("TDFs") are a particularly popular investment option that many retirement plan fiduciaries use to provide tailored investment strategies for participants of all ages. TDFs invest in a diversified mix of asset classes managed towards the approximate date when the investor expects to start

withdrawing money from the fund. Investment companies offer TDFs as a suite with an array of target dates staggered either 5 or 10 years apart, along with an "income" or "retirement" fund for investors who have already retired. As the target retirement date approaches, the investment mix becomes more conservative, typically by shifting away from stock investments towards more conservative fixed income investments. However, TDFs are not limited to stocks and bonds, and often use asset classes such as commodities, real estate, inflation-linked bonds, or emerging markets stocks. TDFs are the most popular Qualified Default Investment Alternative ("QDIA")[8] selected by fiduciaries of defined contribution plans. *See* Willis Towers Watson, *QDIA evolutions — Moving defined contribution plans into the future*, (Apr. 29, 2019), available at https://www.willistowerswatson.com/en-US/Insights/2019/04/qdia-evolutions-moving-defined-contribution-plans-into-the-future. More than $1.7 trillion of American retirement savings was invested in TDFs as of 2019. Morningstar, *2019 Target-Date Fund Landscape* (May 9, 2019), available at https://www.morningstar.com/lp/tdf-landscape?con=17137&cid=CON_DIR0071.

38. Investment funds can be either passively or actively managed. Passive funds, popularly known as "index funds," seek to replicate the performance of a market index, such as the S&P 500, by purchasing a portfolio of securities matching the composition of the index itself. James Kwak, *Improving Retirement Savings Options for Employees*, 15 U. Pa. J. Bus. L. 483, 493 (2013). By following this strategy, index funds produce returns that are very close to the market segment

---

[8] "A QDIA is a default investment option chosen by a plan fiduciary for participants who fail to make an election regarding investment of their account balances" as permitted under Department of Labor regulations. U.S. Employee Benefits Security Administration, *Target Date Retirement Funds: Tips for ERISA Fiduciaries*, at 1 (Feb. 2013), *available at* https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/fact-sheets/target-date-retirement-funds.pdf.

**THIRD AMENDED COMPLAINT**

tracked by the index. *Id.* Index funds therefore offer predictability, diversified exposure to a particular asset or sub-asset class, and low expenses. *Id.*

39.     Passive investment strategies can be used to accomplish a plan's investment objectives at all levels of risk. Though some index funds track the performance of a stock market index, such as the S&P 500, other index funds track other asset classes, such as real estate or fixed income securities, a/k/a bonds. These can be used in combination with an index fund that tracks equities to produce a portfolio that has much lower risk than the market as a whole. There are also index funds such as the Vanguard Balanced Index made up of multiple index funds that track both stocks and bonds, resulting in a more conservative risk/return profile than a portfolio invested entirely in stocks.

40.     Actively managed funds, on the other hand, pick individual stocks and bonds within a particular asset or sub-asset class and try to beat the market through superior investment selection. *Id.* at 485–86. Actively managed funds are typically much more expensive than index funds, but offer the potential to outperform the market (although this potential is typically not realized). U.S. DEP'T OF LABOR, *Understanding Retirement Plan Fees and Expenses*, at 9 (Dec. 2011), available at https://www.dol.gov/sites/dolgov/files/legacy-files/ebsa/about-ebsa/our-activities/resource-center/publications/understanding-retirement-plan-fees-and-expenses.pdf.

41.     As Jeffery Bailey, CFA, retirement plan consultant and senior director of benefits for Target Corporation explains in the CFA Institute's guide for plan sponsors, given the high costs associated with actively managed funds and the large percentage of active managers who fail to justify their fees, "[defined contribution plan] sponsors should adopt passively managed funds as the default choice for their plans." Broad acceptance of this principle has meant that "passive options are becoming ubiquitous offerings in DC plans and in some cases constitute the only offering." Jeffery V. Bailey & Kurt D. Winkelmann, CFA INST. RSCH FOUND., *Defined Contribution Plans: Challenges & Opportunities for Plan Sponsors*, at 116

-15-
**THIRD AMENDED COMPLAINT**

(2021), available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3908085; *see also* 2020 BrightScope/ICI Study at 47 (showing that over 98% of plans with over $1 billion in assets offer one or more index funds). The "high hurdle" needed to justify the use of active investment options can only be cleared if the committee can reasonably conclude that: (1) the asset class is inefficient, and thus "active managers who can add value exist (after fees) in the asset category"; (2) "[t]he committee can identify and hire those managers"; and (3) "[t]he committee can adequately monitor and, when necessary, replace poorly performing managers." Bailey & Winkelmann, at 116.

42. Hedge funds are a type of actively managed investment. While hedge funds are characterized by their use of complex trading strategies and their exorbitant fee structures, they are invested in the same types of underlying assets as standard mutual funds, and the performance of hedge funds is therefore correlated with those asset classes and the financial markets. As one author points out, hedge funds are "nothing more and nothing less than repackaged, and often leveraged, bundles of stocks, bonds, cash, real estate, and commodities; as such, how can they possibly behave differently from the asset classes that comprise them?" William J. Bernstein, SKATING WHERE THE PUCK WAS 19 (2012). Bernstein's point has proven salient, as hedge fund returns have been highly correlated with those of the stock market since the mid-2000s:

**Correlation of HFRX Global Hedge Fund Index with the S&P 500 Rolling 36 Months: 1998–2016**

**THIRD AMENDED COMPLAINT**



*See* Ben Carlson, *The Golden Age of Hedge Funds*, CFA INST. (Mar. 6, 2017), available at https://blogs.cfainstitute.org/investor/2017/03/06/the-golden-age-of-hedge-funds/.

43.     The Plan in this case offered no single-asset class options nor any multi-asset class options tied to a participant's retirement date or risk tolerance. Nor did it offer an index fund option. Instead, the Plan had one packaged investment that pooled participants' assets and invested them on participants' behalf with an investment mix determined by Defendants largely consisting of poorly performing actively managed investments that carried high fees.

### ERISA § 404(C)

44.     ERISA § 404(c) protects a fiduciary from liability for a participant's choice of investments where participants have independent control over their accounts and can invest among different options on the plan's menu. 29 U.S.C. § 1104(c)(1); 29 C.F.R. § 2550.404c-1(d)(2)(i).[9] In order for fiduciaries to qualify

---

[9] Even in cases where this defense applies, fiduciaries may still be held liable for imprudent construction of the plan's investment menu. *See* 29 C.F.R § 2550.404c-1(d)(2)(iv).

**THIRD AMENDED COMPLAINT**

for this potential defense, however, participants must be given an opportunity to choose from a "broad range of investment alternatives." 29 C.F.R. § 2550.404c-1(b)(1)(ii). At a minimum, this requires that the plan offer "at least three investment alternatives" with "materially different risk characteristics" that "enable the participant or beneficiary by choosing among them to achieve a portfolio with aggregate risk and return characteristics at any point within the range normally appropriate for the participant or beneficiary." 29 C.F.R. § 2550.404c-1(b)(3)(i)(B); *Jenkins v. Yager*, 444 F.3d 916, 923 (7th Cir. 2006).

45.    Because Defendants have not maintained an investment menu with multiple investment options and have not allowed participants to exercise any independent control over their accounts, Defendants do not qualify for § 404(c) protection.

### MINIMIZATION OF PLAN EXPENSES

46.    At retirement, employees' benefits "are limited to the value of their own investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Tibble II*, 575 U.S. at 525.

47.    Poor investment performance combined with excessive fees and costs can significantly impair the value of a participant's account. Over time, even seemingly small differences in fees and costs can result in vast differences in the amount of savings available at retirement. The United States Department of Labor has cautioned that a one percent difference in fees and costs can reduce the investor's account balance at retirement by **28 percent**. *See* U.S. DEP'T OF LABOR, *A Look at 401(k) Plan Fees*, at 1–2 (2013), available at https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf. The U.S. Securities and Exchange Commission and others similarly warn that although the fees and costs associated with investment products and services may seem small, over time they can have a major impact on an investor's portfolio.

**THIRD AMENDED COMPLAINT**

48.    A major category of expenses within a defined contribution plan are investment management expenses. *See* Investment Company Institute & Deloitte Consulting LLP, *Inside the Structure of Defined Contribution/401(k) Plan Fees, 2013*, at 17 (Aug. 2014), available at https://www.ici.org/system/files /attachments/rpt_14_dc_401k_fee_study.pdf. Investment management expenses are the fees that are charged by investment managers for managing particular investments, and participants "typically pay these asset-based fees as an expense of the investment options in which they invest." *Id.* at 6.

49.    Even among actively managed investment options, there is a wide range of investment options that charge a wide range of fees. At the high end of this range are hedge funds, which Defendants utilized heavily.  In general, hedge funds charge significantly higher fees than a standard mutual fund because they charge not only a base management fee, but also a performance fee, through which the hedge fund retains some percentage of the profits it earns. For example, the Elliott International fund charged the Plan a base fee of 1.50% per year as well as a performance fee equal to 20% of the fund's profits. *2019 Performance Report, Dkt. 44-6 at 38*. Bridgewater Pure Alpha Major Markets II charged a base fee of 2.25% plus 20% of profits exceeding the returns of 3-month treasury bills. *Id.* Not only can performance fees result in overall fees that are several times higher than the fees for almost all other investment options, but the base fees are themselves quite high compared with other funds (including other actively managed funds): in 2019, the average mutual fund held in a 401(k) plan charged *total* fees that were only 0.39% per year. 2020 BrightScope/ICI Study at 59.

50.    Prudent fiduciaries can minimize plan expenses by selecting low-cost investment options. This task is made significantly easier the larger a plan gets. Economies of scale allow larger plans to reduce investment management fees by

-19-
**THIRD AMENDED COMPLAINT**

selecting funds only available to institutional investors, or by negotiating directly with the investment manager to obtain even lower rates.[10] Economies of scale also make administrating the plan significantly less expensive, because costs on a per-participant basis drop as the number of participants increases. Empirical evidence bears this out. In 2016, total participant-weighted plan fees in the average defined contribution plan were 0.62%, but this varied between an average of 1.29% in plans with $1 million to $10 million in assets, and an average of only 0.25% for plans with over $1 billion in assets. 2019 BrightScope/ICI Study at 47. Indeed, these lower costs are nearly universal among large plans, with 90% of all plans with over $1 billion having total plan costs below 0.48%. *Id.* at 48. Therefore, with approximately $4 billion to $5 billion in Plan assets during the relevant period, Defendants had sufficient negotiating power and economies of scale to keep Plan expenses low.

51. Given the significant variation in total plan costs attributable to plan size, the reasonableness of investment expenses should be determined by comparisons to other similarly sized plans. *See* 29 U.S.C. § 1104(a)(1)(B) (requiring ERISA fiduciaries to discharge their duties in the manner "that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an *enterprise of a like character*") (emphasis added); *Tibble v. Edison Int'l ("Tibble I")*, 2010 WL 2757153, at *9, *15, *28 (C.D. Cal. July 8, 2010)

---

[10] *See* Consumer Reports, *How to Grow Your Savings: Stop 401(k) Fees from Cheating You Out of Retirement Money* (Aug. 2013), available at http://www.consumerreports.org/cro/magazine/2013/09/how-to-grow-your-savings/index.htm (instructing employees of large corporations that "[y]our employer should be able to use its size to negotiate significant discounts with mutual-fund companies"); U.S. Dep't of Labor, *Study of 401(k) Plan Fees and Expenses*, at 17 (April 13, 1998), available at https://www.dol.gov/sites/dolgov/files/legacy-files/ebsa/researchers/analysis/retirement/study-of-401k-plan-fees-and-expenses.pdf (reporting that by using separate accounts and similar instruments, "[t]otal investment management expenses can commonly be reduced to one-fourth of the expenses incurred through retail mutual funds").

**THIRD AMENDED COMPLAINT**

(evaluating the propriety of particular fees and investment decisions in light of the size of the plan), *rev'd on other grounds*, 575 U.S. 523 (2015); *Tussey v. ABB, Inc.*, 2007 WL 4289694, at \*6, \*6 n.5 (W.D. Mo. Dec. 3, 2007) (determining that investment expenses were unreasonable through comparisons to similar plans because "[a]t most, reasonable compensation should mean compensation commensurate with that paid by similar plans for similar services to unaffiliated third parties" (quoting Nell Hennessy, *Follow the Money: ERISA Plan Investments in Mutual Funds and Insurance*, 38 J. Marshall L. Rev. 867, 877 (2005))). Evaluated on this metric (or by any reasonable metric), the Plan's expenses were exorbitant.

## DEFENDANTS' VIOLATIONS OF ERISA

### DEFENDANTS DID NOT APPROPRIATELY CONSIDER THE NEEDS OF PARTICIPANTS IN MANAGING THE PLAN'S INVESTMENTS[11]

52.     As an initial matter, Defendants did not give appropriate consideration to the circumstances of the Plan's beneficiaries. As noted above, the Plan had approximately 79,000 to 92,000 participants, *see supra* at ¶ 20, with a wide range of ages and financial situations.[12] Yet, Defendants gave no consideration to their individual needs in managing the Plan's investments, and gave them no ability to select a portfolio of investments of their own. Instead, Defendants forced a one-size-fits all investment portfolio upon them (without regard to their individual financial goals, risk preferences, and anticipated retirement dates), and simultaneously left them to bear all of the risks and costs associated with that single portfolio.

53.     While it is not *per se* imprudent to include only one investment option in a defined contribution plan, the single option that was chosen here was

---

[11] Plaintiff recognizes that the Court dismissed this aspect of her breach of fiduciary duty claim without leave to amend. *See Dkt. 53 at 8–9.* Plaintiff repeats this aspect of her claim solely for purposes of preserving her rights in the event of any appeal.

[12] For example, participants nearing retirement may wish to preserve the capital in their retirement account rather than take risks that could deplete capital just when they need it most, while younger individuals may be more risk tolerant.

inappropriate. If Defendants wished to use a single investment option, they should have considered a target-date investment that would have adjusted the mix of underlying investments depending on how close participants were to retirement. Alternatively, Defendants could have surveyed participants regarding their investment preferences and used this information as part of their fiduciary investment decision-making process. Yet, Defendants did none of these things. Nor did they offer participants any alternative investments or the option of a self-directed brokerage account if they wished to opt-out of the Plan's single fund structure.

54.     Moreover, the single investment portfolio adopted by Defendants did not serve to benefit participants or meet their retirement needs. Instead, as discussed below, it was laden with excessively costly underlying investments that performed poorly.

**DEFENDANTS RELIED ALMOST EXCLUSIVELY ON HIGH-FEE, ACTIVELY MANAGED FUNDS WHOSE PERFORMANCE DID NOT JUSTIFY THEIR HIGH FEES**

55.     Even if Defendants' one-size-fits-all investment program did not violate their fiduciary duties to participants, Defendants poorly executed that program by over-relying on high-priced investments and investment managers whose performance did not justify their exorbitant fees.

56.     Throughout the statutory period, Defendants allocated over 90% of the Plan's assets into actively managed investment options that carried significant base investment management fees, with hefty performance fees on top of that in many cases. Indeed, seven of the Plan's investment options charged fees averaging over 2% per year.

57.     Defendants' failure to manage the Plan in a cost-conscious manner has made it one of the most expensive plans in the country. As described above, the Plan had between $3.7 and $5.1 billion in assets during the relevant period. In 2017, the average plan with over $1 billion in assets had total plan costs of 0.26% on a participant-weighted basis. *See* 2020 BrightScope/ICI Study at 57. In fact,

**THIRD AMENDED COMPLAINT**

90 percent of plans with over $1 billion in assets had costs of less than 0.46%. *Id.* at 58. The Plan's costs greatly exceed both figures. As of 2019, the only year for which Plaintiff has comprehensive data, total fees amounted to approximately 1.18% of Plan assets, which equates to roughly $60 million in fees per year.[13] These fees are between four and five times higher than the average for plans of similar size, **making the Plan one of the five most expensive plans in the country** out of approximately 951 defined contribution plans with assets over $1 billion dollars covered by ERISA as of the end of 2019. Had the Plan simply maintained average expenses, Defendants would have saved participants approximately **$46 million in fees per year**.

58.     The Plan's payment of high investment fees for actively managed mutual funds and hedge funds did not benefit participants. On the contrary, from 2013 to 2018, the Plan's returns consistently landed it among the **bottom 5% of 1,651 defined contribution plans** with more than $100 million in assets on a 3-year basis, with returns of up to 6% less than the median of these plans, as shown below. Moreover, the Plan's 5-year returns and 10-year returns were similarly abysmal.

---

[13] The fees paid by the Plan consist of three parts: The Plan's administrative fees, asset-based investment management fees, and performance-based investment management fees. Administrative fees for 2019 were reported from page 4 of the Notes to Financial Statements of the Plan's From 5500. Asset-based management fees were taken directly from the 2019 annual report from the Plan. *See Dkt. 44-6 at 20*. Performance fees were calculated by taking the average performance fees over the past three years using the performance fee formulas, *id. at 37–41*, and the investment manager and benchmark performance data, *id. at 33–36*, from the same annual report.

**THIRD AMENDED COMPLAINT**

| MPI Performance Compared to Plans Over $100M[14] | | | | | | |
|---|---|---|---|---|---|---|
| 3-year rolling returns | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 |
| MPI Plan | 7.09% | 6.84% | 2.35% | 2.34% | 4.34% | 4.28% |
| Median Return | 9.48% | 12.20% | 8.00% | 4.60% | 7.75% | 5.90% |
| Percentile Rank | **4.20%** | **0.70%** | **0.30%** | **1.30%** | **1.00%** | **3.50%** |
| Rank | 1582/1651 | 1640/1651 | 1647/1651 | 1631/1651 | 1635/1651 | 1594/1651 |
| 5-year rolling returns | | | | | | |
| MPI Plan | 9.52% | 7.47% | 4.43% | 4.74% | 4.54% | 2.78% |
| Median Return | 12.51% | 9.37% | 6.90% | 8.65% | 9.57% | 4.81% |
| Percentile Rank | **6.70%** | **5.70%** | **1.90%** | **0.40%** | **0.30%** | **1.30%** |
| Rank | 1542/1651 | 1558/1651 | 1621/1651 | 1646/1651 | 1648/1651 | 1630/1651 |
| 10-year rolling returns[15] | | | | | | |
| MPI Plan | N/A | N/A | N/A | N/A | N/A | 6.09% |
| Median Return | N/A | N/A | N/A | N/A | N/A | 8.59% |
| Percentile Rank | N/A | N/A | N/A | N/A | N/A | **2.40%** |
| Rank | N/A | N/A | N/A | N/A | N/A | 1613/1651 |

59.     Among plans with more than $1 billion in assets, the Plan fared even worse in the long term, as shown below. For example, the Plan landed in the **bottom 2% of 175 plans** on both a 5-year basis and 10-year basis in 2018, and was dead last on a five-year basis in 2017.

| MPI Performance Compared to Plans Over $1B[16] | | | | | | |
|---|---|---|---|---|---|---|
| 3-year rolling returns | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 |

[14] Data derived from annual Forms 5500 filed with the Department of Labor and available publicly at https://www.efast.dol.gov/portal/app/disseminatePublic?execution=e2s1.

[15] Plan data used to calculate performance is taken from Form 5500s, and is publicly available on the EBSA website. Pre-2009 data lacks the data points and attached Notes to Financial Statements that Plaintiff needs to reliably calculate performance for years prior to 2009. Accordingly, 2018 is the first year for which Plaintiff can reliably calculate ten-year rolling returns.

[16] Data derived from annual Forms 5500 filed with the Department of Labor and available publicly at https://www.efast.dol.gov/portal/app/disseminatePublic?execution=e2s1.

**THIRD AMENDED COMPLAINT**

| MPI Plan | 7.09% | 6.84% | 2.35% | 2.34% | 4.34% | 4.28% |
|---|---|---|---|---|---|---|
| **Median Return** | 9.46% | 11.99% | 7.88% | 4.69% | 7.68% | 5.93% |
| **Percentile Rank** | **8.50%** | **1.10%** | **1.10%** | **1.10%** | **2.20%** | **9.60%** |
| **Rank** | **161/175** | **174/175** | **174/175** | **174/175** | **172/175** | **159/175** |
| **5-year rolling returns** | | | | | | |
| **MPI Plan** | 9.52% | 7.47% | 4.43% | 4.74% | 4.54% | 2.78% |
| **Median Return** | 12.34% | 9.37% | 6.82% | 8.56% | 9.41% | 4.81% |
| **Percentile Rank** | **5.60%** | **7.30%** | **4.50%** | **1.10%** | **0.50%** | **2.20%** |
| **Rank** | **166/175** | **163/175** | **168/175** | **174/175** | **175/175** | **172/175** |
| **10-year rolling returns** | | | | | | |
| **MPI Plan** | N/A | N/A | N/A | N/A | N/A | 6.09% |
| **Median Return** | N/A | N/A | N/A | N/A | N/A | 8.58% |
| **Percentile Rank** | N/A | N/A | N/A | N/A | N/A | **1.70%** |
| **Rank** | N/A | N/A | N/A | N/A | N/A | **173/175** |

60. Despite the abundance of evidence that Defendants' reliance on high-priced active managers has been disastrous for participants, Defendants have failed to make any changes to their approach, instead doubling down on their misguided decisions. For example, despite having to replace seven of the Plan's eleven equity managers in the past four years, seven new active equity managers have taken their place. And Defendants' response to the horrid performance of its hedge funds has been equally illogical, adding *seven* new alternative investments to the Plan's investment lineup in 2020 alone.

61. Defendants refusal to change course is inexcusable. Defendants were aware that the Plan was performing poorly during the statutory period. In addition to the Plan, Defendants provide members with a defined-benefit pension plan that utilizes an investment strategy substantially similar to that of the Plan, investing in most of the same investments with a similar allocation of assets to those investments. In participant communications, Defendants compared the Plan's performance against two benchmarks: the MSCI World Index,[17] and a more

---

[17] *See* MSCI, "MSCI Developed Markets Indexes," *available at*

traditional investment portfolio containing 60% stocks (as measured by the MSCI World Index) and 40% bonds (as measured by the ICE BofA Broad Market Index).[18] The Plan's performance over the last 10 years on a 3-, 5-, and 10-year basis has trailed Defendants' chosen benchmarks significantly, as shown below. Indeed, over the last three years the Plan's returns were nearly 4% lower than a traditional 60/40 fund and *less than half* of the returns of the MSCI World Index.

| 2019 | 3-year | 5-year | 10-year |
|------|--------|--------|---------|
| **MPI Plan** | **5.77%** | **4.11%** | **5.78%** |
| **Benchmark (60/40)** | 9.32% | 6.65% | 7.51% |
| **MSCI World NR USD** | 12.57% | 8.73% | 9.46% |

https://www.msci.com/developed-markets (last visited July 16, 2020) (explaining that MSCI indexes are "designed to take into account variations reflecting conditions across regions, market cap segments, sectors and styles").

[18] The Plan also uses a custom benchmark to track its performance. However, the components of this benchmark render it unreliable for purposes of measuring performance. Thirty percent (30%) of the benchmark is made up of the HFRI Fund Weighted Composite Index, which measures the performance of "1,400 single-manager funds" and their "net of all fees performance." Hedge Fund Research Institute, *HFRI Indices - Description of Indices*, available at https://www.hfr.com/hfri-indices-index-descriptions (last accessed Jan. 1, 2021). Both the SEC and the CFA condemn the use of peer-group averages as benchmarks as unreliable and failing to meet nearly every necessary criteria of a reliable benchmark. SECURITIES AND EXCHANGE COMMISSION, Note and Comment, Disclosure of Mutual Fund Performance and Portfolio Managers, 58 FR 19050-01, 19053-54 (April 12, 1993); CFA Institute, MANAGING INVESTMENT PORTFOLIOS 739-40 (3d. ed. 2007). Second, the SEC outright prohibits the use of net-of-fees benchmarks for purposes of measuring mutual fund performance. Securities and Exchange Commission, Instructions to Form N-1A, Item 27, Instruction 5, at 61, available at https://www.sec.gov/files/formn-1a.pdf (emphasis added). The reason is simple: the purpose of a benchmark is to determine whether a manager has earned its management fee; a benchmark reporting net-of-fee information does not provide that information. SECURITIES AND EXCHANGE COMMISSION, Disclosure of Mutual Fund Performance and Portfolio Managers, Release No. 33-6988, at 11 (Apr. 6, 1993), available at https://www.sec.gov/rules/final/33-6988.pdf. Given these fundamental flaws with a large component of the benchmark, the Plan's performance against its custom benchmark is not a reliable indicator of how the Plan has performed.

**THIRD AMENDED COMPLAINT**

62.     The Plan's annual report confirms these findings. According to the Plan's 2019 annual report, among its self-defined universe of peers, the Plan performed at the 90th percentile over the past 3 years, at the 93rd percentile over the past 5 years, and at the 87th percentile over the past decade. *Dkt. 44-6 at 25*. The Plan's short-term performance is just as problematic, with the Plan's 11.1% rate of return in 2019 ranking in the 92nd percentile of its peer universe. *Id.* And despite claims that the Plan's investment management was designed to weather market turbulence, these performance numbers remained quite poor in 2020, in part due to the tremendous losses suffered by the Renaissance Institutional Diversified Alpha and Bridgewater Pure Alpha hedge funds, which made up nearly 10% of the Plan's assets, during the pandemic-related market downturn.[19]

63.     The Plan's annual report emphasizes its 20-year performance as of the end of 2019, a period during which the Plan returned 4.9%, compared to 4.5% for the MSCI World benchmark and 5.0% for the 60/40 benchmark. *Dkt. 44-6 at 23*. However, prudent fiduciaries do not ignore poor results for an entire decade simply because better results were achieved 20 years ago in a different market environment. Choosing to focus exclusively on this particular period is reminiscent of CFA Ben Carlson's refrain that "the best way to win any argument about the markets is to change your start and end dates." Ben Carlson, *Reference Points*, A WEALTH OF COMMON SENSE (Oct. 8, 2017), *available at* https://awealthofcommonsense.com/2017/10/reference-points/. As Carlson points out, because "[n]o one is good enough

---

[19] *See* Financial Times, *Covid Crisis Opens Chasm Between Hedge Fund Winners and Losers*, Dec. 23, 2020, available at https://www.ft.com/content/ff81d62b-7a56-43ae-998b-26f722245e72 (showing Renaissance Institutional Diversified Alpha and Bridgewater Pure Alpha hedge funds were down 33.3% and 10%, respectively, over the one-year period ending in November 2020, constituting underperformance of 47.8% and 24.5% compared to the Plan's MSCI World Benchmark, which was up 14.48% during the same period; *see also Dkt. 44-6 at 24* (showing that Renaissance Inst. Diversified Alpha and Bridgewater Pure Alpha together held $458 million, or 9%, of the Plan's assets as of the end of 2019).

to invest at the exact bottom or unlucky enough to put all their chips on the table at the exact peak," showing results over anomalous time periods that begin or end with a market peak or trough is generally misleading, lacking the "caveats" and "context" necessary to interpret the data. *Id.* Notably, the period from 2000 to 2019 is one of the two worst 20-year periods of stock market performance out of 65 such periods occurring since 1936.[20] Thus, measuring the Plan's performance against this period of artificially low returns makes the Plan look better by comparison, and is not a reliable basis upon which to measure performance in a typical market environment (and certainly not a reliable basis to measure performance during the six-year statutory period).

64.     Further, the favorability of this 2000–2019 comparison vanishes once the Plan's abysmal 2020 performance is taken into account.

| 2020 | 1-year return | 5-year avg returns | 10-year avg returns | 21-year avg returns[21] |
|---|---|---|---|---|
| **MPI Plan** | **5.13%** | **5.68%** | **5.07%** | **4.93%** |
| **Benchmark (60/40)** | 13.37% | 9.38% | 7.72% | 5.43% |
| **MSCI World NR USD** | 15.90% | 12.19% | 9.87% | 5.02% |

Incorporation of the Plan's 2020 results demonstrates that the Plan has performed poorly over *all* time periods, but particularly over the past decade.

65.     The Plan's annual report asserts that the Plan's returns have been produced with "significantly less risk" than its benchmarks, presumably based on the Plan's lower volatility levels. *Dkt. 44-6 at 23*.[22] However, this fails to fully account for the Plan's risk level, which in reality is much higher than suggested.

---

[20] The MSCI World benchmark 20-year average performance is 1.52% higher if you shift the period analyzed back by only a year.

[21] Plaintiff is displaying the returns over 21 years because the 20-year returns shown in the Plan's 2019 annual report do not delineate annual performance for 2000 through 2002, and therefore Plaintiff is not able to calculate the performance of the 20-year time period beginning in 2001.

[22] Volatility is one of several metrics used to measure the risk of an investment. Volatility describes the dispersion of returns generated by the investment over time,

**THIRD AMENDED COMPLAINT**

66.     First, the reported volatility figures are unreliable given the illiquid nature of a large number of the Plan's holdings. *See id. at 37–41* (showing that twenty-three of the Plan's investment managers do not provide daily liquidity). Indeed, for nine of the funds in which the Plan is invested, it would take the Plan a year or more to withdraw its investment capital. *Id*. As CFA Ben Carlson points out, volatility measurements of institutional portfolios with "such a large weighting to illiquid fund structures" are "more or less useless because the prices are updated so infrequently." Ben Carlson, *Simple vs. Complex, 2019 Edition*, A WEALTH OF COMMON SENSE (Feb. 6, 2020), *available at* https://awealthofcommonsense.com /2020/02/simple-vs-complex-2019-edition/. The illiquidity of these types of investments "makes these positions far riskier than a diversified low-cost stock market index fund. Even if the volatility looks lower in these funds from their reported numbers, it's masked by the inherent illiquidity." *Id.*

67.     Second, the alternative investments in the Plan take on significant risks that are not reflected in volatility measurements. Hedge funds use significant leverage, meaning that they borrow against their own portfolios and invest the borrowed funds, hoping that they can produce outsized returns by earning more money on the borrowed money than the loan's interest rate. While this can amplify returns when things go well, using leverage multiplies losses, which can subsequently result in a *total* loss of principal—a pattern that has repeated itself over and over again from the failure of Long-Term Capital Management in 1998, triggered by leverage of **30 times** the fund's assets, to the failure of Archegos Capital Management in 2021, which was leveraged as much as ten times its underlying assets.[23] This use of leverage introduces another type of risk known as

typically in terms of the standard deviation from the mean.

[23] *See* Matthieu Benavoli, *LTCM Crisis*, *available at* https://extreme-events-finance.net/resources/ltcm-crisis/ (last accessed Sept. 8, 2021); Reuters, *Archegos Margin Call Share Dump Ripples Across Markets*, *available at*

**THIRD AMENDED COMPLAINT**

counter-party risk: risk related to the institution *lending* money to the hedge fund. For example, many hedge funds failed in 2008 because Lehman Brothers was their primary broker.[24] When these risks are considered, the Plan did not have significantly less risk than its benchmarks, and its low returns certainly cannot be justified based on the level of risk.

**DEFENDANTS FAILED TO CONSIDER SUPERIOR INVESTMENT OPTIONS THAT WERE AVAILABLE IN THE MARKETPLACE AND ADOPTED BY OTHER PLAN FIDUCIARIES**

68.     Defendants' imprudent management of the Plan's investments is further evident from comparisons to other investments with similar investment objectives, and other defined contribution plans with comparable structures.   In relation to both, the Plan materially underperformed and was significantly more expensive.

69.     According to the Plan's quarterly performance report for Q4 2019 (as Defendants have not made available any performance reports from 2020), the Plan's goal "is to generate consistent absolute returns in all market environments." *Dkt. 44-6 at 9*. Such an investment goal could be achieved without heavy reliance on high-fee investment options such as hedge funds. For example, the Building Service 32BJ Retirement Savings Plan ("Building Service Plan") has 95,000 participants and uses a single default investment, in which more than two-thirds of the plan's assets are invested. That default investment option—much like the Plan's single pooled investment option—seeks to "minimize the risk of large losses, and is designed to provide long-term appreciation and capital preservation through a mix of equity and fixed income exposures consistent with a target level of risk

---

https://www.reuters.com/article/us-usa-markets-blocktrades-quotes/archegos-margin-call-share-dump-ripples-across-markets-idUSKBN2BL1V1 (Mar. 29, 2021).
[24] Robert Faff, Jerry Parwada, Eric Tan, *Did Connected Hedge Funds Benefit from Bank Bailouts During the Financial Crisis*, 107 J. BANKING & FINANCE 1, 2 (2019) (explaining that "Lehman's hedge-fund clients doubled their failure rate after the bankruptcy").

appropriate for participants of the Plan as a whole."[25] And, like the Plan, the Building Service Plan's default investment seeks to minimize volatility and thus "may not make as much money as more aggressively invested funds when the market is rising, but it also may not lose as much money as riskier funds when the market is falling."[26]

70.     In order to achieve this objective, the Building Service Plan's default investment option is the Vanguard Wellesley Income Fund, a mutual fund managed by Wellington Management Company with an expense ratio of 16 bps, one-seventh of the Plan's expenses.[27] Not only is the Vanguard Wellesley Income Fund significantly less expensive than the Plan's single-pooled investment option, it also achieved greater returns with lower volatility over the 20-year period. During that time, its returns were 7.55% per year, compared to the Plan's 4.9% returns, with an annualized volatility of 5.68% compared to the Plan's 6.9%.[28]

71.     To put this underperformance more concretely, a person whose account had $100,000 invested in the Vanguard Wellesley Income Fund at the end of 1999 would have approximately $465,000 at the end of 2020, while a person whose account had $100,000 invested in the Plan at the end of 1999 would have approximately $275,000. Thus, the Building Service Plan has achieved greater returns with lower volatility than the Plan for a fraction of the investment management expense because the fiduciaries of that plan—unlike Defendants—selected and retained the Vanguard Wellesley Income Fund instead of relying

---

[25] Building Service 32BJ, *Supplemental Retirement Savings Plan Summary Plan Description* at 16 (March 1, 2020), https://pension.32bjfunds.org/Portals/4/SPD/32BJSRSP_SPD_ENG.pdf?ver=2021-06-16-161939-580.
[26] *Id.*
[27] *See id.*
[28] Indeed, the Vanguard Wellesley Income Fund also outperformed the Plan's custom benchmarks while achieving less volatility.

**THIRD AMENDED COMPLAINT**

exclusively on high-fee actively managed investment options to achieve nearly identical investment objectives.

72.     The Building Service Plan is not an anomaly. Plaintiff has reviewed the universe of defined contribution plans and identified 12 peer defined contribution plans of comparable size that employ a similar structure to the Plan—*i.e.*, plans with more than 10,000 participants and $100 million in assets, with all or most of the plan's assets in a single pool invested in multiple asset classes and that is managed by the plan's trustees, with volatility levels (as measured by standard deviation) between 2010 and 2019 within one percent of the Plan's volatility during that period.[29]

73.     These plans have investment goals similar to the Plan's. For example, the Bricklayers and Trowel Trades International Retirement Savings Plan invests assets "in a mixture of equities, fixed income and real estate equity and debt with the primary goal of earning a reasonable rate of return without incurring unreasonable risk."[30] This broad diversification is intended "to generate a reasonable rate of return

---

[29] Plaintiff first created two lists: one using DOL data from Form 5500s, and the second from BrightScope's database. The first list consisted of all defined contribution plans with over $100 million in assets and 10,000 participants that indicated on the 5500 that they do not qualify for 404(c) status, or that provide participants only limited control of their investments. The second list included every collectively bargained defined contribution plan with over 10,000 participants and less than 5% of the plan's assets in target-date funds. Plaintiff then reviewed the 5500 of each plan, and selected those plans that have a similar structure to MPI, with 70% or more of the plan's assets in a single pool of assets invested in multiple asset classes and selected or managed by the plan's fiduciaries, with participants' performance determined by the investment performance of that pool. The annual returns of every plan meeting those criteria were calculated using the plan's Form 5500s dating back to 2009. *See supra* at 22 n.15. Those returns were translated to under or overperformance versus a benchmark index, so as to permit comparisons of plans with plan years that ended in different months (roughly half of plans in this group have plan years ending in months other than December). The benchmark, DJ Moderately Conservative TR USD, is not intended to be a normative indicator of "good" or "bad" performance, but instead as a Rosetta Stone of sorts, permitting the comparison of plans whose performance took place during different time periods.

[30] Bricklayers & Trowel Trades International Retirement Savings Plan, BAC SAVE,

---

**THIRD AMENDED COMPLAINT**

for its members, while reducing the risk of large investment losses."[31] Similarly, the Boilermakers National Annuity Trust "assets are invested in a manner intended to generate long-term rates of return consistent with the Trust's investment objectives and risk tolerance . . . . The primary investment objectives are to preserve assets and generate an appropriate level of risk-adjusted return."[32] The Southern New England Carpenters Annuity Plan's investment policy likewise "specifies that Fund investments be diversified among various asset classes, such as fixed income, equities, real estate, and alternatives, and permits a level of risk that is reasonable for a long-term perspective."[33]

| | Plan vs. Benchmark | Peer Group Avg vs. Benchmark | Plan vs. Peer Group Avg |
|---|---|---|---|
| **5-year performance ending 2015**[34] | -0.11% | +0.96% | -1.08% |
| *5-year volatility ending 2015* | 0.86% higher | 0.12% lower | 0.99% higher |
| **10-year performance ending 2019** | -0.27% | +0.55% | -0.82% |
| *10-year volatility ending 2019* | 0.15% lower | 0.50% lower | 0.35% higher |

74.     Among this universe of similarly structured plans with comparable levels of risk, the Plan significantly underperformed, as shown by the chart below.

75.     During each time period, the Plan had higher volatility levels than the peer group average, while exhibiting poorer performance. This demonstrates that the

Annuity and 401(k) Summary Plan Description (Jan. 1, 2016) at 4, available at https://bacbenefits.org/sites/default/files/2020-08/RSP%20and%20401k%20SPD_Jan%202016.pdf.
[31] BAC SAVE Update, Bricklayers and Trowel Trades International Pension Fund Annual Report at 12 (2019), available at https://bacbenefits.org/sites/default/files/news/pdf/BAC_Annual_2019.pdf
[32] Fourth Quarter 2017 Fund Fact Sheet, Boilermakers National Annuity Trust Fund (2017), available at http://bnat.retirepru.com/_Assets/docs/BMNAT_4Q17.pdf
[33] Connecticut Carpenters Ann. Fund 2015 Summary Plan Description at 3, http://www.ctcarpentersfunds.org/ccbf/Documents/PenAnn/2015%20SPD%20-%20Final%20to%20the%20printer.pdf. The Southern New England Carpenters Annuity Plan was formerly the Connecticut Carpenters Annuity Fund.
[34] *See supra* at 22 n.15.

**THIRD AMENDED COMPLAINT**

Plan's performed poorly compared with plans with similar investment objectives, acting under similar circumstances.

76.   This difference in returns is largely attributable to Defendants' failure to prudently manage the Plan's investments and almost exclusive use of high-fee, actively managed investments. In fact, Defendants' underperformance of 0.82% per year from 2010 to 2019 is nearly identical to the 0.80% difference between the fees charged by the Plan (1.18%) and the fees associated with the average plan between $500 million and $1 billion assets (0.38%), which is also the size of the median plan in this custom peer group. 2020 BrightScope/ICI Study at 57.

77.   The Plan could have achieved its conservative investment objectives using just a single, lower-cost mutual fund. Again, the Building Service Plan and its use of the Vanguard Wellesley Income Fund is instructive. But that single mutual fund is not an anomaly. Plaintiff has identified several mutual funds that were utilized by one or more defined contribution plans in a manner similar to the Plan's single pooled investment (*i.e.*, to meet the needs of a substantial number of participants with varying financial circumstances and of varying ages). To do this, Plaintiff searched publicly available data from 2015 and identified every plan with more than $50 million in assets and with more than half of the plan's assets invested in a single mutual fund managed in a style similar to the Plan.[35]   To meet the varying needs of such a large group of participants, these investment options maximize diversification in order to reduce overall risk. Every fund meeting these objective criteria for fund type, plan usage, and plan size was included in Plaintiff's analysis. *See supra* at 30 n.29.

78.   The Plan's 2016 Investment Policy Statement ("IPS") states the Plan has adopted "an investment objective of Growth and Income" that "is expected to

---

[35] Plaintiff included funds invested in multiple asset classes including stocks and bonds, at the very least. Target-date funds and single-asset-class funds were excluded.

**THIRD AMENDED COMPLAINT**

achieve a positive rate of return over the long-term" and "[d]iversifies the Portfolio's assets in order to reduce the risk of wide swings in market value." *Investment Policy Statement for Motion Picture Industry Individual Account Plan* (October 2016), *Dkt. 44-10 at 5–6*. Similarly, the Vanguard Wellesley Income Fund "seeks to provide long-term growth of income and a high and sustainable level of current income, along with moderate long-term capital appreciation." *Vanguard Wellesley Income Fund Annual Report* at 1 (Sept. 30, 2020). The investment objective of this fund has not changed and would have been discoverable to a prudent fiduciary conducting a reasonable investigation into market alternatives. *See Vanguard Wellesley Income Fund Summary Prospectus* at 1 (Jan. 27, 2010) (describing the same objective). The same is true of the Fidelity Balanced Fund which seeks "income and capital growth consistent with reasonable risk." *See Fidelity Valanced Fund Summary Prospectus* at 1 (Oct. 30, 2015).

**THIRD AMENDED COMPLAINT**

79.    Comparing the Plan's performance to that of these individual mutual funds reveals that the Plan's poor returns cannot be attributed to lower risk. The table and chart below chart illustrate the risks vs. returns of the Plan and each of the comparator mutual funds. As illustrated, the Plan had worse returns, on a risk-



adjusted basis, than each of the eight mutual funds that held more than half the assets of a plan over $50 million in size as of the end of 2015:

| | Volatility | 20-Year Avg Return as of 12/31/19 | Annual Expenses |
|---|---|---|---|
| **Vanguard Life Strategy Income (A)** | 4.2 | 4.92% | 0.11% |
| **Fidelity Asset Manager 20% (B)** | 4.5 | 4.64% | 0.51% |
| **Vanguard Wellesley Income Fund (C)** | 5.7 | 7.55% | 0.16% |
| **MPI Plan (MPI)** | **6.9** | **4.92%** | **1.18%** |
| **Oakmark Equity and Income (D)** | 9.2 | 8.82% | 0.54% |
| **American Funds American Balanced (E)** | 9.4 | 8.06% | 0.26% |
| **Blackrock Global Allocation (F)** | 9.9 | 7.33% | 0.74% |
| **T. Rowe Price Capital Appreciation[36] (G)** | 10.2 | 10.55% | 0.55% |
| **Fidelity Balanced (H)** | 10.4 | 7.58% | 0.32% |

80.     As set forth above (*see supra* at ¶¶ 65–76), Plaintiff has identified both comparable plans and comparable investment alternatives. With respect to both, the Plan consistently underperformed and incurred greater expenses. It is therefore reasonable to infer that Defendants did not have a prudent process for managing and monitoring the Plan's investments.

81.     Despite the Plan's consistent underperformance compared to superior, less-expensive, and less-volatile investment alternatives during the last decade, Defendants imprudently failed to make necessary changes. Defendants' insistence on following the same failed course even as performance continued to falter was misguided in light of the significant evidence showing that Defendants were not skilled at picking successful hedge fund managers.[37] Further, the hedge fund

---

[36] Though the T. Rowe Price Capital Appreciation mutual fund was closed to new investors in 2014, T. Rowe Price began offering a collective investment trust version of the fund in 2015 employing the identical investment strategy, and with the same underlying investments, that remains open to new retirement plan investors.

[37] The Plan's lengthy track record of poor performance dating back over 10 years should have made it clear to the Plan's fiduciaries that they did not possess either the skill or foresight to identify successful managers. *See* Bailey & Winkelmann, *Defined Contribution Plans: Challenges and Opportunities for Plan Sponsors*, at 111, 116, 119–20 (2021) (stating that the use of actively-managed investments, including hedge funds, is only prudent if the fiduciary has demonstrable ability to identify managers likely to outperform).

industry in general had not been able to generate the returns necessary to justify its outsized fees as the industry matured.[38] The Plan's performance mirrors these trends: While the Plan outperformed its benchmarks between 2000 and 2003, it has consistently trailed them ever since. Yet despite these changes in the investment landscape, and Defendants' failure to consistently pick successful investment managers, the Plan failed to change its approach and reduce its exposure to underperforming, high-fee investment managers.

82.    A prudent fiduciary acting in the best interests of the Plan would not have maintained the same flawed investment approach, despite such resoundingly poor results. To the contrary, a prudent fiduciary would have abandoned this unorthodox and unsuccessful approach, or at the very least investigated significantly better performing underlying investments with lower fees. If Defendants had done so, they would have materially improved participants' investment results and reduced fees in the process. Instead, the Plan suffered tens of millions of dollars in lost investment returns and unnecessary fees, and participants' retirement nest eggs were severely impaired.

83.    Given the high cost and consistently poor track record of Defendants' investment approach, and their failure to account for the individual circumstances and needs of the Plan's participants, it is reasonable to infer that Defendants failed to engage in a prudent process for managing the Plan's investments. *See Toomey*, 2020 WL 3412747, at *3 (denying motion to dismiss an ERISA breach of fiduciary duty claim when plaintiff alleged "that fiduciaries of the Plan were imprudent in

---

[38] *See* Bernstein, SKATING WHERE THE PUCK WAS 9–10 (noting that "as total hedge fund assets sailed past a trillion dollars in the mid-2000s," the markets were "overgrazed" with investors, and the "increasing transactional costs and egregious fees overwhelmed the increasingly slim per-fund pickings."); Larry E. Swedroe & Andrew L. Berkin, THE INCREDIBLE SHRINKING ALPHA 33 (2015); HEDGEWEEK, *Hedge Fund Industry Grows in 2015 Despite Concerns Over Performance* (Feb. 2, 2016), available at https://www.hedgeweek.com/2016/02/02/ 236097/hedge-fund-industry-grows-2015-despite-concerns-over-performance

**THIRD AMENDED COMPLAINT**

1  their consideration of (or their failure to consider) the participants' varying interests

2  and needs in the Plan's allocation structure and investment choices, and that these

3  failures were compounded by a failure to review and revise those choices over

4  time").

5  **PLAINTIFF LACKED KNOWLEDGE OF DEFENDANTS' INVESTMENT PROCESS AND**

6  **OTHER MATERIAL FACTS PRIOR TO SUIT**

7  84.    Plaintiff did not have knowledge of all material facts (including, among

8  other things, the asset allocation of the Plan compared to similar plans, the Plan's

9  poor returns compared to other similar plans, Defendants' failure to re-evaluate their

10  investment decisions after years of poor performance, the underlying investments

11  utilized by the Plan, the investment management fees for those investments, and the

12  availability of less costly and higher performing investment options) until shortly

13  before this suit was filed. Further, Plaintiff does not have actual knowledge of the

14  specifics of Defendants' decision-making processes with respect to the Plan

15  (including Defendants' processes for selecting, monitoring, and evaluating their

16  unorthodox investment approach and Defendants' processes for selecting,

17  monitoring, and removing investments), because this information is solely within

18  the possession of Defendants prior to discovery. For purposes of this Complaint,

19  Plaintiff has drawn reasonable inferences regarding these processes based upon

20  (among other things) the facts set forth above.

21  **PLAN-WIDE RELIEF**

22  85.    29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of the

23  Plan to bring an action individually on behalf of the Plan to obtain for the Plan the

24  remedies provided by 29 U.S.C. § 1109(a). Plaintiff seeks recovery on behalf of the

25  Plan pursuant to this statutory provision.

26  86.    Plaintiff seeks recovery for injuries to the Plan sustained as a result of

27  the aforementioned breaches of fiduciary duties during the statutory period

28  commencing in 2014. *See* 29 U.S. Code § 1113(1) (setting 6-year statute of

**THIRD AMENDED COMPLAINT**

limitations for ERISA breach of fiduciary duties claims in the absence of actual knowledge).[39]

87.     Plaintiff is adequate to bring this derivative action on behalf of the Plan, and her interests are aligned with the Plan's participants and beneficiaries. Plaintiff does not have any conflicts of interest with any participants or beneficiaries that would impair or impede her ability to pursue this action. Plaintiff has retained counsel experienced in ERISA litigation, and intends to pursue this action vigorously on behalf of the Plan.

## CLASS ACTION ALLEGATIONS

88.     Plaintiff additionally and alternatively seeks certification of this action as a class action pursuant to Fed. R. Civ. P. 23.

89.     Plaintiff asserts her claims in Count I on behalf of a class of participants and beneficiaries of the Plan defined as follows:

> All participants and beneficiaries of the Motion Picture Industry Individual Account Plan at any time on or after July 24, 2014, excluding Defendants, or any other persons with responsibility for the Plan's investment or administrative functions.

90.     Numerosity: The Class is so numerous that joinder of all Class members is impracticable. The Plan had over 10,000 participants during the applicable period.

91.     Typicality:   Plaintiff's claims are typical of the Class members' claims. Like other Class members, Plaintiff is a Plan participant and suffered injuries as a result of Defendants' mismanagement of the Plan. Defendants treated Plaintiff consistently with other Class members with regard to the Plan. Defendants' imprudent decisions affected all Plan participants similarly.

---

[39] Plaintiff seeks relief for the period from July 24, 2014 onward, as she initially filed a Demand for Arbitration against Defendants on July 24, 2020. Defendants subsequently waived any right to arbitration of the claims in this case, and asked that Plaintiff refile her claims in federal court. The claims asserted in this Complaint relate back to the claims originally asserted in Plaintiff's Demand.

**THIRD AMENDED COMPLAINT**

92.   Adequacy:   Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff's interests are aligned with the Class that she seeks to represent, and she has retained counsel experienced in complex class action litigation, including ERISA litigation. Plaintiff does not have any conflicts of interest with any Class members that would impair or impede her ability to represent such Class members.

93.   Commonality: Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members, including but not limited to:

a.  Whether the Plan's fiduciaries breached their fiduciary duties by engaging in the conduct described herein;

b.  The proper form of equitable and injunctive relief;

c.  The proper measure of monetary relief.

94.   Class certification is appropriate under Fed. R. Civ. P. 23(b)(1)(A) because prosecuting separate actions against Defendants would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendants.

95.   Class certification is also appropriate under Fed. R. Civ. P. 23(b)(1)(B) because adjudications with respect to individual Class members, as a practical matter, would be dispositive of the interests of the other persons not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests. Any award of equitable relief by the Court, such as removal or replacement of Plan investments or removal or replacement of a Plan fiduciary, would be dispositive of non-party participants' interests. The accounting and restoration of the property of the Plan that would be required under 29 U.S.C. §§ 1109 and 1132 would be similarly dispositive of the interests of other Plan participants.

**THIRD AMENDED COMPLAINT**

96.     Class certification is also appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the Class predominate over any questions affecting only individual Class members, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. Defendants' conduct as described in this Complaint applied uniformly to all members of the Class. Class members do not have an interest in pursuing separate actions against Defendants, as the amount of each Class member's individual claims is relatively small compared to the expense and burden of individual prosecution, and Plaintiff is unaware of any similar claims brought against Defendants by any Class members on an individual basis. Class certification also will obviate the need for unduly duplicative litigation that might result in inconsistent judgments concerning Defendants' practices. Moreover, management of this action as a class action will not present any likely difficulties. In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all Class members' claims in a single forum.

97.     Plaintiff and her undersigned counsel will provide notice to the class to the extent required by Fed. R. Civ. P. 23(c)(2) and the Court. If the class is certified under Rule 23(b)(1), "the court may direct appropriate notice to the class" but is not required to do so. Fed. R. Civ. P. 23(c)(2)(A). If the class is certified under Rule 23(b)(3), "the court must direct to class members the best notice that is practicable under the circumstances," Fed. R. Civ. P. 23(c)(2)(A), which includes notice by United States mail, *id.*

## COUNT I

### Breach of Duty of Prudence

### U.S.C. § 1104(a)(1)(B)

98.     Plaintiff alleges and incorporates by reference the allegations in the preceding paragraphs.

**THIRD AMENDED COMPLAINT**

99.    Defendants are fiduciaries of the Plan under 29 U.S.C. §§ 1002(21) and/or 1102(a)(1).

100.    29 U.S.C. § 1104 imposes a duty of prudence upon Defendants in their administration of the Plan and in selecting and monitoring the Plan's investments.

101.    Among other things, Defendants are responsible for maintaining investments that would meet the needs of participants, prudently selecting quality investment options, evaluating and monitoring the Plan's investments on an ongoing basis and eliminating imprudent ones, ensuring that the Plan's fees are reasonable, and taking all necessary steps to ensure that the Plan's assets are invested prudently.

102.    As described throughout this Complaint, Defendants breached their fiduciary duties and failed to employ a prudent process for selecting, monitoring, and reviewing the Plan's investments. Defendants forced all participants into a single pooled investment that did not serve participants' varying needs and failed to prudently manage that pooled investment by choosing poorly performing underlying investments when better performing investments would have been revealed by a reasonable investigation. Defendants also imprudently retained poorly performing investments and failed to appropriately monitor their performance. In addition, Defendants failed to investigate lower-cost investment options available to them, opting for higher-cost investments with no benefit to participants.

103.    Each of the above actions and omissions described in paragraph 99 and elsewhere in this Second Amended Complaint demonstrate that Defendants failed to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, thereby breaching their duties under 29 U.S.C. § 1104(a)(1)(B).

104.    Each Defendant is personally liable, and jointly and severally liable, under 29 U.S.C. §§ 1109(a), 1132(a)(2), and 1132(a)(3), to make good to the Plan

**THIRD AMENDED COMPLAINT**

the losses resulting from the aforementioned breaches. In addition, Defendants are subject to other equitable relief as provided by ERISA.

## PRAYER FOR RELIEF

105. WHEREFORE, Plaintiff, on behalf of the Plan, prays for relief as follows:

A. A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(3) of the Federal Rules of Civil Procedure;

B. Designation of Plaintiff as Class Representative and designation of Plaintiff's counsel as Class Counsel;

C. A declaration that Defendants have breached their fiduciary duties under ERISA;

D. A declaration that Defendants have no defense to liability under ERISA § 404(c);

E. An order compelling Defendants to personally make good to the Plan all losses that the Plan incurred as a result of the breaches of fiduciary duties described above;

F. Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate;

G. An award of pre-judgment interest;

H. An award of attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g) and/or the common fund doctrine;

I. An award of such other and further relief as the Court deems equitable and just.

Dated: August 7, 2023

**NICHOLS KASTER, PLLP**

*/s/ Paul J. Lukas*
Paul J. Lukas, MN Bar No. 22084X*
lukas@nka.com
Brock J. Specht, MN Bar No. 0388343*

**THIRD AMENDED COMPLAINT**

bspecht@nka.com
Patricia C. Dana, MN Bar No. 400803*
pdana@nka.com
NICHOLS KASTER, PLLP
4700 IDS Center
80 S 8th Street
Minneapolis, MN 55402
Telephone: 612-256-3200
Facsimile: 612-338-4878
*admitted *pro hac vice*

**ROSEN MARSILI RAPP LLP**
Jason Marsili, CA Bar No. 233980
jmarsili@rmrllp.com
ROSEN MARSILI RAPP LLP
3600 Wilshire Blvd Suite 1800
Los Angeles, CA 90010
Telephone: 213-389-6050


ATTORNEYS FOR PLAINTIFF AND
THE PROPOSED CLASS